UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ECOGENSUS LLC, VIKINGPEAK ENERGY FUELS
LLC, VIKINGPEAK MANAGEMENT COMPANY,
LLC, VIKINGPEAK CAPITAL GROUP LLC and
BJØRNULF ØSTVIK,

Civ. Action No.: 1:20-cv-3629

**COMPLAINT**

**[DEMAND FOR JURY TRIAL]**

Plaintiffs,

-against-

MATTHEW PACELLA, MICHAEL M.  MELNIK,
JAY EDELSON, BENJAMIN RICHMAN and
EDELSON PC.
                              Defendants.
-------------------------------------------------------------------X

Plaintiffs Ecogensus LLC ("Ecogensus"), VikingPeak Energy Fuels LLC ("VPEF"),

VikingPeak Management Company, LLC ("VPM"), VikingPeak Capital Group LLC ("VPCG"),

and Bjørnulf Østvik (" Østvik "), (collectively "Plaintiffs"), by and through their counsel, Guzov,

LLC and Tucker Levin, PLLC, as and for their complaint against defendants Matthew Pacella

("Pacella"), Michael M. Melnik ("Melnik"), Jay Edelson ("Edelson"), Benjamin Richman

("Richman") and Edelson PC (the "Edelson Firm" and, together with Edelson and Richman, the

"Edelson Defendants") (collectively, "Defendants"), state as follows:

**NATURE OF THE ACTION**

1.       Pacella and the Edelson Defendants, in their capacity as Plaintiffs' attorneys,

became aware of significant non-public, privileged information during May 2019 and throughout

the summer of 2019 regarding Ecogensus and VikingPeak Energy Fuels (VPEF). This

information included several major successes in May 2019 that were not publicly announced,

including that VPEF acquired a significant interest in a logistics company with operations

throughout the eastern United States, that a confidential demonstration using proprietary

1

Ecogensus fuel to replace coal had been successful, and that VPEF had – through a differently-named subsidiary – been issued an operating permit for its first advanced waste treatment facility using Ecogensus technology. Pacella and the Edelson Defendants also became aware that Ecogensus was debuting its new flagship system in the fall of 2019 and that Østvik was planning a new venture that included a high value acquisition to which it had secured exclusive rights.

2.      Pacella also became aware of non-public, privileged information that valuable patents protecting Ecogensus' flagship product and new design were likely to be soon issued in the coming months, and indeed those patents did issue in January and April 2020.

3.      Based upon this privileged information, Pacella, the Edelson Defendants, and co-conspirator Melnik conspired to take control of the valuable corporate entities through extortion. Therefore, they executed a scheme to extort cash and millions of shares of equity from Plaintiffs by threatening to make public information they believed would cause personal, reputational and economic harm to Østvik and his businesses at a critical juncture for these businesses.

4.      What is remarkable here is that the information used in this extortion scheme was information learned through privileged attorney-client conversations that Plaintiffs disclosed to their lawyers both in-house (Pacella) and outside counsel (the Edelson Defendants.) In turn, Pacella and the Edelson Defendants disclosed the information to Melnik, a non-attorney, who upon hearing privileged information determined that he would spearhead the plan based on his perceived status vis-à-vis the Plaintiffs.

5.       The Edelson Defendants were even brazen enough to put it in writing that they were seeking to leverage confidences and secrets obtained in its representation to the detriment of their former client.

6.      Østvik not only seeks redress for the money already stolen from him, but he seeks

to put an end to this multi-year conspiracy designed to wrest control of his companies away from him.

7.      Masterminded by Pacella who served as the general counsel of Østvik's companies, Pacella, Edelson, Richman and Melnik (collectively, the "Pacella/Edelson Enterprise") utilized their intimate knowledge of Plaintiffs' activities, together with sensitive personal information which Pacella inveigled out of Østvik, to demand increasingly large transfers of cash and equity interests from Østvik and his businesses.[1]

8.      Defendants then became aware in the spring and summer of 2019 of the rapidly increasing value of Østvik's businesses, the upcoming product launch and patents being issued, non-public institutional capital raises underway, and Østvik's consideration of a future IPO for Ecogensus and a planned private equity exit for VPEF. All of this information was gained under privilege, was non-public information, and Defendants knew this information could not be shared publicly.

9.      Apparently emboldened from their success in previously extracting hundreds of thousands of dollars in cash from Østvik, Defendants then began escalating their demands in the summer of 2019 and started to demand not only more cash in order to keep quiet, but significant equity stakes of millions of shares in Østvik's businesses Ecogensus and VPEF.

---

[1]   The Confidential Disclosures fall into two categories. The first relates to Østvik's concerns arising out of an unrelated legal matter and potential retaliation by third parties and his own personal safety appurtenant to this matter. Østvik sought legal counsel from Pacella and the Edelson Defendants on this matter. The second category relates to abuse that Østvik suffered. Østvik expressed concern to Pacella (and a few months later to the Edelson Defendants) about the unrelated legal matter and third parties he was concerned might threaten his and his family's personal safety. With respect to the second category, Østvik recounted a deeply personal, private story of abuse he suffered in childhood and a violent episode in 2014.

Each of the situations set forth in this, and the preceding, paragraphs are areas of great sensitivity for Østvik, and he does not wish for details concerning the Confidential Disclosures to become publicly known. For obvious reasons, Plaintiffs have provided only a brief description of the Confidential Disclosures in this pleading. The details in each situation would cause considerable pain and suffering Plaintiffs and have safety implications, if publicly known. Should the Court require any additional details concerning the Confidential Disclosures, Plaintiffs respectfully request the opportunity to file a supplemental complaint under seal.

10.     The Defendants have repeatedly warned Østvik that they know he does not want sensitive information publicized in writing but have threatened to do so if he did not acquiesce to their demands. Plaintiffs have decided they cannot allow the extortion to succeed any further.

11.     As detailed below, Defendants have variously violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), the Hobbs Act and the Computer Fraud and Abuse Act ("CFAA"), and have committed intentional torts and extortion for which they may be held civilly liable. Defendants, at various times, went so far as to threaten Østvik with disclosure of his personal information, committed assault and battery upon him, and made threats of violence against his family, if their financial demands were not met.  Cowed by these threats, Østvik had no choice but to pay up previously, but now seeks to end this continued campaign of intimidation.  The Pacella/Edelson Enterprise has made no secret of the conspiracy's ultimate goal: to take Ecogensus, VPEF and its affiliates away from Østvik right before the companies' global launch and grow them into a multi-billion-dollar enterprise under their control.

12.     Defendants tortious and criminal actions have wrought massive damages to Plaintiffs. Plaintiffs' damages go far beyond the hundreds of thousands of dollars in wrongful payments to the Defendants. Defendants have inflicted grievous harm on the businesses of Plaintiffs, causing at least tens of millions of dollars of damage to Østvik and his businesses. Indeed, Plaintiffs investigation is ongoing and Østvik continues to discover damages caused by the Pacella/Edelson enterprise.

13.      Pacella and the Edelson Defendants have also breached their fiduciary duties to Plaintiffs, and their intentional acts require them to disgorge all funds received in the past.  In addition to the compensatory damages owed by all defendants for their illegal and tortious conduct, Pacella must disgorge all funds paid to him, in salary, cash, or any claims to equity and

the Edelson Defendants must disgorge all fees paid to the firm.  Melnik has aided and abetted the

Pacella/Edelson enterprise in these wrongful acts and has conspired with them to put them into

effect and must disclaim and/or any equity interests he may own in Ecogensus and VPEF.

14.     Moreover, Defendants' misconduct is so intentional and egregious that the Court

must punish the Defendants to deter others from engaging in similar conduct. Defendants'

conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and

otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess

of $100,000,000 in punitive damages for Defendants' shocking—and criminal—misconduct.

## THE PARTIES

15.     Plaintiff is a natural person who is a citizen of the United States and is domiciled

in the State of Connecticut.  He is the founder, president and majority shareholder of Plaintiff

VPM, VPCG, Ecogensus and VPEF.

16.     Plaintiff Østvik has an extensive career in ground-breaking technology

development and related advanced infrastructure, including having worked for Lockheed Martin

Corporation and with various U.S. Department of Energy Laboratories and research universities

in the United States.

17.     Plaintiff VPEF is a limited liability company organized and existing under the

laws of the State of Delaware.

18.     Plaintiff VPM is a limited liability company organized and existing under the

laws of the State of Delaware.

19.     Plaintiff VPCG is a limited liability company organized and existing under the

laws of the State of Delaware.

20.     Plaintiff Ecogensus is a limited liability company organized and existing under the laws of the State of Delaware.

21.     Defendant Pacella is a natural person domiciled in the State of Pennsylvania, city of Pittsburgh.  On information and belief, he is a graduate of Georgetown University Law Center and has held associate or "special counsel" positions with at least two AmLaw 100 law firms working in the Mergers and Acquisitions/Private Equity practice groups.

22.     Defendant Melnik is a natural person who is, on information and belief, domiciled in the Commonwealth of Pennsylvania, city of Greeneville.

23.     Defendant Richman is a natural person who is, on information and belief, domiciled in the State of Illinois, city of Deerfield.  On information and belief, Richman is a principal of the Edelson Corporation and a licensed attorney.

24.     Defendant Edelson is a natural person who is, on information and belief, domiciled in the State of Illinois, city of Chicago.  On information and belief, Edelson is a principal of the Edelson Corporation and a licensed attorney.

25.     Defendant Edelson Firm is a professional corporation organized and existing under the laws of the State of Illinois with principal offices in Chicago, Illinois.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, in that one or more causes of action against one or more of the Defendants arise under the laws of the United States, and pursuant to 28 U.S.C. § 1367, in that supplemental jurisdiction exists over claims arising under state law.

27.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 the jurisdictional amount exceeds $75,000 and no plaintiff shares a state of citizenship with any

defendant.

28.     This Court has jurisdiction over the person of each Defendant based upon such Defendant's commission of tortious acts outside the State of New York which caused foreseeable injury within this state.

29.     Venue is proper in this District because a substantial number of the events giving rise to Plaintiffs' claims occurred within this District.

**FACTUAL ALLEGATIONS**

30.     In 2010, Østvik left his employment with Lockheed Martin to go into business for himself.  Over the next several years, he founded VPM, VPCG, Ecogensus and VPEF.

31.     At present, Østvik is the Chief Executive Officer and Chief Technology Officer of Ecogensus and the Chief Executive Officer of VikingPeak Energy Fuels. Østvik's companies have substantial business interests and own valuable technology rights including through multiple patents issued in the United States and internationally. A significant portfolio of additional patents has been applied for worldwide and technological discoveries have continued to be made through the present many of which have patent applications being actively written.

Pacella Meets Østvik And Gains Entry into Plaintiffs' Businesses

32.     Østvik first became acquainted with Defendant Pacella in early 2016, when an acquaintance introduced him as a potential source of legal assistance and due to his purportedly strong connections to private equity groups and banks.  At this time, Pacella was employed as a part-time "special counsel" at a leading Chicago law firm, focused on mergers and acquisitions in private equity transactions.

33.     After meeting Østvik and learning about Ecogensus' business, Pacella emailed Østvik on January 31, 2016  stating,  "It goes without saying that I am very impressed with what

7

you have accomplished thus far and will continue to be of service to you as you change the world and make billions of dollars doing it."  Despite having just met Østvik and having received no promises or invitations to work together, Pacella enthused: "Let's build an empire."

34.     Over the next few weeks, in the guise of conducting "due diligence" in connection with the introductions Pacella was to make, Pacella requested and received confidential and secret information concerning Ecogensus' technology and business prospects.

35.     Pacella had Østvik return to Chicago in April 2016 for a day of meetings arranged by Pacella with potential investors and financial advisors whom Pacella knew.  Over the course of the day, Pacella learned of certain confidential plans for significant projects that Ecogensus and VPEF were pursuing. That evening, Pacella asked Østvik to let him come work for Østvik full-time, requesting a $200,000 annual salary and equity in the companies. Østvik said he was not ready to hire Pacella at the time but agreed to try to find something that could work later in 2016.

36.     Pacella offered to prove himself via providing some legal drafting services and encouraged Østvik to hire a law firm where Pacella had previously worked as a junior attorney. Pacella later did, in fact, set up an introduction to that firm ("Pacella Former Law Firm 1").

37.     On July 12, 2016, Østvik sent Pacella an Employment Offer Letter. The Offer Letter did not mention any type of signing or relocation bonus. Instead, the Offer Letter specifically stated that Pacella "may be eligible for additional discretionary compensation, up to and including performance awards/bonuses or company equity options" but that "At present, VikingPeak offers no additional discretionary compensation".  Upon receipt of the Offer Letter, Pacella obviously saw an opening to infiltrate the companies.

38.     Also in July, Pacella encouraged Østvik to formally hire Pacella's other former

law firm employer in order to "spread out the legal work" ("Pacella Former Law Firm 2"). Pacella suggested that the relationship be run through a particular partner (" Law Firm Partner 1"), who would, upon information and belief, benefit in the form of additional compensation as the designated "billing partner" or "relationship manager". Pacella did not disclose to Østvik at the time that Law Firm Partner 1 was one of Pacella's closest personal friends. It later would become evident that this was part of Pacella's larger plan to wrest control of the companies.

39.     Pacella signed the offer letter on August 1, 2016 and began his employment for Østvik at VPM as a remote employee, including serving as "Co-General Counsel" for Ecogensus and VPEF.  In this capacity, he provided legal advice for the companies.

40.     In the first few days of employment, Pacella not only began gathering non-public business information about Ecogensus, VPM and VPEF, but he began eliciting confidential information about Østvik himself. Pacella represented that he was also Østvik's "personal lawyer" and assured Østvik that he could – and should – trust him with all of his personal legal issues.

41.      Once Pacella gained his confidence, Østvik made what would be one of his biggest mistakes: believing that he could trust Pacella to keep privileged information confidential and act ethically and loyally as his attorney, Østvik confided in Pacella some of the Confidential Disclosures. In response, Pacella suggested Østvik work with Pacella Former Law Firm 1 to help address his concerns regarding the unrelated legal matter, setting a trap. Insisting on being part of the meetings and phone calls, and repeatedly assuring Østvik that he could trust Pacella, Pacella learned many details over the coming months concerning the Confidential Disclosures.

Pacella Begins to Leverage the Confidences

42.     At the same time that Pacella was becoming privy to Østvik's Confidential

9

Disclosures, he began to demand a relocation bonus and signing bonus, even though such payments had never been discussed by Pacella and Østvik and were not discussed in Østvik 's term sheet regarding Pacella's position, were not described in the employment Offer Letter that Pacella signed, nor in Pacella's initial employment agreement.  Østvik would later learn that Pacella had purchased an expensive new home but used a short-term "bridge" loan from a Chicago friend in order to make the down payment and now was under significant financial pressure to pay back the loan to his friend promptly, the impetus for the commencement of the extortive conduct.

43.     On September 7, 2016, Pacella traveled from Pennsylvania, and Østvik traveled from Connecticut, for a meeting with Former Law Firm 1 in Chicago, Illinois. Just before driving to the airport, understanding that Østvik was under great pressure, Pacella sent Østvik new versions of his agreements which he had prepared. Now, Pacella added a $25,000 signing bonus and consulting payments for June and July 2016 in the amount of $25,000, for a total of $50,000. Pacella continued to pressure Østvik to sign the agreement and pay the $50,000 he demanded. Østvik eventually signed the agreements as drafted and modified by Pacella.

44.     Pacella grew more and more enthusiastic about the business prospects of Ecogensus and VPEF. He also began making some unprofessional and inappropriate remarks to Østvik.  For example, on November 29, 2016, Pacella sent an unprompted (and unnerving) message to Østvik saying "I'm actually becoming obsessed with you".

45.     In November 2016, as certain sales and marketing efforts were beginning, Østvik asked Pacella to draft Anti-Corruption and Lobbying Policies as well as Ethics Codes. Østvik specifically said that he wanted to follow practices he learned at Lockheed Martin Corporation, including instituting complete prohibitions against "kickbacks" in private transactions and Østvik

10

directed Pacella to incorporate language from publicly-available ethics policies.

46.    On November 11, 2016, Pacella sent a draft ethics code which stated that

Officers, directors, managers, employees and Representatives and any member of such persons' immediate family, are prohibited from directly or indirectly accepting any: (i) commissions, profits, payments, loans, (ii) free services or products, or (iii) entertainment, travel or gifts, each case from a person or entity doing, or seeking to do business with the Company.

47.    The draft policy stated that it exempted small courtesies, such as Christmas gifts, provided they have a "value of less than $100." The policy was adopted and as soon as three days later, Pacella began circulating the Company Ethics Policy along with the Company Lobbying Policy and Global Anti-Corruption Policy.

48.    The very next month, Pacella himself violated the Ethics Policy he had written at Østvik's direction. On December 10, 2016, Pacella sent Østvik a message saying "Law Firm Partner 1 sent me $2500 bucks for belated wedding and housewarming gift", even though Pacella's wedding occurred in October 2015 and he had moved to his new home the previous spring. This large cash gift occurred after Pacella steered Østvik's client account to Law Firm Partner 1 and was 25 times higher than the maximum $100 gift threshold permitted, demonstrating that he received an impermissible referral fee and believed that if he called it a belated wedding present it would somehow pass scrutiny. Aware that Østvik might discover this payment and that it was in gross violation of Østvik's Code of Ethics, Pacella preemptively wrote "No pay for play" before Østvik could react.

49.    Sometime during the late fall of 2016, after commencing work as in-house counsel, Pacella learned even more details about the Confidential Disclosures (including specifically that Østvik was a victim of a violent 2014 attack that Østvik sought to keep non-public, fearing reprisal) and realized he had even more leverage over Østvik.

11

Pacella's First Solo Extortion Attempt

50.     The first hint of Pacella's extortion scheme came in January 2017. Østvik was in
Pittsburgh for business meetings, where Pacella lives.

51.     While in Pittsburgh, Østvik told Pacella that he should never have accepted the
large cash gift from one of the company's own vendors. Østvik also happened to mention to
Pacella that Østvik and his wife learned before the Christmas holiday that they were expecting
their first child.

52.     Pacella suggested that he and Østvik have dinner that evening. At Vallozzi's
Restaurant in Pittsburgh, Pacella made an explicit demand for compensation in exchange for
keeping the Confidential Disclosures secret.  Specifically, Pacella made a reference to the 2014
assault, including details which Pacella could only have learned from the perpetrator of the
assault (an associate of Pacella's.) Pacella mentioned he was sure Østvik would certainly not
want any further issues at a time when his young family was just getting started.  Pacella then
immediately changed the subject to his equity compensation package, which Pacella now viewed
as inadequate even though he had only been an employee a few months and previously had said
Østvik had been "generous with [his] equity" to Pacella. Pacella demanded that he be "plus'd
up." Fearing reprisal, Østvik said that he would consider Pacella's demands and attempt to work
something out. In retrospect, it is now clear that Pacella devised a plan of extortion that would
include theft of corporate assets to attempt to wrest control of the companies.

Pacella Recruits Edelson, the Edelson Firm, and Melnik into the Conspiracy

53.     In the spring of 2017, Pacella was working as counsel on certain financial
arrangements for Ecogensus.  Pacella reached out to his college friend, Melnik, and wanted to
him to become involved in Ecogensus. Østvik has to this day never met Melnik. Within a few

12

days of Pacella and Melnik first discussing an arrangement, Pacella arranged for Melnik to have access to confidential materials on May 8, 2017. That same day though, Østvik had signed a deal for VPEF and a few days later spoke at an international conference related to VPEF's activities. Suddenly, Pacella asked if Melnik could also receive interests in VPEF. Østvik declined, saying he would only consider a loan transaction at Ecogensus. This would then start a year and a half long effort for Melnik and Pacella to acquire, for Melnik, an equity ownership stake in VPEF. Pacella handled the negotiation, diligence, and closing of the transaction between Ecogensus and Melnik. As would later become clear, Pacella conspired with Melnik and Melnik agreed to make a loan to the company to infiltrate the company as the first step in the conspiracy to extort and attempts to gain interests in VPEF.

54.     At the same time Pacella was arranging for Melnik to infiltrate the company, May 2017, Pacella also began to urge Østvik to hire the Edelson Defendants as his personal counsel. The Edelson law firm is based in Chicago, where Pacella practiced law for several years, but Pacella said he did not know Defendant Edelson. Pacella sent Østvik a message on May 26th, 2017 trying to head off any concerns that Pacella was once again hiring his friends, saying "Bro found this guy randomly at midnight and I thought I hope he takes it…he is awesome." Thirty-nine minutes later, Pacella wrote to Østvik "Hire these guys right now. It will make them feel good. The other lawyers are too conservative and typical."  Pacella insisted Østvik speak to Jay Edelson that afternoon. Østvik agreed to an introductory call. Edelson emailed a proposal immediately after the call, suggesting that Østvik pay reduced hourly fees but pay Edelson a 20% success fee. At no time did Pacella tell Østvik that he would be entitled to any referral fee from the Edelson Firm. However, it later became clear that his exuberance about working with the firm was motivated by unethical financial gain.

55.    Pacella continued arrangements with Melnik and on June 5th 2017, Pacella sent Østvik a message saying "Melnick in", referring to the fact that Pacella and Melnik had reached an agreement regarding the loan agreement between Melnik and Ecogensus.

56.    Approximately two weeks later, Pacella arranged meetings for Østvik in Chicago with both Melnik and Edelson.  After arriving in Chicago though, Pacella informed Østvik that Pacella would be meeting with Melnik alone.

57.    Østvik did, however, meet with Edelson and Richman that day for a legal consultation. Although the consultation required Østvik to reveal many of the Confidential Disclosures, he made sure to instruct Edelson and Richman to maintain strict confidentiality of all information being discussed. Obviously, as attorneys everything is confidential, but Østvik acted in an overabundance of caution. Østvik stressed that if he moved forward with an engagement, the Edelson Defendants would have to agree – just as Østvik's lawyers handling the investigation had agreed – not to put anything in writing regarding the Confidential Disclosures. Edelson agreed not to put any of this information in writing.

58.    In retrospect, Østvik now understands it was a mistake to reveal just how concerned he was about the Confidential Disclosures going public. But, he had every reason to believe that as officers of the court, the Edelson Defendants and Pacella would maintain confidentiality.  When he made the disclosures to Edelson and Richman in June 2017 (just as he had to Pacella a few months earlier), Østvik explained in detail the very ramifications he was afraid of and unwittingly provided his audience with the fodder for this scheme.

The Edelson Defendants' Begin Wide-Ranging Representation of Østvik and his
Companies; Pacella Formalizes Melnik High-Yield Loan to Ecogensus

59.    Østvik entered into an agreement with the Edelson firm on June 20, 2017 in connection with a wide-ranging matter to which the Confidential Disclosures were an important

14

component, with Østvik also adding his companies to the engagement as well.

60.     On June 23, 2017, Melnik sent a message to Pacella regarding an upcoming financial windfall, of which he wanted a portion to be loaned to Ecogensus to earn a high interest yield and obviously to gain a solid position to infiltrate the company.

61.     On June 30, 2017, Melnik sent a message to Pacella saying "They actually are p DTF cute guys lol", to which Pacella responded "Don't forget to wire Monday if you want in – the exclusivity provision prevents us from raising debt after we sign. Need to sign by Monday COB UK time before offer expires. If you already wired disregard. Btw just seeing that second text exchange…DTF college girls??? You are living the dream." Melnik replied to Pacella: "It'll be there Monday. It's past the deadline to get in today."

62.     Ecogensus' successes were increasing in July 2017, but Østvik also was beginning to observe Pacella unravel. Østvik told Pacella that Ecogensus' first patent was going to be granted soon, due to an allowance by the patent examiner. Ecogensus was also negotiating a major European license agreement that month, on which Pacella was leading the legal drafting. However, it was that same month that Østvik observed Pacella's increasing volatility and proclivity for anger. Following a meeting that took place in New York City on July 13, 2017, Pacella became angry at Østvik and said he was still expecting an equity "plus up" that was the subject of his extortive demand in January. Pacella was angry that Østvik had not acquiesced and warned that he was growing impatient. Pacella then called Østvik a vulgar expletive that has strong misogynistic undertones. Østvik was shocked and said this behavior was absolutely unacceptable. Pacella then apologized, offering the explanation that he was particularly stressed that day because he had found out that his grandmother's elderly friend was sick. In the days following this incident, Pacella was contrite, and sent a series of complimentary messages to

Østvik, saying for example "thanks for all you do!"

63.    Three days later though, on July 16, 2017, Pacella informed Østvik that he had been arrested the day the previous night for Driving Under the Influence. Pacella wrote to Østvik "I had three beers". Pacella explained that he was "All good" because Law Firm Partner 1 was getting a referral for Pacella. Two days later, Pacella informed Østvik that the prosecutor had reduced the charges to "careless driving of a golf cart" and that he was now "all good." Pacella then wrote that "the US attorney referred [Pacella's lawyer] so he wants the good graces." Østvik asked if Law Firm Partner 1 had referred him to the US Attorney and Pacella wrote back "I used some chits on this one." Pacella went on to write "Said I'd get [Governor] Nikki Haley to weigh in if needed. Worked out well." In 2018, Pacella would remind Østvik of this incident as an example of his ability to exert influence and threaten Østvik.

64.    Pacella knew at this time that Østvik was considering terminating him, before the Pacella/Edelson Enterprise could enact their conspiracy. Pacella increased the level of his contrition and also sought to remain in Østvik's good graces so as to disarm him. For example, on July 22, 2017, Pacella wrote to Østvik randomly in the evening "You are such an inventor genius and it's awesome to be your lawyer."

The Pacella/Edelson Enterprise Lay the Groundwork

65.    As of July 2017, the Edelson Defendants had commenced work representing Østvik on the confidential unrelated legal matter. On July 28, 2017, Østvik explained that he was concerned about his adversaries' retaliation, and Pacella wrote, citing the Confidential Disclosures, that Østvik should be entitled to $25,000,000.  It would later become clear the Pacella/Edelson Enterprise was highly focused on this approximate value range and sought to maximize how much of it they could extract from Østvik. Pacella described specifically that a

16

jury would award this level of damages "999 times out of 1000". It is not coincidental that several weeks later, Defendant Edelson would begin pressuring Østvik to pursue this level of damages in a public manner, knowing Østvik did not want this. As Østvik's concerns continued about the Confidential Disclosures, Pacella sought to keep Østvik's trust and confidences, writing "This is never going public."

66.     Following the events of July 2017 and sensing Østvik was trying to distance himself, Pacella undertook uncharacteristically proactive work projects during the fall of 2017. For example, on September 11, 2017, Pacella wrote to Østvik that "Part of my baby gift is the 100K in tax distributions that no one told you about." Pacella was referring to various tax liabilities that Østvik had been incurring and paying, but not being reimbursed for, however in fact Østvik's accountants and outside corporate counsel had already brought this to Østvik's attention. Østvik ended up only receiving a small portion of those tax reimbursements, instead deferring them so the company had greater amounts of growth capital available. The same month, Pacella took it upon himself to evaluate the company's orders pipeline and growth projections, doing his own economic modeling, and praising Østvik for his ability to bring the "theoretical" to "actual." Pacella also described that his own assessments showed an expected 9-figure operating income level by 2019 (which would likely imply a valuation exceeding $1 billion), stating "I just did a de novo look in a way I thought was reasonable."

67.     As Pacella was assessing the increasing value of Østvik's companies, he was keeping the Edelson Defendants informed. That month, Defendant Richman previewed what would become a recurring and ominous theme in the extortion against Østvik. On September 13, 2017, Richman discussed a supposedly hypothetical scenario with Østvik.  Richman ventured that if an attorney is in possession of sensitive information about a client that was learned under

privilege, and that client files a legal complaint against the attorney seeking justice, then the client will have broken privilege and the attorney is free to publish the sensitive information about the client. Østvik wrote to Pacella that this seemed against public policy, and that in theory then any attorney could always extort their clients without limitation as soon as they learned one piece of damning or personal information that the client did not want released. Pacella wrote back to Østvik not to worry about it and that Defendant Richman was overstating. It is now apparent that the statement was a veiled threat calculated to ensure that the Edelson Defendants would not be sued for the conspiracy to extort in which they were engaging unbeknownst to Østvik.

68.     As part of the representation, the Edelson Defendants embarked upon a negotiation process attempting to reach a resolution on Østvik's behalf. Pacella and the Edelson Defendants began communication directly, without copying or informing Østvik, despite his repeated requests to the contrary. Around this time, elements of the scheme were starting to come further to light. Despite that Pacella wrote to Østvik "these are all damages to you", referring to the unrelated legal matter for which Pacella and the Edelson Defendants were Østvik's attorneys, he remarkably attempted to push Østvik to use a substantial portion of the proceeds to pay his friend Melnik. At the same time, Pacella also quipped that Østvik could pay Pacella a bonus too and sent a graphic of a person holding their hands out as if to receive something. Østvik ignored the comment.

69.     Østvik had grown uncomfortable with both Pacella and the Edelson Defendants, due both to Pacella's shocking comments as well as Defendant Edelson's constant pressure on Østvik to pursue public litigation. In fact, Edelson said Østvik needed to pursue litigation in court or else he would abandon him, boasting that as a lawyer he was the 'greatest in the

country'. When Østvik sought advice from Pacella privately, Pacella wrote back that although Edelson is a "full-blown narcissist" and Østvik's desire to find alternative outside counsel was understandable, but that Østvik had no choice but to continue with Edelson's representation. Indeed, it is now clear that the Edelson Defendants and Pacella realized that a change of counsel would thwart the conspiracy.

Defendants Seek to Capitalize On Plaintiffs' Burgeoning Success

70.     Østvik was realizing growing successes in the last few months of 2017, including the issuance of a major patent related to a proprietary fuel composition that Østvik had created and assigned to Ecogensus. Østvik was also further laying the groundwork for VPEF's successes, and the Pacella/Edelson Enterprise wanted to be involved.

71.     Defendant Richman recommended to Østvik that the Edelson Defendants serve as commercial litigation lawyers to VPEF in its commercialization (having learned the details of Østvik's market strategy), stating that it hoped to have a larger role in the future.

72.     On December 2, 2017, Pacella once again sought to give Melnik an equity stake in VPEF, sending Melnik a message "Do you want a piece of our facility development company [VPEF]?" Pacella did so unprompted without seeking Østvik's consent to do so. Pacella also knew that Østvik had declined several months earlier to allow Melnik to purchase equity in VPEF. Specifically, Pacella sought to sell a $500,000 portion of VPEF to Melnik.

73.     A few weeks later, Pacella wrote to Østvik that Law Firm Partner 1 was "very juiced up" about what Østvik's businesses would be doing in 2018 and that he was leaving for a new firm. Around the same time, Pacella revealed that Law Firm Partner 1 was Melnik's counsel as well.

Østvik Reaches a Resolution; Edelson Is "Furious" At Østvik

74.     By late 2017, an initial mediation session had occurred regarding the unrelated legal matter, represented by Pacella and the Edelson Firm unsuccessfully.  Following this, the Edelson Firm increased their pressure on Østvik to pursue litigation, but Østvik was unwilling to do so. Not yet understanding the conspiracy, Østvik repeatedly confided in Pacella regarding his frustrations and desire to find alternate counsel, but Pacella reiterated to Østvik that it would be a "mistake" to switch counsel.

75.     On March 11, 2018, Østvik told Pacella that he was ready to switch counsel. Pacella issued a threat on behalf of Edelson, warning Østvik that it is "Not great to have a dispute with crazy litigators." Østvik wrote back "It'd be better for you to focus on helping me be heard by Edelson than scaring me in standing up for what's right." Despite the strong objections from Edelson and the Edelson Firm, a second mediation session was scheduled in Chicago in late March 2018.

76.     The Edelson Defendants quickly became frustrated at and angry about Østvik's reluctance to pursue his claims in a way that would maximize the monetary award, despite that he had numerous times expressed his concerns about the Confidential Disclosures and that his main focus was simply justice and safety.

77.     Perhaps motivated by this displeasure and unbeknownst to Østvik, the Edelson Defendants and Pacella had begun to formulate their plan to exploit the vulnerabilities wrought by the Confidential Disclosures.

78.     The second mediation session occurred as scheduled and resulted in a quick resolution for Østvik. Edelson was angry and told Østvik that he should have sued and not been so worried about the Confidential Disclosures, and, shockingly, that Edelson only took Østvik's

case because Pacella was involved.

79.     Thereafter, Pacella told Østvik that the Edelson Defendants were "furious" at the result and discussed with Pacella that Østvik cost them a substantial contingent fee, believing the settlement would have been $20,000,000, closer to the amount Pacella had predicted in in July 2017, had Østvik focused more on monetary gain.

    The Pacella/Edelson Enterprise Ramps Up Its Campaign of Threats And Intimidation

80.     After the resolution, Pacella had congratulated Østvik and wrote to him that "I just want to do my small part to make you what you are destined to be." Pacella went out drinking with Defendant Richman that night though and plotted their next move.

81.     In what Plaintiffs later learned was part of a plan conceived of and executed by the Pacella/Edelson Enterprise, Pacella pushed Østvik to come to a meeting in early April 2018 in New York City with Law Firm Partner 1, who had now moved to a new firm. This was the first time Østvik had seen Pacella since Pacella's outing with Defendant Richman, approximately two weeks earlier. After Pacella and Østvik had each arrived in New York City on April 5, 2018 and checked into their respective hotels, Pacella told Østvik that Law Firm Partner 1 would not be making it due to jury duty. Østvik agreed to meet Pacella for a dinner to discuss next steps with the business.

82.     Over the course of the evening meeting, Pacella repeated the prior threats that unless Østvik gave in to his demands, he would "destroy" Østvik and could "bring down" his companies. Pacella described that he was "very close" to Defendant Richman and that they remained angry that Østvik had been so sensitive about the Confidential Disclosures and pursuing litigation.

83.      Pacella also told Østvik that Defendant Edelson felt deprived of publicity he

could have earned if Østvik had not been so private. Pacella began pressuring Østvik to purchase a watch for him, testing the waters to see how far he could push Østvik.

84.     When Østvik attempted to turn the conversation toward business, Pacella became enraged, screaming threats and obscenities at Østvik and saying that Pacella "should get a piece of everything Østvik makes."  At one point, Pacella pushed Østvik and screamed that he, Pacella, had an uncle in the Mafia and that Pacella himself hoped to become a "made man." Pacella warned Østvik that any future references to Pacella's family would be a code that meant he was referring to his Mafia family member and that Østvik's safety was at stake.

85.     That evening, Pacella showed Østvik a Maserati key. Østvik asked "You got a Maserati?" Pacella replied "YOU got me a Maserati", suggesting that Pacella had already made an expensive purchase expecting to be successful in extorting Østvik on his trip to New York.

86.     Østvik's settlement proceeds were due to arrive soon after the trip to New York City. Rather than use an escrow agent for the settlement proceeds, Edelson had insisted that they receive the funds, withhold a portion for themselves, and release the amount they determined to be due to Østvik. Defendant Richman kept Pacella, but not his client Østvik, informed of funds status. Østvik sent messages to Pacella stating that Defendant Richman was ignoring him for over a week and a half, but then Pacella stated he was in constant contact with Defendant Richman and said that Østvik could receive a status update by Pacella discussing with Defendant Richman. This fact alone is shocking, that the Edelson Defendants refused to be available to Østvik regarding the status of Østvik's money, for whom they were a trustee, yet all the while were in constant contact with Pacella keeping him apprised of the status. Østvik sought to confirm that this was the case, writing to Pacella "Something weird is going on with Edelson. I've been trying to get in touch with them for a week and a half re accounting." Pacella

responded "What's the issue? Ben just texted me so can call him."

87.    On the day that Pacella told Østvik that Defendant Richman would release funds, Pacella demanded to speak to Østvik. In the early afternoon, Pacella sent a message that "Wire just hit", referring to the Defendant Richman having received funds (but not yet sent to Østvik). Østvik was both traveling for work out of state, which Pacella knew, and Østvik wrote to Pacella that he had to deal with an emergency that had happened to his wife (who had received troubling medical news).   Pacella feigned sympathy but then hours later became aggressive and hysterical that Østvik had not yet been available to speak to Pacella. Pacella wrote that he was "freaking out". Pacella began sending messages volunteering that if he is terminated for cause, he will not like it but will not fight it. Pacella wrote to Østvik reiterating his threats from New York City, writing that he expected a payment that week and making references to "anxiety in the household over here".

88.    Pacella's harassment continued and Østvik finally responded, referencing the assault and threats days earlier: "When you threaten to ruin me and my family (amongst even worse things) then it's better to give me a few days, esp given what I'm going through with [Østvik's wife], then start freaking out about wanting money." Pacella coldly replied with his familial code, saying only: "I have to take care of me family" (sic).

89.    Several hours later, Pacella attempted an odd conciliatory approach, writing "Listen bro, I have read a ton about this tonight. The Xanax for the anxiety that I took right before coming out [to New York City] caused me to lose my brain."

90.     Pacella issued his specific threats the next day when he spoke to Østvik by phone and saw him in person, saying he would exit his employment as Plaintiff's attorney and leave Østvik alone but only if his demands were met. Pacella threatened:

(i)     that Confidential Disclosures would be made public;

(ii)    that Østvik's safety was at risk;

(iii)   that he could sabotage certain important pending deals of Østvik's businesses;

(iv)   that Melnik could become "problematic" for Østvik.

91.     In order not to carry out these threats, Pacella would need Østvik to personally pay him substantial portions of cash from Østvik's settlement proceeds immediately, provide three months of salary, figure out a way to give Pacella more equity in the company and a bonus, plus play along with Pacella's intent to make it appear Pacella left the businesses on his own. Østvik did not consent to the deal but asked for time to think about it.

92.     Pacella reiterated his demand for payment and threats for several more days, including over a series of messages between April 17 and April 20, 2018.  On April 18, 2018, Østvik wrote "I feel very threatened by yesterday's conversation, explicitly and implicitly. In the context of Thurs in NYC, it just adds to my concern." Østvik asked to talk "this time without your anger, without the pressure on paying you money". Pacella wrote back: "re [Østvik's wife], I reacted like a dick because you had said my finances weren't your problem and it made me angry – it wasn't nice and I'm sorry." Fifteen minutes later Pacella sent a follow up message trying to explain his behavior: "Maybe I'm going crazy man I don't know I wouldn't fuck you though."

93.     Pacella made it clear though he was not going to relent and that the Edelson Defendants had received their money but both Pacella and the Edelson Defendants believed it could have and should have been much more. Østvik eventually capitulated and paid Pacella $228,000 in an effort to buy his silence and protect himself from the threats of violence, proving the success of the threats to the Defendants. Pacella said the funds would be structured as a retroactive personal legal services bill, with Pacella sending an engagement letter and an invoice

together on the same day. In order to cover his tracks, Pacella's engagement letter said "My policy at the outset of an engagement with a client is to outline not only the nature of the engagement, but also the basis on which I will provide legal services and bill for them." Pacella post-dated the engagement letter to August 1, 2016 even though he first drafted and sent it on April 19, 2018. Pacella's invoice simply said it was for "Legal Services Rendered" and that $228,000 was due from Østvik to Pacella personally.

94.     In exchange for this payment, Østvik and Pacella agreed that Pacella would be terminated from his roles at Østvik's companies in three months and not sabotage any of Østvik's business initiatives.

95.     When Østvik transferred the funds to Pacella, he taunted Østvik sending a message on April 23, 2018 saying he and his wife had caviar and Dom Perignon champagne thanks to Østvik.

96.     On May 2, 2018, Pacella wrote that "Melnick will want to keep in through December", referring to Melnik keeping his Ecogensus debt outstanding through December 2018. Pacella then restructured the payment obligation. Two months earlier, Ecogensus had repaid the only other debt the company had, so Melnik would then be the only debt holder for the remainder of the year. Not coincidentally, Pacella, refused to cease his role as general counsel after the three month "termination window" elapsed in July 2018, instead engaging Østvik in additional discussions concerning his ongoing role, hinting that he could do harm to Plaintiffs' businesses if he did not receive additional funds. Pacella made references to Plaintiffs' deals going "sideways" if he exited the company during July and August 2018, continuing the threats. Pacella continued to remind Østvik that Melnik would become problematic if Pacella departed. Pacella requested, and Østvik paid, additional months of compensation.  During this time Pacella

25

sought to ingratiate himself with Plaintiffs' customers, investors and Board members in order to strengthen his bargaining position.

97.     During the second half of 2018, Pacella repeatedly assured Østvik that he had secured alternative employment at a technology company. In October 2018, Pacella finally said his other employment opportunity was ready, and he agreed to stop being an employee, instead reducing his role to an independent contractor for a period of time. Pacella emailed Østvik that he was making preparations "in connection with transition to 1099".

The Pacella/Edelson Enterprise Set Themselves Up to Continue Extorting Plaintiffs in 2019

98.     In the end of 2018, Pacella's new job suddenly had fallen through and he simply announced to Østvik that he was staying onboard.

99.     Around the same time frame, on December 8, 2018, Østvik learned that the Edelson Defendants asked Pacella to run a litigation financing fund in conjunction with them, which would allow the Pacella/Edelson Enterprise. A litigation financing fund would provide the Pacella/Edelson firm substantially more fuel to pursue lawsuits. When Østvik asked about this, Pacella wrote that he first tried to refer the Edelson litigation fund idea to other law firms for structuring assistance, such as Greenberg Traurig LLP and Winston & Strawn LLP, but that "no law firms will touch [Edelson] w a ten foot pool" (*sic*)  Pacella claimed at the time that he "declined" to work on the litigation fund with the Edelson Defendants even though they would "crush it", but Østvik would learn in the summer of 2019 that the Pacella/Edelson Enterprise was in full pursuit. Adding insult to injury, they actually wanted to exploit Østvik's successes to adopt a track record for themselves as fund managers – in order specifically to raise the litigation fund. That would come later though, as Pacella sought in December 2018 to maintain leverage over Østvik.

26

100.    In order to secure this continued leverage, Pacella and Melnik acted in concert demanding Østvik pay back Melnik's loan to Ecogensus in full.  It was clear that Melnik was not in immediate need of payment, as Pacella and Melnik then arranged for Melnik to acquire a portion in VPEF, which Pacella had been attempting for a year and a half. In fact, Pacella wanted to arrange for the exact amount that he had sought since December 2017.  As a result, Ecogensus was now short of working capital at the beginning of 2019.  Østvik, focused on growing his companies, was forced to accede to one-sided terms by Pacella and lenders aligned with and working with Pacella.  In particular, Pacella secretly coordinated with an Ecogensus Board member to make a last-minute switch (having strung Østvik along for several weeks) from an aggregated conventional structure, to a strange and unorthodox capital structure in which each lender had equal and competing secured interests. When Østvik stated that this did not make sense even from the lender's perspective, Pacella said that he and the Board member would coordinate everything behind the scenes.

101.    Østvik began thinking about ways to placate Pacella in a way that Østvik could be freed from Pacella's ongoing threats and intimidation. Trying a different approach in late March 2019, Østvik proposed that Pacella take a role at a new subsidiary that Østvik would form. Østvik's hope was that Pacella would become busy with this project and stop his daily involvement with Østvik's activities. However, Østvik would then discover new information that informed him this plan would never succeed in freeing him from Pacella.

The Pacella/Edelson Enterprise's Scheme Unravels

102.    As planned since the prior fall, in early 2019, Pacella had become a contractor to two of Østvik's companies rather than an employee.  In April 2019 Pacella enlisted Law Firm Partner 1 to support Pacella in developing potential legal documents for his own continuing

27

consulting arrangements, despite that Law Firm Partner 1 was also providing legal services to Østvik's company (and at least previously, to Melnik).

103.    In May 2019, Pacella promised he was going to close a VPEF project financing and announced that he wanted the Edelson Defendants to be involved with VPEF's strategic acquisition of a business. Around the same time, Law Firm Partner 1 completed their review of potential documents related to Pacella's consulting arrangement.

104.    In the first week of June 2019, Østvik happened to log into his corporate services billing account where Law Firm Partner 1 and his subordinates would arrange certain services for Østvik's companies. Pacella knew that, historically, Østvik would pay the invoice by direct transfer, without logging on to pay through the web service. It was only due to this change in habit that Østvik made a discovery – two company names that he did not recognize. It would turn out that Pacella and Law Firm Partner 1 had put Pacella's own newly formed entity, Sanctus Holdings LLC, and the entity of a friend, on Østvik's account so Østvik would unknowingly pay Pacella and his friend's bills. Law Firm Partner 1 and Pacella claimed that it was just a mistake. Pacella sought to reassure Østvik that nothing was amiss, saying Sanctus Holdings LLC was merely a holding company for him to be paid consulting fees through.

105.    Apparently sensing Østvik was getting closer to learning the scheme, Pacella amended the draft documents (which had not been signed) to include a provision entitling him to extra payments if Østvik terminated him. Østvik refused to sign.

106.    In July 2019, Østvik's suspicions were confirmed, as he learned that Pacella had set up a second entity, this one named Sanctus Capital Advisors, Inc., an odd name choice and complex structure for a supposed "family holding company". Østvik learned that this new company had been formed on June 24, 2019 and in fact had launched a website,

28

www.sanctuscapital.com, that featured Pacella. It became clear that Pacella had secretly

launched a competing business (and adding further insult to injury, had even attempted to have

Plaintiffs pay the formation costs without knowing).

107.    When Østvik confronted Pacella with his discoveries, Pacella launched yet

another verbal tirade against Østvik, once again threatening to destroy him by publicizing the

Confidential Disclosures.  To Østvik's shock, Pacella said, in particular, that he looks forward to

"sitting on a beach drinking mai tais" when Ecogensus is worth several billion dollars and

discussing how much more of it Østvik will give to Pacella. Pacella had no right to such equity

and Østvik had no intention of granting it, so after this conversation, Østvik made a plan to

distance himself from Pacella while exploring legal options.

108.    The Pacella/Edelson Enterprise did keep pressuring Østvik for the remainder of

July 2019 as Østvik distanced himself. In particular, Pacella told Østvik that Defendant Edelson

wanted to be given free equity at VPEF. On learning that Østvik was planning to create a fund

for acquiring high value assets, Pacella wrote to Østvik on July 20, 2019 asking for Defendant

Edelson to be listed as a lawyer and operating partner for Østvik's fund. Pacella explained that

Defendant Edelson' intent was to create a perception that he had a personal track record in fund

management, so the Pacella/Edelson Enterprise would be more likely to have success raising

their planned litigation fund.

109.    Pacella also told Østvik that the Edelson Defendants wanted to individually

acquire a portion of Østvik's highest value acquisition being pursued at the time and also have an

economic interest in a planned "NYC-area" acquisition. On July 23, 2019, Defendant Richman

sent a message to Pacella and Østvik saying they were ready to invest and requested documents.

110.    Østvik did not reply to Defendant Richman's message and did not list Defendant

Edelson on his presentation materials. Sensing Østvik was distancing himself, Pacella frantically made one more effort to advance the VPEF project financing with the group he had introduced, but Østvik told him he wanted to take it a different direction.

111.    Østvik was out of contact from the Pacella/Edelson Enterprise in the first half of August. Pacella grew angry and frustrated, sending 23 text messages to Østvik, including very lengthy ones expressing his anger. During this time, Østvik only sent 3 short messages to Pacella, saying he was busy. First Pacella made a variety of attempts to catch Østvik's attention including claiming that the Edelson Defendants and Law Firm Partner 1 were frustrated with Østvik, but that Pacella could help. Østvik did not take the bait.

112.    On August 15, 2019, Pacella attempted to extract some more final payments from Østvik. He sought payments of $20,000 to be paid "tonight" and then claimed "At that juncture, only thing open from my end are expenses I've been holding onto forever."

113.    When Østvik did not respond, Pacella sent a string of messages, including one that said Østvik's distance "has added so much stress to my family."

114.    Pacella then wrote to Østvik, mentioning the "NY issue" and "3 month termination window", exclaiming he has a "clean conscience". Pacella sent a final message to Østvik saying he understood he was terminated and would "reach out with final invoices, expenses and equity understanding". But Pacella never did. Pacella never returned his company computer nor confidential files owned by Plaintiffs.

The Pacella/Edelson Enterprise Threaten to Disclose Sensitive Information Unless Østvik Pays Them

115.    Pacella remained in contact with one of Østvik's investors, from whom he learned that Østvik was meeting on August 27, 2019 with one of Plaintiff's capital partners regarding the next phase of their successful venture. Pacella had performed a legal review of documents that

effectuated this venture in May 2019. Angry that Østvik was trying to move forward with a post-Pacella/Edelson life, Pacella accessed Plaintiff's computer system, pretending to still be the company's counsel.

116.    On August 27, 2019, the Edelson Defendants sent a letter timed to coincide with Østvik's celebratory dinner with the capital partner. The letter was sent to Law Firm Partner 1 and another person, who Pacella each called beforehand to coordinate. The letter claimed that now the Edelson Defendants – Østvik's attorneys – were instead Pacella's attorneys. The letter attempted to recharacterize Pacella's termination as Pacella's choice. In a blatant disregard for multiple attorney ethics rules, the Edelson Defendants sought to discuss with Law Firm Partner 1 payments and company equity grants that they wanted Østvik to make to Pacella.

117.    Law Firm Partner 1 then began a campaign, on behalf of Pacella, to convince Østvik to pay Pacella "to go away." Law Firm Partner 1, no doubt mindful of his own serious violations and liability, warned Østvik that "everyone will get hurt if you fight Pacella". Law Firm Partner 1 also told Østvik that the letter came on Edelson letterhead, when the Edelson Firm was Østvik's attorneys, to "send a message".

118.    The Pacella/Edelson Enterprise, in coordination with Law Firm Partner 1, worked to increase the pressure on Østvik later in September. Pacella was in contact with two Ecogensus Board members attempting to foment concerns about Østvik. On September 18, 2019, Law Firm Partner 1 requested to meet Østvik, which Østvik agreed to. Law Firm Partner 1 had told Østvik everything Østvik told him would remain confidential and that Østvik was his client. Law Firm Partner 1 repeatedly tried to extract a specific dollar figure that Østvik would pay to Pacella in order to not get any more trouble. Østvik realized that Law Firm Partner 1 had been sent by Pacella, so he asked Law Firm Partner 1 if he could keep Pacella from doing anything impulsive

or destructive. Law Firm Partner 1 responded "We will take care of it."

119.    The following day, September 19, 2019, an Ecogensus Board meeting took place. Østvik immediately realized that Pacella had been in touch with two of the Board members (which they later would confirm) to give the false impression that things were not going well at the company. At the Board meeting, Østvik discussed many of the successful ventures underway at the company and the Board discussed raising capital with a planned closing no later than the Christmas holiday, December 25, 2019. Law Firm Partner 1 was present at the meeting as well as a Board member who continued to be in touch with Pacella throughout the fall.

120.    Only a few hours after the Board meeting, the Edelson Defendants sent Plaintiffs – their own clients – a letter demanding payments to both Pacella and Melnik. Pacella knew from weeks earlier that the company was in the midst of launching its new flagship product and a strategic capital fundraise, and Østvik had discussed the details around timing at the Board meeting. The demand letter threatened to make legal filings unless Østvik made an immediate enormous cash payment, personally, to Pacella. The letter further stated that Pacella wanted large payments from each of Østvik's companies, but not right away like the personal payment by Østvik, rather the company payments were demanded no later than December 31, 2019. This timing of course was intended to align with the capital raise, the timeline of which had just been discussed at the Board meeting hours earlier.  The Edelson Defendant's letter demanded a grant of millions of shares in Ecogensus and VPEF. Finally, the letter demanded payments to Melnik and discussed fees allegedly due to Law Firm Partner 1.

121.    Perhaps most shocking of all, the letter from the Pacella/Edelson Enterprise demanded that Østvik personally send an amount which they calculated to be the portion remaining for Østvik from the settlement proceeds, after the previous year's payments to the

Edelson Defendants, Pacella and other legal fees. Put differently, after Østvik had placed his trust in the Edelson Defendants and Pacella to seek justice for himself, the Pacella/Edelson Enterprise now returned to attempt to extort Østvik – their own client – of every last dollar he received in damages.

122.    Pacella was not entitled to this personal payment from Østvik – nor had ever previously requested it – but the Edelson Defendants were so brazen that they did not care to offer even so much as a false basis for why Østvik should personally pay this amount of money to Pacella. Instead they simply described a large figure dollar amount to be paid personally by Østvik to Pacella, in order to prevent the Edelson Defendants from making unrelated legal filings about the companies, and warning they would contain Pacella's vague and unsubstantiated "concerns" about the company – in the middle of a capital raise on a short timeline. The Pacella/Edelson Enterprise's extortion scheme was as brash and careless as it was unconscionable.

123.    The demand letter even contained veiled threats to publicize the Confidential Disclosures if Plaintiffs did not reach a satisfactory resolution.

124.    In particular, the Edelson Firm taunted Østvik, writing that Pacella "knows [Østvik] well and does not think it is in [Østvik's] or the Companies' best interest to call out the numerous issues in writing with specificity unless we ultimately are forced to proceed with litigation." The letter made vague references to Pacella's "partners", seeming to imply that Pacella had secret legal partnerships in place with a number of the company's investors and customers – which are gross violations of Pacella's ethical obligations. The Edelson Defendants referenced a variety of vague "concerns" that Pacella had (none of which would entitle Pacella to relief), yet implied that these "issues" could be dealt with by payment to Pacella.

125.    The letter made exaggerated statements that Pacella would not reveal information regarding Østvik's "personal history", "reassuring" Østvik that Pacella did not intend "to take special steps to make public his allegations" and that Pacella was "open to potentially agreeing" to make filings that "redact sensitive information".

126.    On information and belief, these "reassurances" were intended by the Edelson Firm to specifically remind Østvik that it, and Pacella, were aware of the Confidential Disclosures and could cause them to become public. Østvik himself so construed the Edelson Firm letters.

127.    When Østvik did not acquiesce, Pacella began contacting Østvik's investors, customers and partners, asking for their support and disparaging Østvik. Pacella's goal was to form an alliance to take control of the company away from Østvik. These efforts failed, but Østvik's successes related to the companies continued. In fact, unbeknownst to Pacella, one time Østvik was actually having lunch with one of these parties while Pacella was trying to contact him. That party showed his phone to Østvik as Pacella was trying to make contact, saying "Matt keeps trying to contact me, I'm not going to take it."

128.    When Pacella's attempts to garner outside support for his scheme failed, the Edelson Firm nevertheless sent yet another demand letter in November 2019 reminding Østvik that Pacella had hoped to discuss payments to Pacella "while avoiding harm to the Companies and their ongoing businesses." The Edelson Firm reiterated they did not want to "lay out in detail or writing" their claims and explained that they "reiterate this point not for repetition's sake or to threaten."

129.    On March 2020, the Edelson Firm sent Plaintiff yet another demand letter, this time supposedly on behalf of Melnik separately, reiterating the same demand that the September

34

2019 letter (supposedly on behalf of Pacella) had made with respect to payments to Melnik. Edelson made no excuse for the blatant violation of multiple attorney ethics rules and disregarded the patent conflict-of-interest. The letter claimed Melnik – who only ever spoke to Pacella about his acquisition of VPEF equity – had expected Pacella to remain at VPEF, had expected an imminent acquisition (the very acquisition that Defendant Richman and Defendant Edelson sought to be involved in and invest in), and that VPEF was imminently closing a project financing (the very project financing that Pacella was pursuing through July 2019).

130.    Certain of Pacella's contracts with VPM, Ecogensus and VPEF contain arbitration provisions.  Accordingly, Østvik and the companies commenced a AAA proceeding on or around October 23, 2019.  Pacella, represented by Edelson, failed and refused to proceed with arbitration despite due demand by Østvik that he do so, thus waiving his rights, if any, to arbitrate.

131.    Because of the serious crimes of the Pacella/Edelson Enterprise, Plaintiffs seek redress to put an end to the extortion and recoup the funds that were stolen from them.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
(Violation of Computer Fraud and Abuse Act
18  U.S.C. § 1030 Edelson, Melnik and Pacella)

132.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

133.    Plaintiff's computers and computer systems are "protected computers" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

134.    By his wrongful actions, Defendant Pacella intentionally accessed Plaintiff's protected computer system, without authorization and/or in excess of authorized access, and thereby obtained information from Plaintiff's protected computer system.

135.    By his wrongful actions, Defendant Pacella knowingly and with intent to defraud, accessed Plaintiff's protected computer system, without authorization and/or in excess of authorized access.

136.    Defendant Pacella furthered the intended fraud, obtained unauthorized use of Plaintiff's protected computer system, and obtained Plaintiff's proprietary information, the value of such exceeding $5,000 in value in any one-year period.

137.    The wrongful conduct of Defendant Pacella was done with inducement from and with the knowledge and participation of Defendants Edelson and Melnik, and/or for the benefit of Defendants Edelson and Melnik such that Edelson and Melnik are equally responsible for the wrongful conduct of Pacella.

138.    By their wrongful actions, Defendants Edelson, Melnik and Pacella intentionally accessed Plaintiff's protected computer system without authorization, and as a result of such conduct, caused Plaintiff's damage and loss that exceeds $5,000 in value during any one-year period. Not only have Plaintiffs spent far in excess of $5,000 in responding to the offense and conducting a damage assessment, Plaintiff VPEF lost the opportunity to participate in capital calls.

139.    The activity of Defendants Edelson, Melnik and Pacella constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030(a)(2)C), (a)(4), (a)(5)C), and Plaintiffs are entitled to full compensatory damages under that Act.

### AS AND FOR A SECOND CLAIM FOR RELIEF
(Violation of RICO and Conspiracy to Violate RICO)

140.    The Racketeering Influence Corrupt Organizations Act ("RICO" or "the Act"), 18 U.S.C. § 1961, et seq., provides a private cause of action to recover losses, damages, treble damages and attorney's fees to any person suffering a loss caused by any other person that

violates the Act.

141.    18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

142.    Edelson, Pacella and Melnik are all "persons" as defined under the Act.

143.    Defendants at all relevant times and as alleged herein, associated together and operated as an "Enterprise" with a common purpose. The Enterprise functioned as a unit and engaged in a common course of conduct.

144.    The Enterprise constitutes an "enterprise" or "association in fact enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c) with relationships and longevity to further Defendants' common purpose of committing acts to defraud Plaintiffs and others for financial gain. Edelson, Pacella and Melnik (and other unknown associates) used their strategic alliance to actively seek out young, up-and-coming companies and wrongfully acquire cash or equity stakes in such companies.

145.    Defendants at all relevant times and as alleged herein conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

146.    Defendants engaged in a pattern of racketeering activity consisting of at least two (2) predicate acts of racketeering by each for the purpose of defrauding Plaintiffs for financial gain.

147.    As alleged herein, Defendants made use of the United States mail and/or telephone and wires, and/or committed other acts prohibited by law to extort Plaintiff Østvik,

and they made explicit as well as indirect threats to accomplish those goals.

148.    Defendants also committed acts of mail fraud in violation of 18 U.S.C. § 1341 by using the United States Postal Service and private commercial interstate carriers to knowingly and fraudulently extract money from Plaintiff Østvik.

149.    Defendants also committed acts of wire fraud in violation of 18 U.S.C. § 1343 by using the telephone, e-mail and/or other forms of electronic communications to knowingly and fraudulently make material misrepresentations and/or to deliberately conceal material information from Plaintiffs for the purpose of facilitating their extortionate scheme on Plaintiff Østvik.

150.    Defendants engaged in a pattern of racketeering activity to infiltrate companies and gain leverage using illegal means.

151.    Here, as set forth above, having learned of the Confidential Disclosures that Defendant believed would cause significant harm to Plaintiffs Østvik and Østvik's companies, Defendants extracted cash from Østvik by threatening to make public these Confidential Disclosures and by threatening physical harm.

152.    Even after extracting $228,000 in cash by extortion, Defendants are still attempting to extract more money.

153.    When Defendant Pacella was sent to New York City to meet with Østvik, explicitly threatened bodily harm and threatened to use Pacella's purported ties to organized crime, this was in furtherance of the scheme.

154.    When Defendant Edelson and Pacella threatened to publicly reveal the Confidential Disclosures with the belief that such revelation would be damaging to Østvik personally and in his professional capacity, this was in furtherance of the scheme.

155.    Defendant's violation of 18 U.S.C. § 1962 and caused direct damage to the

Østvik.

## AS AND FOR A THIRD CLAIM FOR RELIEF
(Civil RICO Conspiracy - 18 U.S.C. § 1962(d))

156.    Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

157.     18 U.S.C. 1962(d) makes it unlawful for any person to conspire to violate the

Act.

158.    There existed a conscious agreement among all the Defendants to engage in the

predicate acts constituting the pattern or racketeering alleged herein.

159.     Pacella as the person controlling and directing the coordinated roles and

interrelated activities of the Enterprise encouraged and induced the other Defendants to

participate directly or indirectly in the illegal Enterprise.

160.    Defendants by their words and actions as alleged herein displayed a conscious

agreement to become part of the RICO conspiracy. Defendants committed the predicate acts

alleged herein with the requisite knowledge of the purpose of the Enterprise and with the intent

to further its fraudulent purpose and goals.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
(Intentional Tort: Extortion)

161.    Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

162.    Defendants Pacella and Edelson coerced plaintiff Østvik to part with property,

namely the sum of $228,000.

163.    Defendants Pacella and Edelson coerced through the wrongful use of actual or

39

threatened force, violence and fear.

164.    Here, as set forth above, having learned of the Confidential Disclosures that Defendant believed would cause significant harm to Plaintiffs Østvik and VPM, Defendants extracted cash from Østvik by threatening to make public these Confidential Disclosures and by threatening physical harm.

165.    Even after extracting $228,000 in cash by extortion, Defendants are still attempting to extract more money.

166.    When Defendant Pacella was sent to New York City to meet with Østvik, explicitly threatened bodily harm and threatened to use Pacella's purported ties to organized crime, this was in furtherance of the scheme.

167.    Defendants Edelson and Pacella threatened to publicly reveal the Confidential Disclosures with the belief that such revelation would be damaging to Østvik personally and in his professional capacity, this was in furtherance of the scheme.

168.    Defendants Pacella and Edelson acted with disinterested malevolence, as they had no right to Mr. Østvik's money, yet demanded it using threats of harm and public embarrassment.

169.    Defendants have been unjustly enriched and Plaintiff Østvik has suffered and continues to suffer money damages.

170.    Defendants' conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking— and criminal—misconduct.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
(Breach of Contract—Pacella)

171.    Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

172.    As a condition of his employment with Plaintiffs Defendant Pacella signed and agreed to be bound by the terms of a non-solicitation, confidentiality and intellectual property agreement.

173.    At all relevant times, Plaintiffs performed their duties with respect to the non-solicitation, confidentiality and intellectual property agreement entered into by Defendant Pacella.

174.    Defendant Pacella has breached and continues to breach his obligations to maintain the confidentiality of Plaintiffs' highly confidential and proprietary information under the non-solicitation, confidentiality and intellectual property agreement.

175.    Defendant Pacella wrongfully extracted an additional payment of $228,000, using extortive threats.

176.    Defendant Pacella misappropriated confidential information and contacted Plaintiffs' Investors, Board Members and Outside lawyers to the detriment and harm to Plaintiffs.

177.    Defendant Pacella wrongfully accessed Plaintiffs' computers to extract non-public information to use for his own personal gain.

178.    As a direct and proximate result of the wrongful conduct by Defendant Pacella with respect to the companies, Plaintiffs have suffered and continue to suffer irreparable injury in an amount to be determined at trial but believed to be in excess of $40,000,000.

179.    As a direct and proximate result of the wrongful conduct by Defendant Pacella, Plaintiffs have suffered and continue to suffer substantial money damages in an amount to be determined at trial.

**AS AND FOR A SIXTH CLAIM FOR RELIEF**
(Inducing Breaches of Contracts,
Tortious Interference with Contractual Relations)
(Edelson and Melnik)

180.     Plaintiffs repeat and reallege each and every allegation set above as though fully

set forth herein.

181.     Defendants Edelson and Melnik knew of Pacella's contractual obligations to

Plaintiffs.

182.     By their wrongful actions, Defendants Edelson and Melnik intentionally induced

Pacella to breach their contracts with Plaintiffs and has tortiously interfered with Plaintiffs'

contractual relations with Pacella.

183.     As a direct and proximate result of Defendants Edelson and Melnik's wrongful

conduct, Plaintiffs have suffered and continues to suffer irreparable injury.

184.     As a direct and proximate result of Defendants Edelson and Melnik's wrongful

conduct, Defendants Edelson and Melnik has been unjustly enriched and Plaintiff VPM has

suffered and continues to suffer substantial money damages in an amount to be determined at

trial but believed to be in excess of $40,000,000.

**AS AND FOR A SEVENTH CLAIM FOR RELIEF**
(Misappropriation of Trade Secrets)

185.     Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

186.     By their wrongful actions, Defendant Pacella has knowingly misappropriated and

used VPM, Ecogensus and VPEF trade secrets in breach of their agreements, confidential

relationships and fiduciary duties to Plaintiffs.

187.     Defendants used confidential information including specific patent information,

42

business expansion plans, details of planned capital raises and Confidential Disclosures of Plaintiff to extract or attempt to extract personal gain,

188.   By their wrongful actions, including discovery of Plaintiffs' trade secrets through improper means, Defendants have knowingly misappropriated and used, or aided and abetted the misappropriation and misuse of, Plaintiffs' trade secrets.

189.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Østvik has, due to the lost opportunity to participate in the capital calls, suffered and continue to suffer irreparable injury and damages in an amount to be determined at trial but in any event believed to be in excess of $40,000,000.

190.   As a direct and proximate result of the wrongful conduct of Defendants Edelson, Melnik and Pacella, Defendants have been unjustly enriched and Plaintiffs have suffered and continue to suffer money damages. in an amount to be determined at trial.

191.   Defendants' conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking—and criminal—misconduct.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
(Breaches of Fiduciary Duty by the Edelson Defendants: Equitable Disgorgement)

192.   Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

193.   The June 20, 2017 retention letter with the Edelson firm makes it explicit that Edelson is representing Plaintiffs VPM, Østvik and Ecogensus.

194.   As an attorney hired to represent Plaintiffs, The Edelson Defendants were entrusted with confidential and privileged information and owed a duty of loyalty.

195.    The professional rules of the state of New York, the common law and the Engagement Letters created a fiduciary relationship by and between the Edelson Defendants and Plaintiffs.

196.    The Edelson Defendants owed Plaintiffs the fiduciary duties that all attorneys owe to their clients and by virtue of the Edelson Defendants' position of trust and responsibility.

197.    At all relevant times, as fiduciaries in whom Plaintiffs placed a special confidence and trust, the Edelson Defendants were bound to act in the utmost good faith and with due regard for the best interests of Plaintiffs, and, at all times, owed Plaintiffs the highest level of loyalty, candor and professional and ethical conduct.

198.    The Edelson Defendants had a duty to avoid acting in a manner detrimental to the business and property rights of Plaintiffs, including a duty to refrain from representing adversaries and demanding a cash payout outside the retainer arrangement or legal representation, and demanding an equity interest in VPM.

199.    As alleged in detail above, the Edelson Defendants breached that fiduciary duty by representing parties adverse to Plaintiffs' interest, demanding monies outside of the legal representation and issuing threats to Plaintiffs to extort such money.

200.    As a result of Defendants' breaches of their fiduciary obligations to Plaintiff, the Edelson Defendants have forfeited any and all right to compensation they received for their services to Plaintiffs during the time period relevant to these claims and should disgorge all ill-gotten fees they have received from Plaintiffs in an amount to be determined at trial, but in any event not less than $930,972.00 plus legal fees and costs.

**AS AND FOR A NINTH CLAIM FOR RELIEF**
(Breaches of Fiduciary Duty against Pacella: Equitable Disgorgement)

201.    Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

202.    Pacella, as General Counsel to the business Plaintiffs, acted in the capacity of in-house counsel during the terms of employment, and as outside counsel before and after the term of the employment agreements.

203.    Pacella acted as personal lawyer to Plaintiff Østvik.

204.    As an attorney hired to represent Plaintiffs' interests, Pacella was entrusted with confidential and privileged information and owed a duty of loyalty.

205.    The professional rules of the States of New York, Illinois, Pennsylvania and Connecticut and the common law of the state of New York created a fiduciary relationship by and between Pacella and Plaintiffs.

206.    Pacella owed Plaintiffs the fiduciary duties that all attorneys owe to their clients and by virtue of the Edelson Defendants' position of trust and responsibility.

207.    At all relevant times, as fiduciaries in whom Plaintiffs placed a special confidence and trust, Pacella was bound to act in the utmost good faith and with due regard for the best interests of Plaintiffs, and, at all times, owed Plaintiffs the highest level of loyalty, candor and professional and ethical conduct.

208.    Pacella had a duty to avoid acting in a manner detrimental to the business and property rights of Plaintiffs, including a duty to refrain from acting in his own self-interest, conspiring with third parties, abusing the Plaintiffs' confidences by threatening to make public highly confidential information, and demanding a cash payout outside any type of retainer arrangement or legal representation, and demanding equity interests in Ecogensus and VPEF.

209.    As alleged in detail above, Pacella breached that fiduciary duty by acting in his

own self-interest, contacting Board Members, Investors and Outside Counsel, conspiring with third parties, abusing the Plaintiffs' confidences by threatening to make public highly confidential information, threatening violence against Østvik and demanding a cash payout outside the retainer arrangement or legal representation, and demanding an equity interest in VPM.

210.    As a result of Pacella's extreme breaches of his fiduciary obligations to Plaintiffs, Pacella has forfeited any and all right to compensation he received for his services to Plaintiffs during the time period relevant to these claims and should disgorge all ill-gotten fees he has received from Plaintiffs in an amount to be determined at trial, but in any event not less than $513,000, plus legal fees and costs.

WHEREFORE, Plaintiffs demand judgment against Defendants, for the following relief:

1) Awarding Plaintiffs actual, compensatory and punitive damages to the full extent allowed by law but in no event less than $140,000,000;

2) Awarding Plaintiffs costs and attorneys' fees to the full extent provided for by the RICO statute, 18 U.S.C. § 1964.

3) Awarding Plaintiffs actual and trebled damages to the full extent provided by 18 U.S.C. § 1030 and 18 U.S.C. § 1964, in an amount to be determined at trial.

4)  Granting such other relief as this Court deems just and equitable.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable of right.

Dated:  New York, New York
        May 8, 2020

                        GUZOV, LLC


                        By:  /s/ Debra J. Guzov_ _ _
                        Debra J. Guzov (DJG 7121)
                        Anne W. Salisbury (AWS 7333)
                        David J. Kaplan (DJK 0100)
                        805 Third Avenue, 8th Floor
                        New York, New York 10022
                        Tel:    (212) 371-8008
                        dguzov@guzovllc.com
                        *Attorneys for Plaintiffs*


                        TUCKER LEVIN, PLLC


                        By: /s/ Duncan Levin
                        Duncan Levin (DL 1577)
                         230 Park Avenue, Suite 440
                        Tel.: (212) 330-7626
                        dlevin@tuckerlevin.com
                        www.tuckerlevin.com