UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ECOGENSUS LLC, VIKINGPEAK ENERGY FUELS
LLC, VIKINGPEAK MANAGEMENT COMPANY,
LLC, VIKINGPEAK CAPITAL GROUP LLC and
BJØRNULF ØSTVIK,

CASE NO: 1:20-cv-3626

**FIRST AMENDED COMPLAINT**

**[DEMAND FOR JURY TRIAL]**

                                    Plaintiffs,

                -against-

MATTHEW PACELLA, MICHAEL M. MELNIK,
JAY EDELSON, BENJAMIN RICHMAN and
EDELSON PC.
                                    Defendants.
-----------------------------------------------------------------X

        Plaintiffs Ecogensus LLC ("Ecogensus"), VikingPeak Energy Fuels LLC ("VPEF"),

VikingPeak Management Company, LLC ("VPM"), VikingPeak Capital Group LLC ("VPCG"),

and Bjørnulf Østvik (" Østvik "), (collectively "Plaintiffs"), by and through their counsel, Guzov,

LLC and Tucker Levin, PLLC, as and for their complaint against defendants Matthew Pacella

("Pacella"), Jay Edelson ("Edelson"), Michael Melnik ("Melnik"), Benjamin Richman

("Richman") and Edelson PC (the "Edelson Firm" and, together with Edelson and Richman, the

"Edelson Defendants") (collectively, "Defendants"), state as follows:

### NATURE OF THE ACTION

        1.      Pacella (Plaintiffs' former General Counsel) and the Edelson Defendants

(Plaintiffs' former outside counsel), in their capacity as Plaintiffs' attorneys, joined forces to

leverage sensitive, privileged and confidential information gathered in the course of their

representation of Plaintiffs to extract cash and shares for themselves.

        2.      Based upon this privileged information, Pacella and the Edelson Defendants

conspired to take control of the valuable corporate entities through extortion. Therefore, they

1

executed a scheme to extort cash and millions of shares of equity from Plaintiffs by threatening to make public information they believed would cause personal, reputational, and economic harm to Østvik and his businesses at a critical juncture for these businesses.

3.      What is remarkable here is that the information used in this extortion scheme was learned through privileged attorney-client conversations that Plaintiffs disclosed to their lawyers, both in-house (Pacella) and outside counsel (the Edelson Defendants). In turn, Pacella and the Edelson Defendants used Michael Melnik to join in and assist the plan based on his perceived status vis-à-vis the Plaintiffs.

4.      The Edelson Defendants were even brazen enough to put it in writing that they were seeking to leverage confidences and secrets obtained in its representation to the detriment of their former client.

5.      Østvik not only seeks redress for the money already stolen from him, but he seeks to put an end to this multi-year conspiracy designed to wrest control of his companies away from him.

6.      Masterminded by Pacella who served as the general counsel of Østvik's companies, Pacella, Edelson, Richman and the Edelson Firm (collectively, the "Pacella/Edelson Enterprise") utilized their intimate knowledge of Plaintiffs' activities, together with sensitive personal information which Pacella inveigled out of Østvik, to demand increasingly large transfers of cash and equity interests from Østvik and his businesses.[1]

---

[1]   The Confidential Disclosures fall into two categories. The first relates to Østvik's concerns arising out of a legal matter for which Pacella and the Edelson Defendants were his attorneys, including potential retaliation by third parties and his own personal safety appurtenant to this matter. The second category relates to abuse that Østvik suffered, which Pacella and the Edelson Defendants learned of in the course of their legal representation of Østvik. Østvik expressed concern to Pacella (and a few months later to the Edelson Defendants) about the legal matter and third parties he was concerned might threaten his and his family's personal safety. With respect to the second category, Østvik recounted a deeply personal, private story of abuse he suffered in childhood and a violent episode in 2014.

7.     Defendants then became aware in the spring and summer of 2019 of the rapidly increasing value of Østvik's businesses, the upcoming product launch and patents being issued, non-public institutional capital raises underway, Østvik's consideration of a future IPO for Ecogensus, and a planned private equity exit for VPEF.  Specifically, Pacella and the Edelson Defendants learned that:

a) VPEF acquired a significant interest in a logistics company with operations throughout the eastern United States, that a confidential demonstration using proprietary Ecogensus fuel to replace coal had been successful, and that VPEF's subsidiary had been issued an operating permit for its first advanced waste treatment facility using Ecogensus technology;

b) Ecogensus was debuting its new flagship system in the fall of 2019;

c) Østvik was planning a new venture that included a high value acquisition to which it had secured exclusive rights.

8.     Pacella also became aware of non-public, privileged information that valuable patents protecting Ecogensus' flagship product and new design were likely to be issued in the coming months, and indeed those patents were issued in January and April 2020.  All of this information was gained under privilege, was non-public information, and Defendants knew this information could not be shared publicly.

9.     Apparently emboldened from their success in previously extracting hundreds of thousands of dollars in cash from Østvik, Defendants then began escalating their demands in the summer of 2019 and started to demand not only more cash in order to keep quiet, but significant equity stakes of millions of shares in Østvik's businesses Ecogensus and VPEF.

---

Each of the situations set forth in this, and the preceding, paragraphs are areas of great sensitivity for Østvik, and he does not wish for details concerning the Confidential Disclosures to become known. For obvious reasons, Plaintiffs have provided only a brief description of the Confidential Disclosures in this pleading. The details in each situation would cause considerable pain and suffering Plaintiffs and have safety implications, if publicly known. Should the Court require any additional details concerning the Confidential Disclosures, Plaintiffs respectfully request the opportunity to file a supplemental complaint under seal.

10.     At the same time Pacella was complaining of the financial difficulties in which he found himself due to large back tax payments, loans owed to friends, high living expenses and gambling debts, he was also buying a Maserati, expensive dinners, Dom Perignon champagne, two-thousand-dollar Armani suits and $3,500 per bottle Louis XIII cognac at his cigar club. Pacella's desire to fuel his lifestyle despite perpetual financial difficulties often seemed to motivate his constant years-long pressure campaign to extract continuously more cash from Østvik.

11.     The Defendants have repeatedly warned Østvik that they know he does not want sensitive information publicized in writing but have threatened to do so if he did not acquiesce to their demands. Plaintiffs have decided they cannot allow the extortion to succeed any further.

12.     As detailed below, Defendants have variously violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), the Hobbs Act and the Computer Fraud and Abuse Act ("CFAA"), and have committed intentional torts and extortion for which they may be held civilly liable. Defendants, at various times, went so far as to threaten Østvik with disclosure of his personal information, committed assault and battery upon him, and made threats of violence against his family, if their financial demands were not met.  Cowed by these threats, Østvik had no choice but to pay up previously, but now seeks to end this continued campaign of intimidation.  The Pacella/Edelson Enterprise has made no secret of the conspiracy's ultimate goal: to take Ecogensus, VPEF and its affiliates away from Østvik right before the companies' global launch and grow them into a multi-billion-dollar enterprise under their control.

13.     Defendants tortious and criminal actions have wrought massive damages to Plaintiffs. Plaintiffs' damages go far beyond the hundreds of thousands of dollars in wrongful payments to the Defendants. Defendants have inflicted grievous harm on the businesses of

Plaintiffs, causing at least tens of millions of dollars of damage to Østvik and his businesses. Indeed, Plaintiffs investigation is ongoing and Østvik continues to discover damages caused by the Pacella/Edelson enterprise.

14.    Pacella and the Edelson Defendants have also breached their fiduciary duties to Plaintiffs, and their intentional acts require them to disgorge all funds received in the past.  In addition to the compensatory damages owed by all defendants for their illegal and tortious conduct, Pacella must disgorge all funds paid to him, in salary, cash, or any claims to equity and the Edelson Defendants must disgorge all fees paid to the firm.  Melnik has aided and abetted the Pacella/Edelson enterprise in these wrongful acts and has conspired with them to put them into effect and must disclaim and/or any equity interests he may own in Ecogensus and VPEF.

15.    Moreover, Defendants' misconduct is so intentional and egregious that the Court must punish the Defendants to deter others from engaging in similar conduct. Defendants' conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking—and criminal—misconduct.

## THE PARTIES

16.    Plaintiff is a natural person who is a citizen of the United States and is domiciled in the State of Connecticut.  He is the founder, president and majority shareholder of Plaintiff VPM, VPCG, Ecogensus and VPEF.

17.    Plaintiff Østvik has an extensive career in ground-breaking technology development and related advanced infrastructure, including having worked for Lockheed Martin Corporation and with various U.S. Department of Energy Laboratories and research universities in the United States.

18.     Plaintiff VPEF is a limited liability company organized and existing under the laws of the State of Delaware.

19.     Plaintiff VPM is a limited liability company organized and existing under the laws of the State of Delaware.

20.     Plaintiff VPCG is a limited liability company organized and existing under the laws of the State of Delaware.

21.     Plaintiff Ecogensus is a limited liability company organized and existing under the laws of the State of Delaware.

22.     Defendant Pacella is a natural person domiciled in the Commonwealth of Pennsylvania, city of Pittsburgh.  On information and belief, he is a graduate of Georgetown University Law Center and has held associate or "special counsel" positions with at least two AmLaw 100 law firms working in the Mergers and Acquisitions/Private Equity practice groups.

23.     Defendant Melnik is a natural person who is, on information and belief, domiciled in the Commonwealth of Pennsylvania.

24.     Defendant Richman is a natural person who is, on information and belief, domiciled in the State of Illinois, city of Deerfield.  On information and belief, Richman is a principal of the Edelson Corporation and a licensed attorney.

25.     Defendant Edelson is a natural person who is, on information and belief, domiciled in the State of Illinois, city of Chicago.  On information and belief, Edelson is a principal of the Edelson Corporation and a licensed attorney.

26.     Defendant Edelson Firm is a professional corporation organized and existing under the laws of the State of Illinois with principal offices in Chicago, Illinois.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, in that one or more causes of action against one or more of the Defendants arise under the laws of the United States, and pursuant to 28 U.S.C. § 1367, in that supplemental jurisdiction exists over claims arising under state law.

27.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 the jurisdictional amount exceeds $75,000 and no plaintiff shares a state of citizenship with any defendant.

28.     This Court has jurisdiction over the person of each Defendant based upon such Defendant's commission of tortious acts outside the State of New York which caused foreseeable injury within this state.

29.     Pacella engaged in a key purposeful activity in this State in relation to the extortion scheme for the benefit of and with the knowledge and consent of the Edelson Defendants, who exercised some control over Pacella in the matter.

30.     The Defendants have also availed themselves of conspiracy jurisdiction within the State by forming an agreement with Pacella to participate in a conspiracy to extort Plaintiffs, and by committing overt acts in furtherance of this conspiracy.

31.     Venue is proper in this District because a substantial number of the events giving rise to Plaintiffs' claims occurred within this District.

**PRIOR DEMAND FOR ARBITRATION**

32.     On October 21, 2019, Plaintiffs served a Demand for Arbitration on Defendant Pacella, invoking the arbitration clause contained in an employment agreement dated August 1, 2016. The demand alleged multiple breaches of fiduciary duties owed to the Plaintiffs, breaches of his contractual obligations and tortious interference with current and prospective business

relationships under applicable law. No demand was made concerning the conspiracy and extortion scheme that lies at the heart of this case, and no demand was made upon any of the other Defendants (nor could it have been.)

33.     Pacella and his counsel (the Edelson Defendants) neither entered an appearance nor filed an answer or response to the repeated inquiries of the Case Administrator, Chante Little.

34.     Finally, on January 7, 2020, Defendant sent an email to Ms. Little, simply stating:

> Morning Chante: Our client will not agree to proceed before the AAA.
> Happy New Year.
> Best, Ben

35.     Pacella tried at one point to convince Plaintiffs' new counsel to mediate in front of one of three mediators that Defendant Richman wrote were "neutrals", apparently forgetting that Defendant Edelson had bragged to Plaintiffs almost two years prior about insider ties and personal connections to these mediators, even calling one a "father figure".

36.     Plaintiff's counsel tried in vain to get the arbitration on track. Pacella unequivocally rejected, forfeited, and waived the right to arbitrate.

## FACTUAL ALLEGATIONS

### Background of Østvik and the Plaintiff Entities

37.     In 2010, Østvik left his employment with Lockheed Martin to go into business for himself.  Over the next several years, he founded Ecogensus and VPEF and, at present, Østvik is the Chief Executive Officer and Chief Technology Officer of Ecogensus and the Chief Executive Officer of VPEF. Østvik's companies have substantial business interests and own valuable technology rights including through multiple patents issued in the United States and

internationally. A significant portfolio of additional patents has been applied for worldwide and technological discoveries have continued to be made through the present many of which have patent applications being actively written.

### Pacella Meets Østvik And Gains Entry into Plaintiffs' Businesses

38.     Østvik first became acquainted with Defendant Pacella in early 2016, when an acquaintance introduced him as a potential source of legal assistance and due to his purportedly strong connections to private equity groups and banks.  At this time, Pacella was employed as a part-time "special counsel" at a leading Chicago law firm, focused on mergers and acquisitions in private equity transactions.

39.     After meeting Østvik and learning about Ecogensus' business, Pacella emailed Østvik on January 31, 2016  stating,  "It goes without saying that I am very impressed with what you have accomplished thus far and will continue to be of service to you as you change the world and make billions of dollars doing it."  Despite having just met Østvik and having received no promises or invitations to work together, Pacella enthused: "Let's build an empire."

40.     Over the next few weeks, under the guise of conducting "due diligence" in connection with the introductions Pacella was to make, Pacella requested and received confidential and secret information concerning Ecogensus' technology and business prospects.

41.     Pacella had Østvik return to Chicago in April 2016 for a day of meetings arranged by Pacella with potential investors and financial advisors whom Pacella knew.  Over the course of the day, Pacella learned of certain confidential plans for significant projects that Ecogensus and VPEF were pursuing. That evening, Pacella asked Østvik to let him come work for Østvik full-time, requesting a $200,000 annual salary and equity in each of the companies. Østvik said he was not ready to hire Pacella at the time but agreed to try to find something that could work

later in 2016.

42.     Pacella encouraged Østvik to hire two different law firms where Pacella had previously worked as a junior lawyer. Unbenownst to Plaintiffs, a partner at one of the firms turned out to be one of Pacella's closest friends ("Law Firm Partner 1").

43.     On July 12, 2016, Østvik sent Pacella an Employment Offer Letter at a $200,000 annual salary rate, which referenced the possibility of future "company equity options", perhaps giving Pacella the idea to gain equity and infiltrate the Plaintiffs.

44.     Pacella signed the offer letter on August 1, 2016 and began his employment for Østvik at VPM as a remote employee, including serving as "Co-General Counsel" for Ecogensus and VPEF.  In this capacity, he provided legal advice for the companies.

45.     In the first few days of employment, Pacella not only began gathering non-public business information about Ecogensus, VPM and VPEF, but he began eliciting confidential information about Østvik himself. Pacella represented that he was also Østvik's "personal lawyer" and assured Østvik that he could – and should – trust him with all of his personal legal issues.

46.     Once Pacella gained his confidence, Østvik made what would be one of his biggest mistakes: believing that he could trust Pacella to keep privileged information confidential and act ethically and loyally as his attorney, Østvik confided in Pacella some of the Confidential Disclosures. In response, Pacella suggested Østvik discuss some of his concerns with one of former law firms, setting a trap. Insisting on being part of the meetings and phone calls, and repeatedly assuring Østvik that he could trust Pacella and constantly reminding Østvik that everything was privileged, Pacella learned many details over the coming months concerning the Confidential Disclosures.

<u>Pacella Begins to Leverage the Confidences</u>

47.     At the same time that Pacella was becoming privy to Østvik's Confidential
Disclosures, he began to demand a relocation bonus and signing bonus, even though such
payments had never been discussed by Pacella and Østvik and were not discussed in Østvik 's
term sheet regarding Pacella's position, were not described in the employment Offer Letter that
Pacella signed, nor in Pacella's initial employment agreement.  Østvik would later learn that
Pacella had purchased an expensive new home but used a short-term "bridge" loan from a
Chicago friend in order to make the down payment and now was under significant financial
pressure to pay back the loan to his friend promptly, the impetus for the commencement of the
extortive conduct.

48.     Almost immediately after learning of the Confidential Disclosures, Pacella started
pressing Østvik for money he was never entitled to receive: a signing bonus and extra
"consulting" fees for a proposed, backdated Consulting agreement Pacella suddenly proffered.

49.     Pacella grew more and more enthusiastic about the business prospects of
Ecogensus and VPEF. He also began making some unprofessional and inappropriate remarks to
Østvik.  For example, on November 29, 2016, Pacella sent an unprompted (and unnerving)
message to Østvik saying "I'm actually becoming obsessed with you".

50.     In November 2016, as certain sales and marketing efforts were beginning, Østvik
asked Pacella to draft Anti-Corruption and Lobbying Policies as well as Ethics Codes. Østvik
specifically said that he wanted to follow practices he learned at Lockheed Martin Corporation,
including instituting complete prohibitions against "kickbacks" in private transactions and Østvik
directed Pacella to incorporate language from publicly-available ethics policies.

51. On November 11, 2016, Pacella sent a draft ethics code which stated that

Officers, directors, managers, employees and Representatives and any member of such persons' immediate family, are prohibited from directly or indirectly accepting any: (i) commissions, profits, payments, loans, (ii) free services or products, or (iii) entertainment, travel or gifts, each case from a person or entity doing, or seeking to do business with the Company.

52.     The draft policy stated that it exempted small courtesies, such as Christmas gifts, provided they have a "value of less than $100." The policy was adopted and as soon as three days later, Pacella began circulating the Company Ethics Policy along with the Company Lobbying Policy and Global Anti-Corruption Policy.

53.     The very next month, Pacella himself violated the Ethics Policy he had written at Østvik's direction. On December 10, 2016, Pacella sent Østvik a message saying "[Law Firm Partner 1] sent me $2500 bucks for belated wedding and housewarming gift", even though Pacella's wedding occurred in October 2015 and he had moved to his new home the previous spring. This large cash gift occurred after Pacella steered Østvik's client account to Law Firm Partner 1 and was 25 times higher than the maximum $100 gift threshold permitted, demonstrating that he received an impermissible referral fee and believed that if he called it a belated wedding present it would somehow pass scrutiny. Aware that Østvik might discover this payment and that it was in gross violation of Østvik's Code of Ethics, Pacella preemptively wrote "No pay for play" before Østvik could react.

54.     On information and belief, that same month while Pacella was acting in his capacity as Østvik's attorney, Pacella came to learn from a third party that Østvik was a victim of a violent 2014 attack that Østvik sought to keep non-public, fearing reprisal. Pacella then realized he had even more leverage over Østvik.

Pacella's First Solo Extortion Attempt

55.     The first hint of Pacella's extortion scheme came in January 2017. Østvik was in

Pittsburgh for business meetings, where Pacella lives. This was the first time Østvik had seen Pacella since Østvik had learned of the improper $2,500 payment that Pacella had received.

56.     While in Pittsburgh, Østvik told Pacella that he should never have accepted the large cash gift from one of the company's own vendors. In passing, Østvik also happened to mention to Pacella that Østvik and his wife learned before the Christmas holiday that they were expecting their first child.

57.     Pacella suggested that he and Østvik have dinner that evening at Vallozzi's Restaurant in Pittsburgh, Pacella, where he then made an explicit demand for compensation in exchange for keeping the Confidential Disclosures secret.  Specifically, Pacella made a reference to the 2014 assault, including details which Pacella could only have learned from the perpetrator of the assault (an associate of Pacella's.) Pacella ominously said that he assumed Østvik would not want any further issues at a time when his young family was just getting started.  Pacella then immediately changed the subject to his equity compensation package, which Pacella now viewed as inadequate even though he had only been an employee a few months and previously had said Østvik had been "generous with [his] equity" to Pacella. Pacella now demanded that he be "plus'd up."

58.     Having observed Pacella's anger, apparent substance-abuse problems and mania, and due to Pacella's explicit and implicit threats, Østvik said that he would consider Pacella's demand and attempt to work something out. In retrospect, it is now clear that Pacella devised a plan of extortion that would include theft of corporate assets to attempt to wrest control of the companies.

        Pacella Recruits the Edelson Defendants into the Conspiracy

59.     For the next several months, Østvik sought to keep Pacella placated and kept him

13

in his employ (while trying not to yield to Pacella's January demand). In the spring of 2017,
Pacella was working as counsel on documents for Ecogensus financing.  Pacella reached out to
his college friend, Melnik, who had received a significant financial windfall and wanted to him
to become involved in Ecogensus to make more money.

60.  ████████████████████████

*61.*    Melnik had sent a message to Pacella saying "Let's rage", after which Pacella said
to Melnik "I need a million for my next one. Will make you ten*."*

62.    Within a few days of Pacella and Melnik first discussing an arrangement, Pacella
arranged for Melnik to have access to confidential materials on May 8, 2017. That same day
though, Østvik had signed a deal for VPEF and a few days later spoke at an international
conference related to VPEF's activities. Suddenly, Pacella wanted Melnik to also receive
interests in VPEF. Østvik declined, saying he would only consider a loan transaction at
Ecogensus. This would then start a year and a half long effort for Melnik and Pacella to acquire,
for Melnik, an equity ownership stake in VPEF.  Pacella handled the negotiation, diligence, and
closing of the transaction between Ecogensus and Melnik.

63.    At or around May 2017, Pacella also began to urge Østvik to hire the Edelson
Defendants as his personal counsel.  The Edelson law firm is based in Chicago, where Pacella
practiced law for several years, but Pacella said he did not know Defendant Edelson. Pacella sent
Østvik a message on May 26th, 2017 trying to head off any concerns that Pacella was once again
hiring his friends, saying "Bro found this guy randomly at midnight and I thought I hope he takes
it…he is awesome." Thirty-nine minutes later, Pacella wrote to Østvik "Hire these guys right
now. It will make them feel good. The other lawyers are too conservative and typical."  Pacella
insisted Østvik speak to Jay Edelson that afternoon. Østvik agreed to an introductory call.

Edelson emailed a proposal immediately after the call, suggesting that Østvik pay reduced hourly fees but pay Edelson a 20% success fee. At no time did Pacella tell Østvik that he would be entitled to any referral fee from the Edelson Firm. However, it later became clear that his exuberance about working with the firm was motivated by unethical financial gain.

64. █████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ .

65. On June 5th, 2017, Pacella sent Østvik a message saying "Melnick in", referring to the fact that Pacella and Melnik had reached an agreement regarding the loan agreement between Melnik and Ecogensus.

66. Approximately two weeks later, Pacella arranged meetings for Østvik in Chicago with both Melnik and Edelson. After arriving in Chicago though, Pacella informed Østvik that Pacella would be meeting with Melnik alone but that Østvik would meet with Defendant Edelson and Defendant Richman for a legal consultation.

67. Although the consultation with the Edelson Defendants required Østvik to reveal many of the Confidential Disclosures, he made sure to instruct Edelson and Richman to maintain strict confidentiality of all information being discussed. Obviously, as attorneys everything is confidential, but Østvik acted in an overabundance of caution. Østvik stressed that if he moved forward with an engagement, the Edelson Defendants would have to agree – just as Østvik's lawyers handling the investigation had agreed – not to put anything in writing regarding the Confidential Disclosures. Edelson agreed not to put any of this information in writing.

68. In retrospect, Østvik now understands it was a mistake to reveal just how concerned he was about the Confidential Disclosures going public. But, he had every reason to

believe that as officers of the court, the Edelson Defendants and Pacella would maintain confidentiality.  When he made the disclosures to Edelson and Richman in June 2017 (just as he had to Pacella a few months earlier), Østvik explained in detail the very ramifications he was afraid of and unwittingly provided his audience with the fodder for this scheme.

> The Edelson Defendants' Begin Wide-Ranging Representation of Østvik and his Companies; Pacella Formalizes Melnik High-Yield Loan to Ecogensus

69.     Østvik entered into an agreement with the Edelson firm on June 20, 2017 in connection with a wide-ranging matter to which the Confidential Disclosures were an important component, with Østvik also including his companies to the engagement as well.

70.     On June 23, 2017, Melnik sent a message to Pacella regarding his upcoming financial windfall, of which he had lined up a portion to be loaned to Ecogensus to earn a high interest yield and obviously to gain a solid position to infiltrate the company.

71.     On June 30, 2017, Melnik sent a message to Pacella saying "They actually are p DTF cute guys lol", to which Pacella responded "Don't forget to wire Monday if you want in – the exclusivity provision prevents us from raising debt after we sign. Need to sign by Monday COB UK time before offer expires. If you already wired disregard. Btw just seeing that second text exchange…DTF college girls??? You are living the dream." Melnik replied to Pacella: "It'll be there Monday. It's past the deadline to get in today."

72.     Ecogensus' successes were increasing in July 2017, but Østvik also was beginning to observe Pacella unravel. Østvik told Pacella that Ecogensus' first patent was going to be granted soon, due to an allowance by the patent examiner. Ecogensus was also negotiating a European license agreement that month, on which Pacella was working on the legal drafting. Pacella began to encourage a salary increase for Østvik, suggesting that a certain increase would be "very cheap [to the company] frankly for what you do." Pacella then encouraged Østvik "yeah

16

just do it bro. You deserve it. It's very cheap." Østvik elected not to increase his salary though.

73.     Pacella's increasing volatility and proclivity for anger was on full display following a meeting that took place in New York City on July 13, 2017. Pacella became angry at Østvik and said he was still expecting an equity "plus up" that was the subject of his extortive demand in January at Valozzi's restaurant. Pacella was angry that Østvik had not acquiesced and warned that he was growing impatient. Pacella started screaming and then called Østvik a vulgar expletive that has strong misogynistic undertones. Østvik was shocked and said this behavior was absolutely unacceptable. Pacella later apologized, explaining that he was particularly stressed that day because he had found out that his grandmother's elderly friend was sick. In the days following this incident, Pacella was contrite, and sent a series of complimentary messages to Østvik, saying for example "thanks for all you do!"

74.     Three days later, on July 16, 2017, Pacella informed Østvik that he had been arrested the day the previous night for Driving Under the Influence. Pacella wrote to Østvik "I had three beers," Pacella explained that he was "All good" because Law Firm Partner 1 was getting a referral for Pacella. Two days later, Pacella informed Østvik that the prosecutor had reduced the charges to "careless driving of a golf cart" and that he was now "all good." Pacella then wrote that "the US attorney referred [Pacella's lawyer] so he wants the good graces." Østvik asked if Law Firm Partner 1 had referred him to the US Attorney and Pacella wrote back "I used some chits on this one." Pacella went on to write "Said I'd get [Governor] Nikki Haley to weigh in if needed. Worked out well." In 2018, Pacella would remind Østvik of this incident as an example of his ability to exert influence and threaten Østvik.

75.     Pacella knew at this time that Østvik was considering terminating him. Since his termination would prevent the Pacella/Edelson Enterprise from enacting their conspiracy, Pacella

increased the level of his contrition and also sought to remain in Østvik's good graces so as to

disarm him. For example, on July 22, 2017, Pacella wrote to Østvik randomly in the evening

██████████████████████████████

The Pacella/Edelson Enterprise Lay the Groundwork

76.     As of July 2017, the Edelson Defendants had commenced work representing

Østvik on the confidential unrelated legal matter. On July 28, 2017, Østvik explained that he was

concerned about his adversaries' retaliation, and Pacella wrote, citing the Confidential

Disclosures, that Østvik should be entitled to $25,000,000.  It would later become clear the

Pacella/Edelson Enterprise was highly focused on this approximate value range and sought to

maximize how much of it they could extract from Østvik. Pacella described specifically that a

jury would award this level of damages "999 times out of 1000". It is not coincidental that

several weeks later, Defendant Edelson would begin pressuring Østvik to pursue this level of

damages in a public manner, knowing Østvik did not want this. As Østvik's concerns continued

about the Confidential Disclosures, Pacella sought to keep Østvik's trust and confidences,

writing "This is never going public."

77.     Following the events of July 2017 and sensing Østvik was trying to distance

himself, Pacella undertook uncharacteristically proactive work projects during the fall of 2017.

For example, on September 11, 2017, Pacella wrote to Østvik that "Part of my baby gift is the

100K in tax distributions that no one told you about." Pacella was referring to various tax

liabilities that Østvik had been incurring and paying, but not being reimbursed for, however in

fact Østvik's accountants and outside corporate counsel had already brought this to Østvik's

attention. Østvik ended up only receiving a small portion of those tax reimbursements, instead

deferring them so the company had greater amounts of growth capital available. The same

month, Pacella took it upon himself to evaluate the company's orders pipeline and growth projections, doing his own economic modeling, and praising Østvik for his ability to bring the "theoretical" to "actual." Pacella also described that his own assessments showed an expected 9-figure operating income level by 2019 (which would likely imply a valuation exceeding $1 billion), stating "I just did a de novo look in a way I thought was reasonable."

78.     As Pacella was assessing the increasing value of Østvik's companies, he was keeping the Edelson Defendants informed. That month, Defendant Richman previewed what would become a recurring and ominous theme in the extortion against Østvik. On September 13, 2017, Richman discussed a supposedly hypothetical scenario with Østvik.  Richman ventured that if an attorney is in possession of sensitive information about a client that was learned under privilege, and that client files a legal complaint against the attorney seeking justice, then the client will have broken privilege and the attorney is free to publish the sensitive information about the client. Østvik wrote to Pacella that this seemed against public policy, and that in theory then any attorney could always extort their clients without limitation as soon as they learned one piece of damning or personal information that the client did not want released. Pacella wrote back to Østvik not to worry about it and that Defendant Richman was overstating.  It is now apparent that the statement was a veiled threat calculated to ensure that the Edelson Defendants would not be sued for the conspiracy to extort in which they were engaging unbeknownst to Østvik.

79.     As part of the representation, the Edelson Defendants embarked upon a negotiation process attempting to reach a resolution on Østvik's behalf.  Pacella and the Edelson Defendants began communication directly, without copying or informing Østvik, despite his repeated requests to the contrary. Around this time, elements of the scheme were starting to

come further to light. Despite that Pacella wrote to Østvik "█████████████████████" referring to the unrelated legal matter for which Pacella and the Edelson Defendants were Østvik's attorneys, he remarkably attempted to push Østvik to use a substantial portion of the proceeds to pay his friend Melnik. At the same time, Pacella also quipped that Østvik could pay Pacella a bonus too and sent a graphic of a person holding their hands out as if to receive something. Østvik ignored the comment.

80.      Østvik had grown uncomfortable with both Pacella and the Edelson Defendants, due both to Pacella's shocking comments as well as Defendant Edelson's constant pressure on Østvik to pursue public litigation.  In fact, Edelson ██████████████████████ ██████████████████████████████████████████████ ████████  When Østvik sought advice from Pacella privately, Pacella wrote back that although Edelson is a███████████████████████████████████████ ████████████████████████████████████████ Indeed, it is now clear that the Edelson Defendants and Pacella realized that a change of counsel would thwart the conspiracy. Indeed, Pacella had warned Østvik in writing that he would not want Defendant Edelson "████████████████████████████████████

Defendants Seek to Capitalize On Plaintiffs' Burgeoning Success

81.      Østvik was realizing growing successes in the last few months of 2017, including the issuance of a major patent related to a proprietary fuel composition that Østvik had created and assigned to Ecogensus. Østvik was also further laying the groundwork for VPEF's successes, and the Pacella/Edelson Enterprise wanted to be involved.

82.      Defendant Richman recommended to Østvik that the Edelson Defendants serve as commercial litigation lawyers to VPEF in its commercialization (having learned the details of

20

Østvik's market strategy), stating ███████████████████████

83.     On December 2, 2017, Pacella once again sought to give Melnik an equity stake in VPEF, sending Melnik a message "Do you want a piece of our facility development company [VPEF]?" Pacella did so unprompted without seeking Østvik's consent to do so. Pacella also knew that Østvik had declined several months earlier to allow Melnik to purchase equity in VPEF. Specifically, Pacella sought to sell a $500,000 portion of VPEF to Melnik.

84.     A few weeks later, Pacella wrote to Østvik that Law Firm Partner 1 was "very juiced up" about what Østvik's businesses would be doing in 2018 and that he was leaving for a new firm. Around the same time, Pacella revealed that Law Firm Partner 1 was Melnik's counsel as well.

Østvik Reaches a Resolution; Edelson Is "Furious" At Østvik

85.     By late 2017, an initial mediation session had occurred regarding the unrelated legal matter, represented by Pacella and the Edelson Firm unsuccessfully.  Following this, the Edelson Firm increased their pressure on Østvik to pursue litigation, but Østvik was unwilling to do so. Not yet understanding the conspiracy, Østvik repeatedly confided in Pacella regarding his frustrations and desire to find alternate counsel, but Pacella reiterated to Østvik that it would be a "mistake" to switch counsel.

86.     Pacella continued throughout 2017 to push for Østvik to receive a substantial raise, heaping praise on him. Pacella wrote to Østvik "you work harder than anyone I know and are vastly under compensated. Also pay yourself a year end bonus". Pacella suggested a specific bonus amount that Østvik should receive that year and declared that as his counsel, he could confirm Østvik could receive it "without one ounce of anxiety legally". Pacella went on to tell Østvik "you worked hard as fuck this year and did so much. You have never [been] paid a bonus.

Take the raise immediately and take the bonus." Then Pacella declared "you are the least greedy person I've ever met."  However, Østvik did not increase his salary then or later and ultimately only receive a portion of the bonus payments Pacella had advocated, which to date is the only bonus Østvik has ever been paid in the company's 7-year history. On the day Østvik was paid this one-time bonus, Pacella wrote "Congrats on your bonus today btw. You deserve it!"

87.     Yet, after several months of persistent, unsolicited encouragement pushing Østvik to increase receive higher compensation in numerous ways, Østvik declining every time except for a single one-time bonus, Pacella then seized on this. Indeed, Pacella attempted to turn his own legal advice and encouragement against Østvik, implying he would make a false unjust enrichment claim in litigation unless Østvik paid Pacella, in cash, thirty times (30x) the amount of Østvik's bonus to prevent Pacella from making public allegations in writing. The Pacella/Edelson Enterprise indeed made reference to this single bonus paid to Østvik as one of Pacella's supposed "concerns" that he hoped to not have to put in writing unless he was paid seven figures worth of cash and granted millions of shares of equity. Pacella failed to acknowledge that he had actually receive the exact same amount in bonus payments earlier that very year, several months before Østvik.

88.     On March 11, 2018, Østvik told Pacella that he was ready to switch counsel. Pacella issued a threat on behalf of Edelson, warning Østvik that it is "Not great to have a dispute with crazy litigators." Østvik wrote back "It'd be better for you to focus on helping me be heard by Edelson than scaring me in standing up for what's right." Despite the strong objections from Edelson and the Edelson Firm, a second mediation session was scheduled in Chicago in late March 2018.

89.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

90.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

91.     The second mediation session occurred as scheduled and resulted in a quick resolution for Østvik. The Edelson Defendants quickly produced a rushed, short settlement agreement which Østvik was to sign there before leaving. Edelson was angry and told Østvik that he should have sued and not been so worried about the Confidential Disclosures, and, shockingly, that Edelson only took Østvik's case because Pacella was involved.

92.     Thereafter, Pacella told Østvik that the Edelson Defendants were "furious" at the result and discussed with Pacella that Østvik cost them a substantial contingent fee, believing the settlement would have been $20,000,000, closer to the amount Pacella had predicted in in July 2017, had Østvik focused more on monetary gain.

93.     Defendant Edelson insisted that Østvik ride with him in Defendant Edelson's private chauffeured Maybach. When Østvik remarked that he felt rushed by the settlement agreement and that he was confused about what the next steps would be from an accounting standpoint, Defendant Edelson told him to be in touch with Defendant Richman.

The Pacella/Edelson Enterprise Ramps Up Its Campaign of Threats And Intimidation

94.     After Østvik had been dropped off at the airport, Pacella stayed in Chicago and went out drinking with Defendant Richman that night and plotted their next move.

95.     In what Plaintiffs later learned was part of a plan conceived of and executed by

23

the Pacella/Edelson Enterprise, Pacella pushed Østvik to come to a meeting a couple of weeks later, early April 2018, in New York City. The meeting would be with Law Firm Partner 1, who had now moved to a new firm. It was an odd premise, because Østvik was going to see Law Firm Partner 1 the following week in Chicago anyway. However, Pacella strongly insisted that Østvik come to New York City for a separate meeting with him and Law Firm Partner 1, who he said would be flying in for the meeting.

96.     This was the first time Østvik had seen Pacella since Pacella's outing with Defendant Richman. After Pacella and Østvik had each arrived in New York City on April 5, 2018 and checked into their respective hotels, Pacella told Østvik that Law Firm Partner 1 would not be making it due to being called for jury duty. Already in New York, Østvik agreed to meet Pacella for a dinner to discuss next steps with the business.

97.     Immediately when Østvik met Pacella, it became clear that Pacella had another agenda. Pacella described that he had discussed matters with Defendant Richman two weeks prior. Pacella then warned Østvik that he could "bring down" Østvik and his companies.

98.     Over the course of the evening meeting, Pacella repeated the prior threats that unless Østvik gave in to his demands, he would "destroy" Østvik. Pacella emphasized that he was "very close" to Defendant Richman and that they remained angry that Østvik had been so sensitive about the Confidential Disclosures and pursuing litigation.

99.     Pacella also told Østvik that Defendant Edelson felt deprived of publicity he could have earned if Østvik had not been so private. Pacella began pressuring Østvik to purchase a watch for him, testing the waters to see how far he could push Østvik.

100.     When Østvik attempted to turn the conversation toward business, Pacella became enraged, screaming threats and obscenities at Østvik and saying that he "should get a piece of

everything [Østvik] makes." At one point, Pacella physically pushed Østvik and screamed that he, Pacella, had an uncle in the Mafia and that Pacella himself hoped to become a "made man." Pacella warned Østvik that any future references to Pacella's family would be a code that meant he was referring to his Mafia family member and that Østvik's safety was at stake.

101. That evening, Pacella showed Østvik a Maserati key. Østvik asked "You got a Maserati?" Pacella replied "YOU got me a Maserati", implying that Pacella had already made an expensive purchase expecting to be successful in extorting Østvik on his trip to New York.

102. After Pacella assaulted Østvik and threatened him in New York City, Pacella wrote a few days later to Østvik "if you are going to terminate me for cause or something, I would not like be okay with that". Yet, Pacella knew that he would be unsuccessful in a legal challenge and wrote that he "won't fight" the 'for Cause' termination. Instead, Pacella continued issuing threats and demanding money payment.

103. Østvik's settlement proceeds were due to arrive soon after the trip to New York City. Rather than use an escrow agent for the settlement proceeds, Edelson had insisted that they receive the funds, withhold a portion for themselves, and release the amount they determined to be due to Østvik. Defendant Richman kept Pacella, but not his client Østvik, informed of every detail of the funds status and the timing, which enabled Pacella to time his pressure towards Østvik. Østvik sent messages to Pacella stating that Defendant Richman was ignoring him for over a week and a half, but then Pacella stated he was in constant contact with Defendant Richman and said that Østvik could receive a status update by communicating through Pacella (despite that Defendant Richman represented Østvik personally). This fact alone is shocking, that the Edelson Defendants refused to be available to Østvik regarding the status of Østvik's money, for whom they were a trustee, yet all the while were in constant contact with Pacella keeping him

apprised of the status. Østvik sought to confirm that this was the case, writing to Pacella "Something weird is going on with Edelson. I've been trying to get in touch with them for a week and a half re accounting." Pacella responded "What's the issue? Ben just texted me so can call him."

104.     On the day that Pacella told Østvik that Defendant Richman would release funds, Pacella demanded to speak to Østvik. In the early afternoon, Pacella sent a message that "Wire just hit", referring to the Edelson Defendants having received funds (but not yet sent to Østvik). Østvik was both traveling for work out of state, which Pacella knew, and Østvik wrote to Pacella that he had to deal with an emergency that had happened to his wife (who had received troubling medical news).   Pacella feigned sympathy but then hours later became aggressive and hysterical that Østvik had not yet been available to speak to Pacella. Pacella wrote that he was "freaking out". Pacella wrote to Østvik reiterating his threats from New York City, writing that he expected a payment that week and making references to "anxiety in the household over here".

105.     Pacella's harassment continued and Østvik finally responded, referencing the assault and threats days earlier: "When you threaten to ruin me and my family (amongst even worse things) then it's better to give me a few days, esp given what I'm going through with [Østvik's wife], then start freaking out about wanting money." Pacella coldly replied with his familial code, saying only: "I have to take care of me family" (sic).

106.     Several hours later, Pacella attempted an odd conciliatory approach, writing "Listen bro, I have read a ton about this tonight. The Xanax for the anxiety that I took right before coming out [to New York City] caused me to lose my brain."

107.     Pacella issued his specific threats the next day when he spoke to Østvik by phone and saw him in person, saying he would exit his employment as Plaintiff's attorney and leave

26

Østvik alone but only if his demands were met. Pacella threatened:

    a)  that Confidential Disclosures would be made public;

    b)  that Østvik's safety was at risk;

    c)  that he could sabotage certain important pending deals of Østvik's businesses;

    d)  that Melnik could become "problematic" for Østvik.

108.    In order not to carry out these threats, Pacella would need Østvik to personally pay him substantial portions of cash from Østvik's settlement proceeds immediately and provide three months of salary, plus play along with Pacella's intent to make it appear Pacella left the businesses on his own. Østvik did not consent to the deal but asked for time to think about it.

109.    Pacella had warned Østvik that he could use his position as Østvik's lawyer in order to inflict harm. On April 16, 2018, Pacella accidentally caused his mobile device to send an alert to Østvik that caused Østvik to realize that Pacella was copying privileged conversations.

110.    Pacella reiterated his demand for payment and threats for several more days, including over a series of messages between April 17 and April 20, 2018.  On April 18, 2018, Østvik wrote "I feel very threatened by yesterday's conversation, explicitly and implicitly. In the context of Thurs in NYC, it just adds to my concern." Østvik wrote, "your continuous anger and pressure and legal comments are really making me worried. Every conversation since Thurs, when YOU threatened me, has nevertheless been about what YOU want."  Østvik pleaded that "you couldn't even give me a few days space to absorb everything while dealing with personal family emergencies that I told you about", and then Østvik asked to talk to Pacella "this time without your anger, without the pressure on paying you money". Pacella wrote back: "re [Østvik's wife], I reacted like a dick because you had said my finances weren't your problem and it made me angry – it wasn't nice and I'm sorry." Fifteen minutes later Pacella sent a follow up

message trying to explain his behavior: "Maybe I'm going crazy man I don't know I wouldn't fuck you though."

111.    Pacella made it clear though he was not going to relent and that although the Edelson Defendants had received a substantial amount of fees, both Pacella and the Edelson Defendants believed it could have and should have been much more. Østvik eventually capitulated and paid Pacella $228,000 in an effort to buy Pacella's silence and protect himself from the threats of violence, the threat Melnik posed, and the other threats made by Pacella.. Pacella said the funds would be structured as a retroactive personal legal services bill, with Pacella sending an engagement letter and an invoice together on the same day. In order to cover his tracks, Pacella's engagement letter said "My policy at the outset of an engagement with a client is to outline not only the nature of the engagement, but also the basis on which I will provide legal services and bill for them." Pacella post-dated the engagement letter to August 1, 2016 even though he first drafted and sent it on April 19, 2018. Pacella's invoice simply said it was for "Legal Services Rendered" and that $228,000 was due from Østvik to Pacella personally.

112.    In exchange for this payment, Pacella agreed that he would stop the threats, not hurt Østvik, Melnik would not cause problems, and Pacella would not sabotage any of Østvik's business initiatives. Pacella agreed that he would depart from the companies after three more months of salary payments.

113.    When Østvik transferred the funds to Pacella, he taunted Østvik sending a message on April 23, 2018 saying he and his wife had caviar and Dom Perignon champagne thanks to Østvik.

114.    On May 2, 2018, Pacella wrote that "Melnick will want to keep in through December", referring to Melnik keeping his Ecogensus debt outstanding through December

28

2018. Pacella then restructured the payment obligation. Two months earlier, Ecogensus had repaid the only other debt the company had, so Melnik would then be the only debt holder for the remainder of the year. Not coincidentally, Pacella, refused to cease his role as general counsel after the three month "termination window" elapsed in July 2018, instead engaging Østvik in additional discussions concerning his ongoing role, hinting that he could do harm to Plaintiffs' businesses if he did not receive additional funds. Pacella made references to Plaintiffs' deals going "sideways" if he exited the company during July and August 2018, continuing the threats. Pacella continued to remind Østvik that Melnik would become problematic if Pacella departed. Pacella requested, and Østvik paid, additional months of compensation.  During this time Pacella sought to ingratiate himself with Plaintiffs' customers, investors and Board members in order to strengthen his bargaining position.

115.     After Pacella's successful extortion, Pacella caused evidence in his possession to be destroyed. Pacella bizarrely sent Østvik a picture of Pacella's company computer badly damaged. Pacella said that his friend "chucked my computer bag off his roof last night like a fucking idiot" and then declared that it was "unsalvageable." Østvik became very concerned about the destruction of the files and to this day, Pacella has not returned Plaintiff's computer nor confidential company files in his possession. Pacella sought to assuage Østvik by stating he "backed up all of our shit two months ago so we are good on computer", referring to the time period of the April 2018 extortion when Østvik caught Pacella making duplicates of privileged conversations. Yet, Pacella to this date has not returned these company files.

116.     Despite that Pacella's original demand had been for Østvik to keep him as an employee for three months following the April 2018 termination for Cause, Pacella had continuously demanded one-month extensions to secure alternative employment. In October

2018, Pacella finally said his other employment opportunity was ready, and he agreed to stop being an employee, instead reducing his role to an independent contractor for a period of time as he transitioned out. Pacella emailed Østvik that he was making preparations "in connection with transition to 1099".

The Pacella/Edelson Enterprise Set Themselves Up to Continue Extorting Plaintiffs in 2019

117.    Around the same time frame, on December 8, 2018, Østvik learned that the Edelson Defendants asked Pacella to run a litigation financing fund in conjunction with them, which would give the Edelson firm substantially more fuel to pursue their lawsuits. When Østvik asked about this, Pacella wrote that he first tried to refer the Edelson litigation fund idea to other law firms for structuring assistance, such as Greenberg Traurig LLP and Winston & Strawn LLP, but that "no law firms will touch [Edelson] w a ten foot pool" (sic).  Pacella claimed at the time that he "declined" to work on the litigation fund with the Edelson Defendants even though they would "crush it", but Østvik would learn in the summer of 2019 that the Pacella/Edelson Enterprise was in full pursuit. Adding insult to injury, they actually wanted to exploit Østvik's successes to adopt a track record for themselves as fund managers – in order specifically to raise the litigation fund. That would come later though, as Pacella first sought in December 2018 to maintain leverage over Østvik.

The Melnik Loan

118.    In order to secure this continued leverage, Pacella and Melnik acted in concert, demanding Østvik pay back Melnik's loan to Ecogensus in full but seeking to arrange for Melnik to acquire a portion in VPEF. Pacella had been attempting for a year and a half to arrange for Melnik to obtain equity in VPEF and now sought to obtain for him the exact amount that he had sought since December 2017.

119.    On December 20, 2018, Melnik was repaid the entire principal of his loan to Ecogensus, in the amount of $850,000, plus interest in the amount of $295,890 for a total of $1,045,890. In advance of this payment, Defendant Pacella prepared the final repayment calculations and sent them to Melnik on December 6, 2018. In this email, Pacella forwarded what he calls the "payoff letter and payoff calculations", requesting that Melnik send along his wire instructions, and congratulating Melnik for the "mutually successful investment."

120.    In this same email, Pacella also attached a draft VikingPeak subscription agreement for Melnik's review, which he signed.

121.    Pacella then coordinated with one Ecogensus Board member to force and trick Østvik to accede to one-sided financing terms. First, the Ecogensus Board member demanded Østvik personally provide money to the company in order to show support to the company. Then, after Østvik had wired money to the company, Pacella coordinated with that Ecogensus Board member to make a last-minute switch in the lenders' structure, against the company's interest, to a strange and unorthodox capital structure in which each investor in the lender's fund had direct, equal and competing secured interests instead of the planned structure.

122.    Østvik wrote to Pacella that if he "███████████████████████████ ██████████████████████████████████" Frustrated, Østvik said this was ██████████████████████████████████. Pacella wrote to Østvik "███████████████████████". A few months later as those loans became due, it was Pacella – Østvik's own lawyer - who began ████████████████████████. Østvik would also later learn that Pacella had made arrangements with the Board member to secretly provide rights to extra future equity, which Pacella accomplished by secretly hiding a bonus warrant grant in the "Miscellaneous" section of the loan documents (but not the actual warrant

grants document concurrently signed by the lenders). In order to deceive Østvik, Pacella told

Østvik that the documents were the standard documents the company had used in the past, and

Østvik never thought to search for a secret warrant grant hidden in the boilerplate section of the

loan document. Østvik only became aware of it nearly a year later, when that Board member told

Østvik about it and showed him.

123.    After Pacella's aligned Board member had forced this loan structure, Østvik

began thinking about ways to placate Pacella in a way that Østvik could be freed from Pacella's

ongoing threats and intimidation. Trying a different approach in late March 2019, Østvik

proposed that Pacella take a role at a new subsidiary that Østvik would form. Østvik's hope was

that Pacella would become busy with this project and stop his daily involvement with Østvik's

activities. However, Østvik would then discover new information that informed him this plan

would never succeed in freeing him from Pacella.

<u>The Pacella/Edelson Enterprise's Scheme Unravels</u>

124.    In early 2019, as planned, Pacella had become a contractor on a month-to-month

basis providing legal services, rather than an employee.

125.    ███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████.

126.    ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

127.    In May 2019, Pacella also learned that a confidential Ecogensus fuel demonstration had been successful and that VPEF had acquired a significant interest in a major logistics company that provided a strategic market advantage. In the case of the acquisition, Pacella had provided legal services that consisted of reviewing contract documents and, therefore, was aware that this transaction (between private companies) needed to remain confidential, yet was extremely valuable.

128.    Pacella wrote to Østvik that month, "It is almost freakin me out how great everything is [right now]". A few days later, Pacella described how many company stakeholders were excited about the company's developments and Pacella said of the fuel demonstration "it's gigantic bro".

129.    Sensing Østvik's distancing, Pacella scrambled to further entrench himself by promising he was going to close a VPEF project financing and announced that he wanted the Edelson Defendants to be involved with VPEF's strategic acquisition of a business. Ironically it was Pacella's ultimate failure in these two specific projects that the Pacella/Edelson Enterprise, including Melnik, would later reference in demanding cash payments to Melnik.

130.    ████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████.

131.    ██████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████

132.    ██████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

133.    █████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

134.   Upon having had his secret activities discovered, Pacella launched a verbal tirade against Østvik, once again threatening to destroy him by publicizing the Confidential Disclosures.  To Østvik's shock, Pacella said, in particular, that he looks forward to "sitting on a beach drinking mai tais" when Ecogensus is worth several billion dollars and discussing how much more of it Østvik will give to Pacella. Pacella had no right to such equity, and in fact his entire stake was forfeited upon termination. Østvik had no intention of granting any new equity, so after this conversation, Østvik made a plan to distance himself from Pacella while exploring legal options for protecting himself.

135.   The Pacella/Edelson Enterprise did keep pressuring Østvik for the remainder of July 2019 as Østvik distanced himself. In particular, Pacella told Østvik that Defendant Edelson wanted to be given free equity at VPEF. On learning that Østvik was planning to create a fund for acquiring high value assets, Pacella wrote to Østvik on July 20, 2019 asking for Defendant Edelson to be listed as a lawyer and operating partner for Østvik's fund. Pacella explained that Defendant Edelson' intent was to create a perception that he had a personal track record in fund management, so the Pacella/Edelson Enterprise would be more likely to have success raising their planned litigation fund.

136.   Pacella also told Østvik that the Edelson Defendants wanted to individually acquire a portion of Østvik's highest value acquisition being pursued at the time and also have an economic interest in a planned "NYC-area" acquisition. On July 23, 2019, Defendant Richman sent a message to Pacella and Østvik saying they were ready to invest and requested documents.

137.   Østvik did not reply to Defendant Richman's message and did not list Defendant Edelson on his presentation materials. Sensing Østvik was distancing himself, Pacella frantically made one more effort to advance the VPEF project financing with the group he had introduced,

but Østvik told him he wanted to take it a different direction.

138.    Østvik was out of contact from the Pacella/Edelson Enterprise in the first half of August. Pacella grew angry and frustrated, sending 23 text messages to Østvik, including very lengthy ones expressing his anger. During this time, Østvik only sent 3 short messages to Pacella, saying he was busy. First Pacella made a variety of attempts to catch Østvik's attention including claiming that the Edelson Defendants and Law Firm Partner 1 were frustrated with Østvik, but that Pacella could help. Østvik did not take the bait.

139.    On August 15, 2019, Pacella attempted to extract some more final payments from Østvik. He sought payments of $20,000 to be paid "tonight" and then claimed "At that juncture, only thing open from my end are expenses I've been holding onto forever."

140.    When Østvik did not respond, Pacella sent a string of messages, including one that said Østvik's distance "has added so much stress to my family."

141.    Pacella then wrote to Østvik, mentioning the "NY issue" and "3 month termination window", exclaiming he has a "clean conscience". Pacella sent a final message to Østvik saying he understood he was terminated and would "reach out with final invoices, expenses and equity understanding". But Pacella never did. Pacella never returned his company computer nor confidential files owned by Plaintiffs.

142.    At the time of his termination all unvested Incentive Units were forfeited by Pacella, pursuant to the Incentive Grant Agreements.

The Pacella/Edelson Enterprise Threaten to Disclose Sensitive Information Unless Østvik Pays Them

143.    Pacella remained in contact with one of Østvik's investors, from whom he learned that Østvik was meeting on August 27, 2019 with one of Plaintiff's capital partners regarding the next phase of their successful venture. Pacella had performed a legal review of documents that

effectuated this venture in May 2019. Angry that Østvik was trying to move forward with a post-Pacella/Edelson life, Pacella accessed Plaintiff's computer system on August 26, 2019, pretending to still be the company's counsel to a third party, while sending a veiled threat to Østvik.

144.     On August 27, 2019, the Edelson Defendants then sent a letter, on behalf of Pacella, timed to coincide with Østvik's celebratory dinner with the capital partner. The letter was sent to Law Firm Partner 1 and another person, who Pacella each called beforehand to coordinate. The letter claimed that now the Edelson Defendants – Østvik's attorneys – were instead Pacella's attorneys. The letter attempted to recharacterize Pacella's termination as Pacella's choice. In a blatant disregard for multiple attorney ethics rules, the Edelson Defendants sought to discuss with Law Firm Partner 1 payments and company equity grants that they wanted Østvik to make to Pacella.

145.     Law Firm Partner 1 then began a campaign, on behalf of Pacella, to convince Østvik to pay Pacella "to go away." Law Firm Partner 1, no doubt mindful of his own serious violations and liability, warned Østvik that "everyone will get hurt if you fight Pacella". Law Firm Partner 1 also told Østvik that the letter came on Edelson letterhead, when the Edelson Firm was Østvik's attorneys, to "send a message".

146.     The Pacella/Edelson Enterprise, in coordination with Law Firm Partner 1, worked to increase the pressure on Østvik later in September. Pacella was in contact with two Ecogensus Board members attempting to foment concerns about Østvik. On September 18, 2019, Law Firm Partner 1 requested to meet Østvik, which Østvik agreed to. Law Firm Partner 1 had told Østvik everything Østvik told him would remain confidential and that Østvik was his client. Law Firm Partner 1 repeatedly tried to extract a specific dollar figure that Østvik would pay to Pacella in

order to not get any more trouble. Østvik realized that Law Firm Partner 1 had been sent by

Pacella, so he asked Law Firm Partner 1 if he could keep Pacella from doing anything impulsive

or destructive. Law Firm Partner 1 responded "We will take care of it."

147.    The following day, September 19, 2019, the Pacella/Edelson Enterprise would lay

out their extortion demands in writing. That day, an Ecogensus Board meeting took place. Østvik

immediately realized that Pacella had been in touch with two of the Board members (which they

later would confirm) to give the false impression that things were not going well at the company.

At the Board meeting, Østvik discussed many of the successful ventures underway at the

company and the Board discussed raising capital with a planned closing no later than the

Christmas holiday in December (2019). Law Firm Partner 1 was present at the meeting as well as

the Board member who continued to be in touch with Pacella throughout the fall and in 2020,

with whom Pacella had coordinate the unorthodox loan structures earlier that year.

> The Edelson Demand Letters and Destructive "Preservation" Letters

148.    Only a few hours after the Board meeting, the Edelson Defendants sent Plaintiffs

a letter dated September 19, 2019 demanding payments to both Pacella and Melnik referencing

the very matters for which Østvik was their client. Pacella knew from weeks earlier that the

company was in the midst of launching its new flagship product and a strategic capital fundraise,

and Østvik had discussed the details around timing at the Board meeting. The demand letter

threatened to make legal filings unless Østvik made an immediate enormous cash payment,

personally, to Pacella. The letter further stated that Pacella wanted large payments from each of

Østvik's companies, but not right away like the personal payment by Østvik, rather the company

payments were demanded no later than December 31, 2019. This timing of course was intended

to align with the capital raise, the timeline of which had just been discussed at the Board meeting

hours earlier.  The Edelson Defendant's letter demanded a grant of millions of shares in

Ecogensus and VPEF. Finally, the letter demanded payments to Melnik and discussed fees

allegedly due to Law Firm Partner 1.

149.    Perhaps most shocking of all, the letter from the Pacella/Edelson Enterprise

demanded that Østvik personally send an amount which they calculated to be the portion

remaining for Østvik from the settlement proceeds, after the previous year's payments to the

Edelson Defendants, Pacella and other legal fees. Put differently, after Østvik had placed his

trust in the Edelson Defendants and Pacella to seek justice for himself, the Pacella/Edelson

Enterprise now returned to attempt to extort Østvik – their own client – of every last dollar he

received in damages specifically from the matter they represented him in.

150.    Pacella was not entitled to this personal payment from Østvik – nor had ever

previously requested it – but the Edelson Defendants were so brazen that they did not care to

offer even so much as a false basis for why Østvik should personally pay this amount of money

to Pacella. Instead they simply described a large figure dollar amount to be paid personally by

Østvik to Pacella, in order to prevent the Edelson Defendants from making unrelated legal filings

about the companies, and warning they would contain Pacella's vague and unsubstantiated

"concerns" about the company – in the middle of a capital raise on a short timeline. The

Pacella/Edelson Enterprise's extortion scheme was as brash and careless as it was

unconscionable.

151.    The demand letter even contained veiled threats to publicize the Confidential

Disclosures if Plaintiffs did not reach a satisfactory resolution.

152.    In particular, the Edelson Firm taunted Østvik, writing that Pacella "knows

[Østvik] well and does not think it is in [Østvik's] or the Companies' best interest to call out the

numerous issues in writing with specificity unless we ultimately are forced to proceed with litigation." The letter made vague references to Pacella's "partners", seeming to imply that Pacella had secret legal partnerships in place with a number of the company's investors and customers – which are gross violations of Pacella's ethical obligations. The Edelson Defendants referenced a variety of vague "concerns" that Pacella had (none of which would entitle Pacella to relief), yet implied that these "issues" could be dealt with by payment to Pacella.

153.    The letter made exaggerated statements that Pacella would not reveal information regarding Østvik's "personal history", "reassuring" Østvik that Pacella did not intend "to take special steps to make public his allegations" and that Pacella was "open to potentially agreeing" to make filings that "redact sensitive information".

154.    On information and belief, these "reassurances" were intended by the Edelson Firm to specifically remind Østvik that it, and Pacella, were aware of the Confidential Disclosures and could cause them to become public. Østvik himself so construed the Edelson Firm letters.

155.    When Østvik did not acquiesce, Pacella began contacting Østvik's investors, customers and partners, asking for their support and disparaging Østvik. Pacella made numerous false statements regarding Østvik and his companies, under the guise of his own sudden fear. For example, Pacella told one investor that Østvik's companies were bankrupt and going under. These were blatantly false statements. Pacella's goal was to form an alliance to take control of the company away from Østvik. These efforts failed, but Østvik's successes related to the companies continued. In fact, unbeknownst to Pacella, one time Østvik was actually having lunch with one of these parties while Pacella was trying to contact him. That party showed his phone to Østvik as Pacella was trying to make contact, saying "Matt keeps trying to contact me,

I'm not going to take it."

156.    When Østvik's attorneys wrote to the Edelson Defendants in October 2019 that Østvik did not intend to acquiesce to the threats and would not pay Pacella, just days later and not a coincidence a Pacella associate made a separate and unrelated demand for money.

157.    When Pacella's attempts to garner outside support for his scheme failed, the Edelson Firm nevertheless sent yet another demand letter in November 2019 reminding Østvik that Pacella had hoped to discuss payments to Pacella "while avoiding harm to the Companies and their ongoing businesses." The Edelson Firm reiterated they did not want to "lay out in detail or writing" their claims and explained that they "reiterate this point not for repetition's sake or to threaten."

158.    On March 2020, the Edelson Firm sent Plaintiff yet another demand letter, this time supposedly on behalf of Melnik separately, reiterating the same demand that the September 2019 letter (supposedly on behalf of Pacella) had made with respect to payments to Melnik. Edelson made no excuse for the blatant violation of multiple attorney ethics rules and disregarded the patent conflict-of-interest. The letter claimed Melnik – who only ever spoke to Pacella about his acquisition of VPEF equity – had expected Pacella to remain at VPEF, had expected an imminent acquisition (the very acquisition that Defendant Richman and Defendant Edelson sought to be involved in and invest in), and that VPEF was imminently closing a project financing (the very project financing that Pacella was pursuing through July 2019).

159.    In October of 2019, the Edelson firm, clearly utilizing information that must have been provided by Pacella, wrote a series of intentionally damaging letters to Plaintiffs' prominent and high-profile clients. These so-called "preservation" letters purported to put them on "notice" to preserve documents, but in actuality communicated a false and disparaging narrative about

41

Plaintiff, informing them that Plaintiffs were subject to "investigation and potential prosecution" among a litany of other allegations of wrongdoing.

Conflict of Interest

160.    The Edelson Defendants' representation of Pacella arose out of, and was related to, their prior representation of Plaintiffs. The Edelson Defendants concede as much in the September 2019 demand letter claiming Pacella was entitled to some of "a recent settlement of various claims both Bjornulf and the Companies had against their past legal counsel." That settlement was, of course, the very matter for which the Edelson Defendants were Plaintiffs' counsel.

161.    The conflict of interest is further revealed in their letter dated September 19, 2019, wherein they claim they are representing Defendant Pacella and their goal is "avoiding harm to the Companies and their ongoing businesses" while at the same time demanding cash payments and dilutive equity grants of shares of the Companies that, by definition, are detrimental to the Companies.

162.    When Plaintiffs did not immediately capitulate, the Edelson Defendants proceeded to send so-called "Preservation Notices" to one of the Companies' key investors as well as an important customer inserting irrelevant, superfluous, and damaging information meant to harm the Companies. A true and correct copy of one such letter is attached hereto as Exhibit B.

163.    Throughout the course of the representation, Plaintiffs sought and received legal advice on a wide variety of issues, as the case grew and evolved.

164.    ████████████████████████████████████
████████████████████████████████████████████



168.     Certain of Pacella's contracts with VPM, Ecogensus, and VPEF contain arbitration provisions. Accordingly, Østvik and the companies commenced an AAA proceeding on or around October 23, 2019.  Pacella, represented by Edelson, failed and refused to proceed with arbitration despite due demand by Østvik that he do so, thus waiving his rights, if any, to arbitrate.

Wrongful Access and/or Attempted Access to Plainitffs' Computer Systems

169.     Pacella's employment was terminated on August 23, 2019, and yet he has never returned the company computer nor any of the files contained on it. Over the course of time, when he was asked about the company laptop, he stated he threw it off the top of a building.  He later changed his story, saying that he was able to have it repaired.

170.     As the extortion scheme escalated, Østvik grew increasingly concerned: not only had Pacella kept in his possession a vast amount of sensitive business information, but he had

also been attempting to unlawfully access current corporate data. Østvik first retained Marcum Technology, LLC, a digital forensics Services company ("Marcum") on behalf of plaintiffs Ecogensus LLC and VikingPeak Management Company, LLC in late April 2020 to investigate possible hacks into the corporate network. During the course of his employment, Pacella utilized two email accounts, matthew.pacella@ecogensus.com and matthew.pacella@vikingpeak.com. Østvik asked Marcum to perform a forensic analysis of activity on the two accounts for the period immediately following Pacella's termination on August 23, 2019, until the present date.

171.    Marcum detected repeated attempts to access Pacella's old email accounts originating from an IP address that resolves to a physical location somewhere in Pittsburgh, Pennsylvania, where Pacella lives. These intrusions occurred as recently as July 6, 2020. The attempts to log on were rejected due to an "error validating credentials due to invalid username or password." Marcum concluded that the login attempts were not caused by any sort of passive or automated login event. Each failed attempt to intrude would have been met with a pop-up error message which requires the user to close the error message purposefully and affirmatively.

172.    Under these circumstances, given Pacella's purposeful and pernicious attempts to cause harm to Plaintiffs (and enrich himself), Plaintiffs cannot afford the risk that Pacella will succeed in future intrusion attempts

173.    Plaintiffs were not only damaged in incalculable ways by the breach of security and exposure of confidential business information, but Plaintiffs also had to expend resources to rectify the breach.

174.    Plaintiffs' damage and loss vastly exceeds the statutory minimum of $5,000 in value during any one-year period.

175.    Because of the serious crimes of the Pacella/Edelson Enterprise, Plaintiffs seek

redress to put an end to the extortion and recoup the funds that were stolen from them.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
(Violation of Computer Fraud and Abuse Act
18  U.S.C. § 1030 against Pacella)

176.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

177.    Plaintiff's computers and computer systems are "protected computers" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

178.    By his wrongful actions, Defendant Pacella intentionally accessed Plaintiff's protected computer system, without authorization and/or in excess of authorized access, and thereby obtained information from Plaintiff's protected computer system.

179.    By his wrongful actions, Defendant Pacella knowingly and with intent to defraud, accessed Plaintiff's protected computer system, without authorization and/or in excess of authorized access.

180.    Defendant Pacella furthered the intended fraud, obtained unauthorized use of Plaintiff's protected computer system, and obtained Plaintiff's proprietary information, the value of such exceeding $5,000 in value in any one-year period.

181.    The wrongful conduct of Defendant Pacella was done for his own benefit, to the detriment of Plaintiff.

182.    By his wrongful actions, Pacella intentionally accessed Plaintiff's protected computer system without authorization, and as a result of such conduct, caused Plaintiff's damage and loss that exceeds $5,000 in value during any one-year period. Not only have Plaintiffs spent far in excess of $5,000 in responding to the offense and conducting a damage assessment, Plaintiff VPEF lost the opportunity to participate in capital calls.

45

183.    The activity of Pacella constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030(a)(2)C), (a)(4), (a)(5)C), and Plaintiffs are entitled to full compensatory damages under that Act.

### AS AND FOR A SECOND CLAIM FOR RELIEF
(Violation of RICO and Conspiracy to Violate RICO
against the Edelson Defendants and Pacella
18 U.S.C. § 1962(c))

184.    The Racketeering Influence Corrupt Organizations Act ("RICO" or "the Act"), 18 U.S.C. § 1961, et seq., provides a private cause of action to recover losses, damages, treble damages and attorney's fees to any person suffering a loss caused by any other person that violates the Act.

185.    18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

186.    Edelson, Richman, the Edelson firm and Pacella are all "persons" as defined under the Act.

187.    Defendants at all relevant times and as alleged herein, associated together and operated as an "Enterprise" with a common purpose. The Enterprise functioned as a unit and engaged in a common course of conduct.

188.    The Enterprise constitutes an "enterprise" or "association in fact enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c) with relationships and longevity to further Defendants' common purpose of committing acts to defraud Plaintiffs and others for financial gain. Edelson, Pacella and Richman (and other unknown associates) used their strategic alliance to actively seek out young, up-and-coming companies and wrongfully acquire cash or

46

equity stakes in such companies.

189.    Defendants at all relevant times and as alleged herein conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

190.    Defendants engaged in a pattern of racketeering activity consisting of at least two (2) predicate acts of racketeering by each for the purpose of defrauding Plaintiffs for financial gain.

191.    As alleged herein, Defendants made use of the United States mail and/or telephone and wires, and/or committed other acts prohibited by law to extort Plaintiff Østvik, and they made explicit as well as indirect threats to accomplish those goals.

192.    Defendants also committed acts of mail fraud in violation of 18 U.S.C. § 1341 by using the United States Postal Service and private commercial interstate carriers to knowingly and fraudulently extract money from Plaintiff Østvik.

193.    Defendants also committed acts of wire fraud in violation of 18 U.S.C. § 1343 by using the telephone, e-mail and/or other forms of electronic communications to knowingly and fraudulently make material misrepresentations and/or to deliberately conceal material information from Plaintiffs for the purpose of facilitating their extortionate scheme on Plaintiff Østvik.

194.    Defendants engaged in a pattern of racketeering activity to infiltrate companies and gain leverage using illegal means.

195.    Here, as set forth above, having learned of the Confidential Disclosures that Defendant believed would cause significant harm to Plaintiffs Østvik and Østvik's companies, Defendants extracted cash from Østvik by threatening to make public these Confidential

Disclosures and by threatening physical harm.

196.    Even after extracting $228,000 in cash by extortion, Defendants are still attempting to extract more money.

197.    When Defendant Pacella was sent to New York City to meet with Østvik, Pacella physically assaulted Østvik, explicitly threatened bodily harm, threatened Østvik's family, and threatened to use Pacella's purported ties to organized crime, this was in furtherance of the scheme.

198.    When Defendant Edelson and Pacella threatened to publicly reveal the Confidential Disclosures with the belief that such revelation would be damaging to Østvik personally and in his professional capacity, this was in furtherance of the scheme.

199.    When Defendant Edelson called Østvik's prior counsel on September 10, 2019 demanding payment from Østvik without any basis whatsoever, and implicitly threatening to publicly reveal the Confidential Disclosures, this was in furtherance of the scheme.

200.    When Richman called Østvik's prior counsel in July of 2019 to insinuate that Melnik could cause a problem if Østvik would not "get in a room" with Defendants this was in furtherance of the scheme.

201.    Defendant's violation of 18 U.S.C. § 1962 and caused direct damage to the Østvik.

202.    Defendants' conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking— and criminal—misconduct.

### AS AND FOR A THIRD CLAIM FOR RELIEF
(against the Edelson Defendants and Pacella)

48

Civil RICO Conspiracy - 18 U.S.C. § 1962(d))

203.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

204.    18 U.S.C. 1962(d) makes it unlawful for any person to conspire to violate the Act.

205.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Amended Complaint; namely, through a multi-faceted campaign of lies  threats to try and coerce Plaintiffs into paying untold amounts of money to the Defendants and their co-conspirators.

206.    There existed a conscious agreement among all the Defendants to engage in the predicate acts constituting the pattern or racketeering alleged herein.

207.    These Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities

208.    Pacella as the person controlling and directing the coordinated roles and interrelated activities of the Enterprise encouraged and induced the other Defendants to participate directly or indirectly in the illegal Enterprise.

209.    Defendants have been responsible for oversight of the scheme to extort Plaintiffs, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise-namely, threatening to disclose the Confidential Information and ominously writing to investors and other third-parties hinting at serious wrongdoing.

210.    In short, Defendants perpetrated a massive public and private pressure campaign designed to spread false and misleading information about Plaintiffs.

49

211.    Defendants by their words and actions as alleged herein displayed a conscious agreement to become part of the RICO conspiracy. Defendants committed the predicate acts alleged herein with the requisite knowledge of the purpose of the Enterprise and with the intent to further its fraudulent purpose and goals.

212.    Defendants' conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking— and criminal—misconduct.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
(Intentional Tort: Extortion against the Edelson Defendants and Pacella)

213.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

214.    Defendants Pacella and the Edelson Defendants coerced plaintiff Østvik to part with property, namely the sum of $228,000.

215.    Defendants Pacella and the Edelson Defendants coerced through the wrongful use of actual or threatened force, violence and fear.

216.    Here, as set forth above, having learned of the Confidential Disclosures that Defendant believed would cause significant harm to Plaintiffs Østvik and VPM, Defendants extracted cash from Østvik by threatening to make public these Confidential Disclosures and by threatening physical harm.

217.    Even after extracting $228,000 in cash by extortion, Defendants are still attempting to extract more money.

218.    When Defendant Pacella was sent to New York City to meet with Østvik, explicitly threatened bodily harm and threatened to use Pacella's purported ties to organized

crime, this was in furtherance of the scheme.

219.    Defendants Edelson and Pacella threatened to publicly reveal the Confidential

Disclosures with the belief that such revelation would be damaging to Østvik personally and in

his professional capacity, this was in furtherance of the scheme.

220.    Defendants Pacella and the Edelson Defendants acted with disinterested

malevolence, as they had no right to Mr. Østvik's money, yet demanded it using threats of harm

and public embarrassment.

221.    Defendants have been unjustly enriched and Plaintiff Østvik has suffered and

continues to suffer money damages.

222.    Defendants' conduct is beyond merely intentional; the conduct was malicious,

wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or

jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking

misconduct.

## <u>AS AND FOR A FIFTH CLAIM FOR RELIEF</u>
(Breach of Contract—Pacella)

223.    Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

224.    As a condition of his employment with Plaintiffs Defendant Pacella signed and

agreed to be bound by the terms of a non-solicitation, confidentiality and intellectual property

agreement.

225.    At all relevant times, Plaintiffs performed their duties with respect to the non-

solicitation, confidentiality and intellectual property agreement entered into by Defendant

Pacella.

226.    Defendant Pacella has breached and continues to breach his obligations to

maintain the confidentiality of Plaintiffs' highly confidential and proprietary information under the non-solicitation, confidentiality and intellectual property agreement.

227.    Defendant Pacella wrongfully extracted an additional payment of $228,000, using extortive threats.

228.    Defendant Pacella misappropriated confidential information and contacted Plaintiffs' Investors, Board Members and Outside lawyers to the detriment and harm to Plaintiffs.

229.    Defendant Pacella wrongfully accessed Plaintiffs' computers to extract non-public information to use for his own personal gain.

230.    As a direct and proximate result of the wrongful conduct by Defendant Pacella with respect to the companies, Plaintiffs have suffered and continue to suffer irreparable injury in an amount to be determined at trial but believed to be in excess of $20,000,000.

231.    As a direct and proximate result of the wrongful conduct by Defendant Pacella, Plaintiffs have suffered and continue to suffer substantial money damages in an amount to be determined at trial.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
(Inducing Breaches of Contracts,
Tortious Interference with Contractual Relations)
(The Edelson Defendants and Melnik)

232.    Plaintiffs repeat and reallege each and every allegation set above as though fully set forth herein.

233.    Defendants Edelson and Melnik knew of Pacella's contractual obligations to Plaintiffs.

234.    By their wrongful actions, Defendants Edelson and Melnik intentionally induced Pacella to breach their contracts with Plaintiffs and has tortiously interfered with Plaintiffs'

contractual relations with Pacella.

235.    As a direct and proximate result of Defendants Edelson and Melnik's wrongful conduct, Plaintiffs have suffered and continues to suffer irreparable injury.

236.    As a direct and proximate result of Defendants Edelson and Melnik's wrongful conduct, Defendants Edelson and Melnik has been unjustly enriched and Plaintiff VPM has suffered and continues to suffer substantial money damages in an amount to be determined at trial but believed to be in excess of $40,000,000.

**AS AND FOR A SEVENTH CLAIM FOR RELIEF**
(Breaches of Fiduciary Duty by the Edelson Defendants:
Equitable Disgorgement)

237.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

238.    The June 20, 2017 retention letter with the Edelson firm makes it explicit that Edelson is representing Plaintiffs VPM, Østvik and Ecogensus.

239.    As an attorney hired to represent Plaintiffs, The Edelson Defendants were entrusted with confidential and privileged information and owed a duty of loyalty.

240.    The professional rules of the state of New York, the common law and the Engagement Letters created a fiduciary relationship by and between the Edelson Defendants and Plaintiffs.

241.    The Edelson Defendants owed Plaintiffs the fiduciary duties that all attorneys owe to their clients and by virtue of the Edelson Defendants' position of trust and responsibility.

242.    At all relevant times, as fiduciaries in whom Plaintiffs placed a special confidence and trust, the Edelson Defendants were bound to act in the utmost good faith and with due regard for the best interests of Plaintiffs, and, at all times, owed Plaintiffs the highest level of loyalty, candor and professional and ethical conduct.

243.    The Edelson Defendants had a duty to avoid acting in a manner detrimental to the business and property rights of Plaintiffs, including a duty to refrain from representing adversaries and demanding a cash payout outside the retainer arrangement or legal representation, and demanding an equity interest in VPM.

244.    As alleged in detail above, the Edelson Defendants breached that fiduciary duty by representing parties adverse to Plaintiffs' interest, demanding monies outside of the legal representation and issuing threats to Plaintiffs to extort such money.

245.     As a result of Defendants' breaches of their fiduciary obligations to Plaintiff, the Edelson Defendants have forfeited any and all right to compensation they received for their services to Plaintiffs during the time period relevant to these claims and should disgorge all ill-gotten fees they have received from Plaintiffs in an amount to be determined at trial, but in any event not less than $930,972.00 plus legal fees and costs.

### AS AND FOR AN EIGHTH CLAIM FOR RELIEF
(Breaches of Fiduciary Duty against Pacella: Equitable Disgorgement)

246.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

247.    Pacella, as General Counsel to the business Plaintiffs, acted in the capacity of in-house counsel during the terms of employment, and as outside counsel before and after the term of the employment agreements.

248.    Pacella acted as personal lawyer to Plaintiff Østvik.

249.    As an attorney hired to represent Plaintiffs' interests, Pacella was entrusted with confidential and privileged information and owed a duty of loyalty.

250.    The professional rules of the States of New York, Illinois, Pennsylvania and Connecticut and the common law of the state of New York created a fiduciary relationship by

and between Pacella and Plaintiffs.

251.    Pacella owed Plaintiffs the fiduciary duties that all attorneys owe to their clients and by virtue of the Edelson Defendants' position of trust and responsibility.

252.    At all relevant times, as fiduciaries in whom Plaintiffs placed a special confidence and trust, Pacella was bound to act in the utmost good faith and with due regard for the best interests of Plaintiffs, and, at all times, owed Plaintiffs the highest level of loyalty, candor and professional and ethical conduct.

253.    Pacella had a duty to avoid acting in a manner detrimental to the business and property rights of Plaintiffs, including a duty to refrain from acting in his own self-interest, conspiring with third parties, abusing the Plaintiffs' confidences by threatening to make public highly confidential information, and demanding a cash payout outside any type of retainer arrangement or legal representation, and demanding equity interests in Ecogensus and VPEF.

254.    As alleged in detail above, Pacella breached that fiduciary duty by acting in his own self-interest, contacting Board Members, Investors and Outside Counsel, conspiring with third parties, abusing the Plaintiffs' confidences by threatening to make public highly confidential information, threatening violence against Østvik and demanding a cash payout outside the retainer arrangement or legal representation, and demanding an equity interest in VPM.

255.    As a result of Pacella's extreme breaches of his fiduciary obligations to Plaintiffs, Pacella has forfeited any and all right to compensation he received for his services to Plaintiffs during the time period relevant to these claims and should disgorge all ill-gotten fees he has received from Plaintiffs in an amount to be determined at trial, but in any event not less than, $904,666 plus legal fees and costs.

## AS AND FOR A NINTH CLAIM FOR RELIEF
(Aiding and Abetting Breaches of Fiduciary Duty
against Pacella, the Edelson Defendants and Melnik)

256.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

257.    Pacella, as General Counsel to the business Plaintiffs and personal counsel to Plaintiff Østvik, and the Edelson Defendants, as outside counsel, were aware of each other's respective fiduciary duties to Plaintiffs and acted in the capacity of in-house counsel during the terms of employment and as outside counsel before and after the term of the employment agreements.

258.    Pacella and the Edelson Defendants breached their respective fiduciary obligations.

259.    Pacella and the Edelson Defendants knowingly participated and substantially assisted each other's breaches.

260.    The breaches resulted in actual damages to Plaintiffs in an amount to be determined at trial.

261.    As a result of Defendants' aiding and abetting of each other's extreme breaches of fiduciary obligations to Plaintiffs, Defendants should disgorge all ill-gotten fees Pacella  received from Plaintiffs in an amount to be determined at trial, but in any event not less than $904,666 for the Pacella breach and $930,972.00 for the Edelson Defendants' breaches plus compensatory damages in an amount to be determined at trial, plus legal fees and costs.

262.    Defendants' conduct is beyond merely intentional; the conduct was malicious, wanton, outrageous, and otherwise more deserving of punishment in the eyes of the judge or jury. Plaintiffs seek in excess of $100,000,000 in punitive damages for Defendants' shocking—and criminal—misconduct.

56

**AS AND FOR A TENTH CLAIM FOR RELIEF**
(Conspiracy to Commit Intentional Torts
against Pacella and the Edelson Defendants)

263.    Plaintiffs repeat and reallege each and every allegation set forth above as though

fully set forth herein.

264.    There existed a conscious agreement among all the Defendants to engage in the

predicate acts conspiring to commit intentional torts, constituting the pattern or racketeering

alleged herein.

265.    Defendants by their words and actions as alleged herein displayed a conscious

agreement to become part of the conspiracy to commit intentional torts.

266.    Defendants committed the predicate acts alleged herein with the requisite

knowledge of the purpose of the scheme and with the intent to further its fraudulent purpose and

goals.

267.    As a result of the conspiracy, Defendants have been damaged and are entitled to

compensatory damages in an amount to be determined at trial, plus legal fees and costs.


WHEREFORE, Plaintiffs demand judgment against Defendants, for the following relief:

1)  Awarding Plaintiffs actual, compensatory and punitive damages to the full extent allowed
    by law but in no event less than $100,000,000 in punitive damages against All
    Defendants: All Defendants are responsible for  $904,666 in Pacella's disgorgement,
    $930,972.00 in Edelson Defendants' disgorgement and Pacella is responsible for
    $20,440,000 in damage for lost participation in the equity raise.

2)  Awarding Plaintiffs costs and attorneys' fees to the full extent provided for by the RICO
    statute, 18 U.S.C. § 1964.

3)  Awarding Plaintiffs actual and trebled damages to the full extent provided by 15 U.S.C. §
    1117 and 18 U.S.C. § 1964, in an amount to be determined at trial.

4)   Granting such other relief as this Court deems just and equitable.

57

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable of right.

Dated:  New York, New York
August 26, 2020

GUZOV, LLC

By:  /s/ Debra J. Guzov
Debra J. Guzov (DJG 7121)
Anne W. Salisbury (AWS 7333)
David J. Kaplan (DJK 0100)
805 Third Avenue, 8th Floor
New York, New York 10022
Tel:     (212) 371-8008
dguzov@guzovllc.com
*Attorneys for Plaintiffs*

TUCKER LEVIN, PLLC

By: /s/ Duncan Levin
Duncan Levin (DL 1577)
230 Park Avenue, Suite 440
Tel.: (212) 330-7626
dlevin@tuckerlevin.com
www.tuckerlevin.com