UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ECOGENSUS LLC, VIKINGPEAK ENERGY FUELS   Civ. Action No.: 1:20-cv-3629
LLC, VIKINGPEAK MANAGEMENT COMPANY,
LLC, VIKINGPEAK CAPITAL GROUP LLC and
BJØRNULF ØSTVIK,

Plaintiffs,

-against-

MATTHEW PACELLA, MICHAEL M. MELNIK,
JAY EDELSON, BENJAMIN RICHMAN and
EDELSON PC.

Defendants.
-----------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO EDELSON DEFENDANTS' MOTION TO DISMISS

GUZOV, LLC
Debra J. Guzov, Esq.
Anne W. Salisbury, Esq.
805 Third Avenue, 8th Floor
New York, NY 10022
Tel.:    (212) 371-8008
dguzov@guzovllc.com
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

INCLUSION OF DOCUMENTS IN THE MOTION TO DISMISS ............................................ 3

FACTUAL BACKGROUND ................................................................................ 4

ARGUMENT ................................................................................ 13

    I. This Court Has Personal Jurisdiction Over the Edelson Defendants ................................. 13

    II. This Complaint Satisfactorily Pleads a RICO Claim ........................................ 15

    III. The Complaint's State Law Claims Should Be Sustained ................................. 20

CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................. 15

*Bell Atlantic Co. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................................. 15

*Boyle v. United States,*
556 U.S. 938 (2009) ............................................................................................................. 19

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) ............................................................................................................. 13

*Contant v. Bank of Am. Corp.,*
385 F. Supp.3d 284 (S.D.N.Y. 2019) .................................................................................. 15

*Curiano v. Suozzi,*
63 N.Y.2d 113, 469 N.E.2d 1324 (1984) ............................................................................ 20

*D. Penguin Brothers, Ltd. v. City National Bank,*
587 F.App'x 663 (2d Cir. 2014) .......................................................................................... 19

*D'Addario v. D'Addario,*
901 F.3d 80 (2d Cir. 2018) .................................................................................................. 16

*Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.,*
829 F. Supp. 62 (S.D.N.Y. 1993 .......................................................................................... 14

*GICC Capital Corp. v. Tech. Fin. Group, Inc.,*
67 F.3d 463 (2d Cir. 1995) .................................................................................................. 18

*Gurfein v. Sovereign Group,*
826 F. Supp. 890 (E.D. Pa. 1993) ....................................................................................... 16

*Iqbal v. Hasty,*
490 F.3d 143 (2d Cir. 2007) ................................................................................................ 15

*Johnson v. Nextel Commc'ns, Inc.,*
660 F.3d 131 (2d Cir. 2011) ................................................................................................ 21

*Kreutter v. McFadden Oil Corp.,*
71 N.Y.2d 460 (1988) .......................................................................................................... 13

*Kruse v. Repp*,
2020 WL 1317479 (S.D. Iowa 2020) ................................................................... 19

*LCS Group, LLC v. Shire LLC,*
2019 WL 1234848 (S.D.N.Y. March 8, 2019) ..................................................... 19

*Lightbox Ventures, LLC v. 3rd Home Ltd.*,
No. 16 Civ. 2379, 2017 WL 5312187 (S.D.N.Y. Nov. 13, 2017) ......................... 21

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020. ..................................................................................... 3

*Mayfield v. Asta Funding, Inc.*,
95 F.Supp.3d 685 (S.D.N.Y. 2015) ...................................................................... 19

*Montefiore Med. Ctr. v. Teamsters Local 272*,
642 F.3d 321 (2d Cir. 2011) ................................................................................. 24

*nMotion, Inc. v. Envtl. Tectonics Corp.*,
148 F. App'x 591 (9th Cir. 2005) ......................................................................... 22

*P.T. United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*,
138 F.3d 65 (2d Cir. 1998) ................................................................................... 13

*Pierre v. Planet Auto., Inc.*,
193 F. Supp. 3d 157 (E.D.N.Y. 2016) ................................................................. 25

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industr., Inc.*,
509 U.S. 49 (1993) ............................................................................................... 18

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
624 F.3d 123 (2d Cir. 2010) ................................................................................. 23

*Smith v. Hogan*,
794 F.3d 249 (2d Cir. 2015) ................................................................................... 3

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
366 F. Supp. 3d 516 (S.D.N.Y. 2018) (Broderick, J.) ........................................ 16

*Tri-Star Lighting Corp. v. Goldstein*,
151 A.D.3d 1102 (1st Dep't 2017) ....................................................................... 22

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ............................................................................................. 13

**Statutes**

18 U.S.C. § 1962 ........................................................................................................... 17

18 U.S.C. § 1965 ..................................................................................................... 13, 14

18 U.S.C. § 1965(a) ................................................................................................ 13, 14

18 U.S.C. § 1961 ............................................................................................................. 2

18 U.S.C. § 1962(c) ........................................................................................................ 2

18 U.S.C. § 1962(d) ........................................................................................................ 2

18 U.S.C. § 1964(c) ........................................................................................................ 2

18 U.S.C. § 1965(b) ...................................................................................................... 14

28 U.S.C. 1331 .............................................................................................................. 23

28 U.S.C. § 1332 ........................................................................................................... 23

28 U.S.C. § 1367(a) ...................................................................................................... 24

**Rules**

Illinois Rules of Professional Conduct 1.6(a) ............................................................. 21

**PRELIMINARY STATEMENT**

Plaintiffs Bjørnulf Østvik ("Østvik"), Ecogensus LLC ("Ecogensus"), VikingPeak

Energy Fuels LLC ("VPEF"), VikingPeak Management Company, LLC ("VPM"), and

VikingPeak Capital Group LLC ("VPCG") submit the following memorandum of law in

opposition to the motion to dismiss filed by Defendants Edelson PC ("Edelson Firm"), Benjamin

Richman ("Richman"), and Jay Edelson ("Edelson") (collectively, the "Edelson Defendants").

The Edelson Defendants try to spin this case as an "employment dispute" or even falsely

misrepresent it as a "lost investment" dispute (as an aside, there were no losses, only gains) and

remain tellingly silent about their own actions. How can they explain how it came to pass that

they hooked up with a former General Counsel of one of their clients, then separately hooked up

with an investor in this same client's business and then made an approach demanding money for

all three parties, while communicating a not-too-subtle threat to release their former client's

secrets? They cannot justify this. Instead, they try to dismiss each and every one of Plaintiffs'

well-pleaded claims so as to prevent Plaintiffs from engaging in discovery and accessing their

evidence.

No one does or can dispute that the Edelson Defendants represented Østvik and the

corporate Plaintiffs as outside counsel; they then assisted Defendant Matthew Pacella

("Pacella"), general counsel to Ecogensus and VPEF (and Østvik's personal attorney), as well as

Defendant Melnik, a close associate of Pacella. Plaintiffs allege the actions of this group

evidence a conspiracy to wrest control of the companies away from Østvik. In so doing, the

Edelson Defendants were wrongfully using confidences and secrets belonging to their former

clients to their detriment. This is one of the most serious charges possible to levy against a

lawyer or a law firm, yet the Edelson Defendants have brought this motion raising a myriad of

1

technical and procedural arguments for dismissal of Plaintiffs' First Amended Complaint dated August 28, 2020 (hereafter "Complaint" or "Compl."). This Court should reject the Edelson Defendants' attempts to escape their day of reckoning and deny their motion in its entirety.

Their Memorandum of Law – especially the fact section – is an exercise in obfuscation. They focus on various background and foundation allegations in the Complaint to fit their narrative that the Complaint is nothing more than a litany of "things that upset Mr. Østvik " but they gloss over or ignore the core allegations that comprise Plaintiffs' claims, including alleging significant and serious violations of the United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c) & (d) and 1964(c).

With respect to personal jurisdiction, the allegations of the Complaint demonstrate sufficient jurisdiction-conferring acts committed by or at the direction of each defendant to warrant exercise of personal jurisdiction under New York's long-arm statute. This conclusion is inescapable given the Complaint's well-pleaded allegations of a conspiracy involving the Edelson Defendants, so that the jurisdictional contacts of each member of the conspiracy may be imputed to the others.

Similarly, Plaintiffs' RICO pleading is more than adequate. The Edelson Defendants' reductive description of the Complaint ignores and distorts the allegations especially as it pertains to their own engagement in an illegal enterprise. The Complaint clearly sets forth predicate acts committed by the Edelson Defendants constituting a pattern of racketeering activity, the existence of a continuous enterprise with a defined structure, and injury to Plaintiffs flowing directly from the enterprise's activities. At this early stage of the lawsuit, nothing more is required.

Finally, since federal subject matter jurisdiction can be based on Plaintiffs' valid RICO claim, this Court can and should evaluate Plaintiffs' state court claims and should uphold each of them. Plaintiffs' Fourth Claim For Relief sets forth each of the elements required to establish a *prima facie* tort under New York law, while the Sixth and Seventh Claims For Relief plausibly allege each of the requisite elements for those claims.

## INCLUSION OF DOCUMENTS IN THE MOTION TO DISMISS

In the Edelson Defendants' Motion to Dismiss, they attach several pieces of correspondence as Exhibits, claiming that the Second Circuit permits this practice, because

> ['t]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference,' the Court is permitted to consider documents—such as the retainer agreement and letters discussed below—without converting this motion into a summary judgment motion. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Edelson Defendants' Memorandum of Law in Support of Motion to Dismiss ("Edelson Br." at 2).

The Edelson Defendants omit (intentionally or otherwise) the Second Circuit's explicit and critical clarification of this precedent. The Second Circuit explained that the term "written instrument" used in the *Audiotext* case generally refers to "a 'legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate[,]' citing Black's Law Dictionary (10th ed.2014); and *Smith v. Hogan,* 794 F.3d 249, 254 (2d Cir. 2015). Thus, the Second Circuit explained, the types of exhibits incorporated within the pleadings by Rule 10(c) "consist largely of ... contracts, notes, and other writing[s] on which [a party's] action or defense is based." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020).

Here, the Edelson Defendants attach six letters as Exhibits, far outside of the permissible category. Moreover, the contents, import and intention of the letters are and will be hotly disputed, rendering them even more inappropriate for inclusion. These letters are indeed

3

important and even central documents, and they are quoted or referenced in the Complaint, in context. The related telephone and email communications, the contemporaneous threats, the credibility of testimony will all come into play. It is entirely inappropriate to include such letters on a Motion to Dismiss. Perhaps this was an attempt by the Edelson Defendants to give the Court the impression these six represent the full extent of Plaintiffs' proof. They do not. In any event, Plaintiffs respectfully suggest that the documentary evidence be considered at the appropriate stage of the litigation.

## FACTUAL BACKGROUND

Plaintiffs respectfully refer the Court to the Complaint for a more detailed recitation of the facts pertaining to this Opposition. Briefly, however, Plaintiffs will summarize the allegations against the Edelson Defendants which relate to the arguments raised in the Edelson Defendants' Motion to Dismiss.

Plaintiff Østvik is the Chief Executive Officer and Chief Technology Officer of Ecogensus and the Chief Executive Officer of VPEF. Østvik's companies have substantial business interests and own valuable technology rights including through multiple patents issued in the United States and internationally. Compl. ¶ 37.

Østvik first became acquainted with Pacella in early 2016, when an acquaintance introduced him as a potential source of legal assistance and due to his purportedly strong connections to private equity groups and banks. Compl. ¶ 38. Østvik retained Pacella to act as general counsel for Ecogensus and VPEF. During the course of his representation of Plaintiffs, Pacella became privy to information (as defined in the Complaint, the "Confidential Disclosures") which Østvik did not wish to have publicly disclosed. *Id.* ¶ 46. Pacella also reassured Østvik repeatedly that he was Østvik's personal attorney as well, and later

memorialized this in an engagement letter.

In or around May 2017, Pacella also began to urge Østvik to hire the Edelson Defendants as his counsel. Compl. ¶ 63. The Edelson law firm is based in Chicago, where Østvik, Richman, and Edelson met for the first consultation. *Id.* ¶¶ 63, 66. Although the consultation with the Edelson Defendants required Østvik to reveal many of the Confidential Disclosures, he made sure to instruct Edelson and Richman to maintain strict confidentiality of all information being discussed. *Id.* ¶ 67. In retrospect, Østvik now understands it was a mistake to reveal just how concerned he was about the Confidential Disclosures going public. *Id.* ¶ 68. At the time, however, he had every reason to believe that as officers of the court, the Edelson Defendants and Pacella would maintain confidentiality. *Id.* When he made the disclosures to Edelson and Richman in June 2017 (just as he had to Pacella a few months earlier), Østvik explained in detail the very ramifications he was afraid of and unwittingly provided his audience with the fodder for their scheme. *Id.*

Østvik entered into an agreement with the Edelson firm on June 20, 2017 in connection with a wide-ranging matter to which the Confidential Disclosures were an important component, with Østvik also including his companies to the engagement as well. Compl. ¶ 70. After diverging on strategy (i.e. pursuing mediation vs. litigation) Østvik repeatedly confided in Pacella regarding his frustrations with the Edelson Firm's increasing pressure to pursue litigation, and his desire to find alternate counsel, but Pacella reiterated to Østvik that it would be a mistake to switch counsel. *Id.* ¶¶ 76, 80.

On March 11, 2018, Østvik told Pacella that he was ready to switch counsel. Compl. ¶ 88. Pacella issued a threat on behalf of Edelson, warning Østvik that it is "Not great to have a dispute with crazy litigators." *Id.* Østvik wrote back "It'd be better for you to focus on helping

me be heard by Edelson than scaring me in standing up for what's right." *Id.* Despite the strong objections from Edelson and the Edelson Firm, a second mediation session was scheduled in Chicago in late March 2018. *Id.* Edelson was angry at the result of that mediation, and chided Østvik for having been so worried about the Confidential Disclosures that the more aggressive strategy was not chosen. *Id.* ¶ 91-92. Edelson also mentioned that his firm only took Østvik's case because Pacella was involved. *Id.* Pacella later discussed Edelson's fury, telling Østvik that the Edelson Defendants were "furious" at the result, believing Østvik cost them a substantial contingent fee, as they had thought the settlement would have been $20,000,000 had they filed a complaint in court – closer to the amount Pacella had predicted in July 2017 – if only Østvik had instead focused more on monetary gain. *Id.* ¶ 92.

In what Plaintiffs later learned was part of a plan conceived of and executed by the Pacella/Edelson Enterprise and furthered, upon information and belief, by Pacella and Richman's March 2018 evening out, Pacella pushed Østvik to come to a meeting a couple of weeks later, in early April 2018, in New York City (under a premise that turned out to be false.) Compl. ¶ 95.

Immediately when Østvik met Pacella, it became clear that Pacella had another agenda. Pacella described that he had discussed matters with Richman two weeks earlier. Pacella then warned Østvik that he could "bring down" Østvik and his companies. Compl. ¶ 97. Over the course of the evening meeting, Pacella repeated the prior threats that unless Østvik gave in to his demands, he would "destroy" Østvik. *Id.* ¶ 98. Pacella emphasized that he was "very close" to Richman and that they remained angry that Østvik had been so sensitive about the Confidential Disclosures and pursuing litigation. *Id.*

Pacella also told Østvik that Edelson felt deprived of publicity he could have earned if Østvik had not been so private. Pacella began pressuring Østvik to purchase a watch for him,

probing to see how far he could push Østvik. *Id.* ¶ 99.

When Østvik attempted to turn the conversation toward business, Pacella became enraged, screaming threats and obscenities at Østvik while claiming that he "should get a piece of everything [Østvik] makes." Compl. ¶ 100. At one point, Pacella physically pushed Østvik and screamed that he, Pacella, had an uncle in the Mafia and that Pacella himself hoped to become a "made man." *Id.* In this context, Pacella's claim for a "piece" of Østvik's future earnings took on a more sinister tone, as this is a common demand made by organized crime extortionists. Pacella ominously warned Østvik that any future references to Pacella's family would be a code that meant he was referring to his Mafia family member and that Østvik's safety was at stake. *Id.* That evening, Pacella showed Østvik a Maserati key. Østvik asked "You got a Maserati?" Pacella replied "YOU got me a Maserati", implying that Pacella had already made an expensive purchase expecting to be successful in extorting Østvik on his trip to New York. *Id.* ¶ 101.

In the days and weeks that followed, Pacella issued additional specific threats both when he spoke to Østvik by phone and saw him in person, saying he would exit his employment as Plaintiff's attorney and leave Østvik alone but only if his demands were met. Pacella threatened:

a)  that Confidential Disclosures would be made public.

b)  that Østvik's safety was at risk.

c)  that he could sabotage certain important pending deals of Østvik's businesses.

d)  that Melnik could become "problematic" for Østvik; and

e)  the Edelson Defendants would need to be paid much more than they received.

Complaint ¶¶ 107-108, 110-111.

Østvik eventually capitulated and paid Pacella $228,000 in an effort to buy Pacella's silence and protect himself from Pacella's threats of physical violence, ominous warnings of the

fury of the Edelson Defendants, and the unmistakable warning of the threat posed by Melnik to Østvik's companies. Complaint ¶ 111. In exchange for this payment, Pacella agreed that he would stop the threats, not hurt Østvik, Melnik would not cause problems, and Pacella would not sabotage any of Østvik's business initiatives. *Id.* ¶ 112.

On December 8, 2018, Østvik learned that the Edelson Defendants had asked Pacella to run a litigation financing fund in conjunction with them, which would give the Edelson Firm substantially more fuel to pursue their lawsuits. Compl. ¶ 117. Despite Pacella's denials and attempts to feign distance between himself and the Edelson Defendants, Østvik learned in the summer of 2019 that the Pacella/Edelson enterprise was in full pursuit. *Id.* Adding insult to injury, they actually wanted to exploit Østvik's successes to adopt a track record for themselves as fund managers – in order specifically to raise the litigation fund. *Id.* Later that summer, Østvik attempted to distance himself from the Edelson Defendants and Pacella and escape Pacella's clutches. *Id.* ¶ 135.

When Pacella's repeated and harassing attempts to contact and intimidate Østvik failed (including explicit mention of pressure from the Edelson Defendants too), a different approach was chosen. On August 27, 2019, the Edelson Defendants then sent a letter to Plaintiffs' former counsel (a fact the Edelson Defendants use to make an incomprehensible point, Edelson Br. at 5) identifying themselves for the first time as <u>Pacella's</u> attorneys. Compl. ¶ 144. In the letter, the Edelson Defendants ask to discuss payments and company equity grants they allege Østvik owed Pacella in a purported employment dispute – an audacious breach of attorney ethics – but this was only a pretense. *Id.* As the Complaint details, this was only the first outwardly coordinated action taken by the Pacella/Edelson Enterprise.

On September 19, 2019, the Pacella/Edelson Enterprise would first lay out the outline of

8

their extortion demands in writing. Only a few hours after a Board meeting held that same day, the Edelson Defendants sent Plaintiffs the September 19 letter demanding payments to both Pacella and Melnik, referencing the very matters for which Østvik was their client. Compl. ¶¶ 147-148. The letter was strategically timed to maximize the threat, as Pacella knew from weeks earlier that the company was in the midst of launching its new flagship product and a strategic capital fundraise. *Id.* ¶ 148. The letter specifically attempted to leverage information revealed at the confidential Board meeting earlier that day, which was attended by two unnamed co-conspirators who Plaintiffs confirmed were in touch with Pacella. The demand letter threatened to make legal filings unless Østvik made an immediate enormous cash payment, personally (contrary to the Edelson Defendants' current explanation for its demand, Edelson Br. at 5) to Pacella. *Id.* The letter further stated that Pacella wanted large payments from each of Østvik's companies, but not right away like the personal payment by Østvik; rather, the company payments were demanded no later than December 31, 2019. *Id.* Indeed, the payment demands and associated threats were aligned with the capital raise timeline that Østvik had revealed to the Board just hours before.

The Edelson Defendant's letter also demanded a grant of millions of shares in Ecogensus and VPEF – also timed perfectly to align with the capital raise. Compl ¶ 148. Finally, the letter demanded payments to Melnik and discussed fees allegedly due to Plaintiffs' previous counsel. *Id.* Perhaps most shocking of all, the letter from the Pacella/Edelson Enterprise demanded that Østvik personally send an amount which they calculated to be the portion remaining for Østvik from the settlement proceeds, after the previous year's payments to the Edelson Defendants, Pacella and other legal fees. Compl. ¶ 149. Put differently, after Østvik had placed his trust in the Edelson Defendants and Pacella to seek justice for himself, the Pacella/Edelson Enterprise now

returned to attempt to extort Østvik – their own client – of every last dollar he received in damages specifically from the matter in which they had represented him. *Id.*

Pacella was not entitled to this personal payment from Østvik – nor had ever previously requested it – but the Edelson Defendants were so brazen that they did not care to offer even so much as a pretext for why Østvik should personally pay this amount of money to Pacella. Compl. ¶ 150. Instead they simply described a large figure dollar amount to be paid personally by Østvik to Pacella, in order to prevent the Edelson Defendants from making unrelated legal filings about the companies, and warning they would contain Pacella's vague and unsubstantiated "concerns" about the company – in the middle of a capital raise on a short timeline. The Pacella/Edelson Enterprise's extortion scheme was as brash and careless as it was unconscionable. *Id.*

The demand letter even contained veiled threats to publicize the Confidential Disclosures if Plaintiffs did not reach a satisfactory resolution. Compl. ¶ 151. In particular, the Edelson Firm taunted Østvik, writing that Pacella "knows [Østvik] well and does not think it is in [Østvik's] or the Companies' best interest to call out the numerous issues in writing with specificity unless we ultimately are forced to proceed with litigation." *Id.* ¶ 152. The letter made vague references to Pacella's "partners", seeming to imply that Pacella had secret legal partnerships in place with a number of the company's investors and customers – which are gross violations of Pacella's ethical obligations. *Id.* The Edelson Defendants referenced a variety of vague "concerns" that Pacella had (none of which would entitle Pacella to relief), yet implied that these "issues" could be dealt with by payment to Pacella. *Id.*

Further, the letter made exaggerated statements that Pacella would not reveal information regarding Østvik's "personal history", purportedly "reassuring" Østvik that Pacella did not intend "to take special steps to make public his allegations" and that Pacella was "open to

potentially agreeing" to make filings that "redact sensitive information". *Id.* ¶ 153. On information and belief, these "reassurances" were intended by the Edelson Firm to specifically remind Østvik that it, and Pacella, were aware of the Confidential Disclosures and could cause them to become public. Østvik himself so construed the Edelson Firm's letters. *Id.* ¶ 154.

When Østvik did not acquiesce, Pacella began contacting Østvik's investors, customers and partners, asking for their support and disparaging Østvik. Compl. ¶ 155. Pacella made numerous false statements regarding Østvik and his companies, under the guise of his own sudden fear. *Id.* For example, Pacella told one investor that Østvik's companies were bankrupt and going under. *Id.* These were blatantly false statements. Pacella's goal was to form an alliance to take control of the company away from Østvik. *Id.* When Østvik's attorneys wrote to the Edelson Defendants in October 2019 that Østvik did not intend to acquiesce to the threats and would not pay Pacella, just days later and uncoincidentally, a Pacella associate made a separate and unrelated demand for money. Compl. ¶ 156.

When Pacella's attempts to garner outside support for his scheme failed, the Edelson Firm nevertheless sent yet another demand letter in November 2019 reminding Østvik that Pacella had hoped to discuss payments to Pacella "while avoiding harm to the Companies and their ongoing businesses." Compl. ¶ 157. The Edelson Firm reiterated they did not want to "lay out in detail or writing" their claims and explained that they "reiterate this point not for repetition's sake or to threaten." *Id.*

On March 2020, the Edelson Firm sent Plaintiff yet another demand letter, this time supposedly on behalf of Melnik separately, reiterating the same demand that the September 2019 letter had made (supposedly on behalf of Pacella) with respect to payments to Melnik. Compl. ¶ 158. Edelson made no excuse for the blatant violation of multiple attorney ethics rules and

11

disregarded the patent conflict-of-interest. *Id.* The letter claimed Melnik – who only ever spoke to Pacella about his acquisition of VPEF equity – had expected Pacella to remain at VPEF, had expected an imminent acquisition (the very acquisition that Richman and Edelson had become involved in as attorneys and even sought to invest in), and that VPEF was imminently closing a project financing (the very project financing that Pacella was pursuing through July 2019). *Id.*

In October of 2019, the Edelson Firm, clearly utilizing information that must have been provided by Pacella, wrote a series of intentionally damaging letters to Plaintiffs' prominent and high-profile clients and investors. Compl. ¶ 159. These so-called "preservation" letters purported to put them on "notice" to preserve documents, but in actuality communicated a false and disparaging narrative about Plaintiff, informing them that Plaintiffs were subject to "investigation and potential prosecution" among a litany of other allegations of wrongdoing. *Id.*

The Edelson Defendants' representation of Pacella arose out of, and was related to, their prior representation of Plaintiffs. Compl. ¶ 160. The Edelson Defendants concede as much in the September 2019 demand letter claiming Pacella was entitled to a portion of "a recent settlement of various claims both Bjornulf and the Companies had against their past legal counsel." *Id.* That settlement was, of course, the very matter for which the Edelson Defendants served as Plaintiffs' counsel. *Id.*

The conflict of interest is further revealed in their letter dated September 19, 2019, wherein they claim they are representing Pacella and their goal is "avoiding harm to the Companies and their ongoing businesses" while at the same time demanding cash payments and dilutive equity grants of shares of the Companies that, by definition, are detrimental to the Companies. Compl. ¶ 161. As it has become clear that Defendants will never voluntarily relinquish their unwarranted and unwelcome hold over Østvik and his companies, Plaintiffs had

12

no choice but to commence this action in order to bring Defendants' illegal scheme to an end,

once and for all, and to recover for the extensive damage it has caused to Plaintiffs.

## ARGUMENT

### I.        This Court Has Personal Jurisdiction Over the Edelson Defendants

The Edelson Defendants first assert that this Court lacks personal jurisdiction over them.

*See* Edelson Br. (ECF Docket # 122) at 8. But the Edelson Defendants are mistaken, as this

Court can assert personal jurisdiction over them on two distinct theories.

First, as the Edelson Defendants are compelled to admit, 18 U.S.C. § 1965 considerably

loosens the requirements for personal jurisdiction in cases arising under the RICO statute.

Section 1965(a) permits an action "under this chapter" to be instituted against a person "in the

district court of the United States for any district in which such person resides, is found, has an

agent, or transacts his affairs." 18 U.S.C. § 1965(a). The Second Circuit has interpreted the

language of this provision to require a showing of minimum contacts between such defendant

and the forum. *P.T. United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 70-71 (2d

Cir. 1998). Under a constitutional minimum contacts analysis, due process is not offended "[s]o

long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it

and should reasonably expect to defend its actions there … even if not present in the state."

*Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 466 (1988); *see also Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286

(1980).

In satisfaction of due process requirements, Plaintiffs have alleged claims against a single

defendant with a constitutionally sufficient connection to New York: Matthew Pacella.

Specifically, Pacella is alleged to have concocted a scheme to extort cash and shares from Østvik

13

and to have pursued that scheme through intimidation and threat, including threats and intimidation made during a meeting in New York City. Complaint ¶¶ 96-102. This series of acts is more than sufficient to constitute minimum contacts with New York: a non-resident who pushes, screams at, and threatens another within New York State should reasonably expect to be hauled into court here to answer for his actions. *See, e.g., Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.,* 829 F. Supp. 62, 64 (S.D.N.Y. 1993) (offering one copy of infringing work for sale within New York constituted sufficient contact to warrant exertion of personal jurisdiction).

Having identified a defendant who is subject to personal jurisdiction in New York, as required by 18 U.S.C. § 1965(a), Plaintiffs are entitled to avail themselves of section 1965(b), which permits nationwide service of process upon "other parties" where the "ends of justice" so require. Here, the "ends of justice" require this result because there is no other single judicial district in which all participants in Defendants' corrupt enterprise would be amenable to jurisdiction. As set forth in the Complaint, Østvik is a Connecticut resident, the Edelson Defendants reside in Illinois, while Pacella and Melnik are Pennsylvania residents. Compl. ¶¶ 16-26. At present, there is no other jurisdiction in which all Defendants can be easily subjected to personal jurisdiction besides New York. As such, Plaintiffs were compelled to commence this action in New York, as this jurisdiction represents the only forum in which an efficient resolution can be obtained.[1] Personal jurisdiction over the Edelson Defendants is therefore sustainable under 18 U.S.C. § 1965.

Even setting the RICO statute aside, personal jurisdiction can still be sustained based

---

[1] In the event this action is dismissed, Plaintiffs will have no choice but to begin piecemeal actions against some, but not all, of the Defendants in multiple alternate jurisdictions. While Plaintiffs are prepared to do so if necessary, it would be a gross waste of juridical resources not to permit a single action against all Defendants in this forum.

upon Plaintiffs' conspiracy allegations. As the Edelson Defendants acknowledge, it is well settled that conspiracy jurisdiction is adequately alleged when the complaint sets forth "(1) that a conspiracy existed, (2) the defendant participated in the conspiracy, and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Contant v. Bank of Am. Corp.*, 385 F. Supp.3d 284, 292 (S.D.N.Y. 2019). Each of these elements is alleged in the Complaint in that a conspiracy is alleged to have existed, *see* Compl. ¶¶ 205-211, all Defendants (including the Edelson Defendants) are alleged to have made a conscious agreement to participate in the conspiracy, *id.* ¶ 211, and Defendant Pacella committed overt acts in furtherance within the State of New York for the reasons discussed above.

## II.     This Complaint Satisfactorily Pleads a RICO Claim

The Edelson Defendants attempt to launch a full-scale assault on the adequacy of Plaintiffs' RICO allegations, but their efforts all fail and their motion must therefore be denied.

Under the Supreme Court's decisions in *Bell Atlantic Co. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), faced with the Edelson Defendants' Rule 12(b)(6) motion to dismiss, Plaintiffs have the burden of pleading facts sufficient to state a claim for relief which is "plausible on its face." In this Circuit, compliance with *Iqbal* and *Twombly* requires "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir. 2007) (emphasis in original). However, even under *Twombly* and *Iqbal*, well-pleaded facts (as opposed to legal conclusions) are still entitled to a presumption of truth. Moreover, the RICO statute, as a remedial statute,

ought to be liberally construed to effect its purposes. *See D'Addario v. D'Addario*, 901 F.3d 80,

100 (2d Cir. 2018) (definition of "association-in-fact" should be liberally construed).

As Defendants acknowledge on page 13 of their Brief, Plaintiffs can allege a violation of

18 U.S.C. § 1962(b) by alleging "(1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity." *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d

516, 554 (S.D.N.Y. 2018) (Broderick, J.) (citation omitted). Plaintiffs must also plead statutory

standing, consisting of "(1) a violation of section 1962; (2) injury to business or property; and (3)

causation of the injury by the violation." Edelson Br. at 14. Plaintiffs more than adequately

allege each of these elements, and the Edelson Defendants' arguments to the contrary hold no

water.

With respect to statutory standing, the Edelson Defendants claim that Plaintiffs have

failed to allege an "injury" to business or property. *See* Edelson Br. at 14-16. They are only able

to do so, however, by ignoring large swathes of the Complaint's actual pleading. The Edelson

Defendants generically contend that a RICO "injury" cannot be predicated on either speculative

future harm, or injury to reputation, but at no time does the Complaint attempt to allege such

injury. Rather, the Complaint clearly states that the Defendants (including the Edelson

Defendants) "caused tens of millions of dollars of damage to Østvik and his businesses." Compl.

¶ 13. The Complaint specifies that such damages were caused by, among other activities, the

Edelson Defendants' contacts with Plaintiffs' current and potential investors, including a demand

letter sent to an influential Chicago attorney, Compl. ¶ 144, and "preservation" letters sent to

several of Plaintiffs' investors. *Id.* ¶ 159. Current and ascertainable damage to a business

enterprise is squarely within the RICO statute's definition of damage to "business or property."

*See, e.g., Gurfein v. Sovereign Group,* 826 F. Supp. 890 (E.D. Pa. 1993). Plaintiffs will be able to

16

quantify the precise amount of this damage using expert testimony, but need not do so now in order to survive this motion. The Edelson Defendants' attempts to narrowly cabin the Complaint's damage allegations to a single payment of $228,000 occurring in April 2018, *see* Edelson Br. at 16, must therefore fail.

The Edelson Defendants' attempt to dispute the Complaint's pleading of causation does not require extended discussion, as the bulk of their argument relies upon the false proposition that the Complaint asserts only a single quantifiable injury occurring in April 2018. *See* Edelson Br. at 16-20. In fact, the Complaint asserts a plethora of acts by the Edelson Defendants occurring in late 2019 and 2020, *see* Compl. ¶¶ 144, 148, 159, 198-200, and further asserts that these acts caused damage to Plaintiffs' business or property. *Id.* at 13. At the pleading stage, nothing more is required.

The Complaint also sufficiently alleges a pattern of racketeering activity, as required to state a claim under 18 U.S.C. § 1962. The Edelson Defendants contend that the Complaint alleges only a "single scheme" against a single victim, Edelson Br. at 22, conveniently ignoring the Complaint's explicit allegations that "Edelson, Pacella and Richman (and other unknown associates) used their strategic alliance to actively seek out young, up-and-coming companies and wrongfully acquire cash or equity stakes in such companies." Compl. ¶ 188. Pacella's current position as an executive at a boutique investment bank also gives him ample opportunity to identify other targets for the enterprise alleged in the Complaint. *See* auctuscapitalinc.com/professionals/ (biography of Matthew Pacella). Further, with respect to Plaintiffs in particular, the Complaint alleges that the enterprise carried out two distinct schemes (one in early 2018 and another in late 2019/early 2020) and that their activities began in July 2017, *id.* ¶ 76, continuing through 2020 (thus lasting over two years.)

The Complaint also demonstrates that Plaintiffs were not the sole intended victims of the enterprise. In late July 2019, Defendants asked that Defendant Edelson be listed as a lawyer and operating partner for Østvik's proposed investment fund, with the intent of providing Edelson a track record in fund management for use in forming his own litigation fund. Complaint ¶ 135. Defendants also expressed an interest in acquiring interests in other entities pursued by Plaintiffs, *id.* ¶ 136. It is a fair inference from these allegations that the enterprise intended to acquire interests in other high-value corporations, not merely the Plaintiffs. The Complaint therefore sets forth an open-ended continuous pattern of racketeering activity with the requisite duration to constitute a statutory violation. *See, e.g., GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463 (2d Cir. 1995).

Not unlike their unsuccessful challenge to causation, the Edelson Defendants' attempt to challenge the Complaint's pleading of predicate acts must fail, because the Complaint does in fact assert acts undertaken by the Edelson Defendants after April 2018. Compl. ¶¶ 144, 148, 159, 198-200. Nor should the *Noerr-Pennington* doctrine provide immunity for communications by a law firm against its former client threatening (however obliquely) to reveal that client's confidential communications, as such communications violate ethical rules and lack even a scintilla of good faith.[2] Under these facts this Court should deem these pre-litigation communications to fall within the "sham litigation" exception to *Noerr-Pennington*. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industr., Inc.,* 509 U.S. 49, 60 (1993) (objectively baseless litigation activity which is intended to interfere with competitor's business relationships constitutes sham activity which is not privileged under *Noerr-Pennington).*

---

[2] In addition, several of the predicate acts on which Plaintiffs rely, namely personal conversations between Edelson and Østvik in which Edelson threatened to disclose Østvik's confidences, fall well outside the scope of litigation-related communications purportedly protected by *Noerr Pennington. See* Compl. ¶¶ 198-199

Finally, the Edelson Defendants make a futile attempt to challenge the Complaint's allegations concerning the existence of a RICO "enterprise." The Complaint alleges that the Edelson Defendants (consisting of the Edelson Firm, Richman, and Edelson himself) functioned as an "association in fact" enterprise along with Pacella. Compl. ¶¶ 187-188. This satisfies the requirements for alleging an "enterprise" as set forth by the Supreme Court, namely "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose." *Boyle v. United States,* 556 U.S. 938 (2009). The Edelson Defendants claim that attorneys working on behalf of a client cannot create an "enterprise" as a matter of law, but in fact the law is otherwise. *See Mayfield v. Asta Funding, Inc.*, 95 F.Supp.3d 685, 699-700 (S.D.N.Y. 2015) (association in fact enterprise existed between debt funding company which purchased debts and law firm which conducted litigation strategy conceived by funding company's principal); *Kruse v. Repp*, 2020 WL 1317479 (S.D. Iowa 2020) (finding that association-in-fact enterprise existed between attorney and client for the purpose of fraudulently shielding client's assets from potential judgment creditor). The Edelson Defendants cannot use their law licenses as a shield from liability here.

The authorities cited by the Edelson Defendants are not to the contrary. *LCS Group, LLC v. Shire LLC,* 2019 WL 1234848 (S.D.N.Y. March 8, 2019) involved an argument which the Edelson Defendants do not make—that the "enterprise" consisting of an attorney and client was not distinct from the defendants themselves. Further muddying the waters in *LCS Group* was the fact that the plaintiff had failed to clearly allege the membership of the enterprise. *Id. at*12. The Complaint does not share this defect. The Edelson Defendants' other leading case, *D. Penguin Brothers, Ltd. v. City National Bank*, 587 F.App'x 663 (2d Cir. 2014) is a "summary order" which, while citable, lacks precedential value, and in any event is distinguishable: in *Penguin*

*Brothers* the Second Circuit upheld a finding that the plaintiffs failed to plausibly allege a shared

purpose (to gain political power); in contrast, the Complaint does plausibly allege a shared

purpose (of enriching all Defendants through theft of Østvik's money and shares).

In sum, the relationship between an attorney and client contains a recognizable structure,

and is capable of existing beyond the scope of the RICO predicate acts, and therefore satisfies

the requirements for pleading a RICO enterprise set forth in *Boyle*. This Court should

accordingly deny the Edelson Defendants' motion to dismiss the Complaint's RICO claims on

this ground.

## III.    The Complaint's State Law Claims Should Be Sustained

The Edelson Defendants assert a variety of purported defects in the New York state law

claims alleged in the Complaint. None of their assertions withstand close inspection.

The Edelson Defendants first claim that New York law does not recognize the tort of

"extortion." Edelson Br. at 29. Plaintiffs concur, which is why the Complaint's Fourth Claim For

Relief is expressly labeled "intentional tort: extortion." In other words, Plaintiffs are setting forth

a claim for common law prima facie tort, a cause of action long accepted in New York. As the

New York Court of Appeals has stated:

> Some years ago this court recognized the general principle that harm intentionally inflicted
> is prima facie actionable unless justified . . . That principle has developed into the specific
> cause of action of prima facie tort consisting of four elements: (1) intentional infliction of
> harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or
> series of acts that would otherwise be lawful . . . While prima facie tort may be pleaded in
> the alternative with a traditional tort, once a traditional tort is established the cause of action
> for prima facie tort disappears.

*Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 469 N.E.2d 1324, 1327 (1984) (citations omitted). The

Complaint clearly alleges each of the four elements identified by the Court of Appeals in

*Curiano*. *See* Compl. ¶¶ 214-220. As such, Plaintiffs have stated a claim for prima facie tort based on the enterprise's extortion scheme, and Plaintiffs' Fourth Claim For Relief ought to be sustained as a result.

The Edelson Defendants, likewise, fail to identify any true defects in Plaintiffs' claim for breach of fiduciary duty. They deny that any breach occurred because their representation of Pacella began only after their representation of Plaintiffs ended, and further claim that the two representations had no factual overlap. Edelson Br. at 31. Even if this were the case, however, the Edelson Defendants had an independent ethical duty not to use the confidences and secrets they learned from Østvik against him to his detriment, and it is their failure to fulfill this duty which forms the basic gravamen of the breach of fiduciary duty claim. *See* Illinois Rules of Professional Conduct 1.6(a). Independent knowledge of such Confidential Disclosures by Pacella does not rescue the Edelson Defendants, as they suggest, since Pacella is also an attorney and equally bound to preserve Plaintiffs' confidences. Finally, the Edelson Defendants' arguments concerning causation and damages miss the mark completely: Plaintiffs are not seeking damages, but the equitable remedy of disgorgement of fees paid to the Edelson Defendants. Compl. ¶ 245.

As for Plaintiffs' claim for aiding and abetting breach of fiduciary duty (the Ninth Claim for Relief), the Complaint more than adequately alleges the elements of this claim. To state a claim for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must allege: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157 (1st Dep't 2003)); *accord Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16 Civ. 2379, 2017 WL 5312187 at *14 (S.D.N.Y. Nov. 13, 2017).

Here, the Complaint clearly alleges the breaches by Pacella, *see* Compl. ¶ 254, and alleges knowing participation by the Edelson Defendants and damages flowing from the breach. *Id.* ¶¶ 258-261. The Edelson Defendants incorrectly claim that the bulk of their actions were litigation activity protected by the *Noerr-Pennington* doctrine, a claim which fails as discussed above.

The Edelson Defendants' challenges to Plaintiffs' claim for tortious interference with contract also fail. As the Edelson Defendants acknowledge, the elements of tortious interference with contract are: 1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 1102, 1105 (1st Dep't 2017). Plaintiffs claim that the Edelson Defendants induced Pacella to breach his employment agreement with VPM by, *inter alia*, inducing Pacella to disclose Plaintiffs' confidential information. The Edelson Defendants claim that this breach is not actionable because Plaintiffs fail to specify the confidential information which Pacella disclosed. Yet there is no particularity requirement in cases involving the disclosure of confidential information, and the Edelson Defendants' sole authority for that proposition, *nMotion, Inc. v. Envtl. Tectonics Corp.*, 148 F. App'x 591, 592 (9th Cir. 2005), does not actually create such a pleading requirement (as well as being an out-of-circuit non-precedential order). *nMotion* affirmed a grant of summary judgment to defendants where the plaintiffs could not identify "confidential information" used by defendants which had not already been disclosed. *Id.* Nothing in this decision requires Plaintiffs, at the pleading stage, to provide any specificity concerning the confidential information disclosed by Pacella, which disclosure was induced by the Edelson Defendants.

22

Finally, and contrary to the Edelson Defendants' arguments, Plaintiffs' claim for

conspiracy to commit intentional tort does not rely on conclusory allegations but rather details

(by reference to allegations interposed throughout the Complaint) how Defendants, through their

words and actions, displayed a conscious agreement to become part of a conspiracy to commit

intentional torts.[3] Nothing more is required at the pleading stage.

## IV.   The Court Has Supplemental Jurisdiction Over Plaintiffs' State Law Claims Against the Edelson Defendants

This Court undeniably possesses subject matter jurisdiction to hear Plaintiffs' state-law

claims against the Edelson Defendants. Pacella's efforts to convince the Court otherwise are

unavailing. As a threshold matter, in accordance with 28 U.S.C. § 1331, this Court possesses

subject matter jurisdiction to decide all causes of action arising under the laws of the United

States. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 132 (2d Cir. 2010) (a

district court has federal question jurisdiction pursuant to Article III and 28 U.S.C. § 1331

provided that "the claim as stated in the complaint 'arises under the Constitution or laws of the

United States.'") The scope of this Court's "original" subject matter jurisdiction therefore

necessarily encompasses Plaintiffs' causes of action for relief asserted under the CFAA and

RICO statutes.[4]

With "original" jurisdiction over Plaintiffs' federal-question claims clearly established,

the Court may turn its jurisdictional analysis to Plaintiffs' state law claims against the Edelson

Defendants. In regard to these "ancillary" claims, 28 U.S.C. § 1367(a) directs that the Court

"shall have supplemental jurisdiction over all other claims that are so related to claims in the

---

[3] Plaintiffs are well aware that New York law does not recognize a separate civil tort of conspiracy, as the Edelson Defendants claim. Plaintiffs couched their claim as "conspiracy to commit intentional torts" for this very reason.
[4] Even if Plaintiffs' federal claims are dismissed, this Court may retain jurisdiction based upon diversity of citizenship under 28 U.S.C. § 1332: because Pacella's membership interests in the Plaintiffs terminated with his termination of employment, his residence is no longer included for determining the domicile of those entities, and therefore does not defeat diversity jurisdiction.

action within such original jurisdiction that they form part of the same case or controversy." Such ancillary claims "form part of the same case or controversy" as the claim conferring subject matter jurisdiction when they stem from the same "common nucleus of operative fact; in other words, they must be such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir. 2011) (internal quotation marks omitted).

Plaintiffs' state law claims overlap to a substantial degree with the facts underlying Plaintiffs' claims for relief under the CFAA and RICO statutes, so as to confer supplemental jurisdiction. For example, Plaintiffs' tort and fiduciary duty claims against the Edelson Defendants share a multitude of facts in common with Plaintiffs' RICO and CFAA claims including, *inter alia*, facts surrounding the demands by Pacella and the Edelson Defendants for monies outside of their legal representation of Plaintiffs and the extortionate threats made in connection therewith, which not only violated their fiduciary duties to Plaintiffs but also constituted predicate acts of racketeering in violation of RICO. Compl. ¶¶ 190-200, 243-244, 253-254. Based upon the common nucleus of operative fact that clearly exists between Plaintiffs' federal and state law claims it is perfectly logical for this Court to "try them all in one judicial proceeding" through the exercise of supplemental jurisdiction. *Teamsters Local 272*, 642 F.3d at 332.

Where, as here, plaintiffs' state law claims share a common nucleus of operative fact with their federal claims, "the [district] court can decline to exercise supplemental jurisdiction over the state law claim[s] only if one of the circumstances enumerated at 28 U.S.C. § 1367(c) is present." *Pierre v. Planet Auto., Inc.*, 193 F. Supp. 3d 157, 173–74 (E.D.N.Y. 2016). Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction only if:

(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). None of these exceptions apply here.

Accordingly, there is no basis for this Court to decline supplemental jurisdiction.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the Edelson Defendants' motion to dismiss in all respects and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 20, 2020

                                GUZOV, LLC

By:   _____
             Debra J. Guzov, Esq. (DJG 7125)
             Anne W. Salisbury, Esq. (AWS 7333)
             805 Third Avenue, 8th Floor
             New York, NY 10022
             Tel.:   (212) 371-8008
             dguzov@guzovllc.com
             *Attorneys for Plaintiffs*