UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
:
ECOGENSUS LLC, VIKINGPEAK :
ENERGY FUELS LLC, VIKINGPEAK :
MANAGEMENT COMPANY, LLC, : 20-CV-3629 (VSB)
VIKINGPEAK CAPITAL GROUP LLC and :
BJØRNULF ØSTVIK, : **OPINION & ORDER**
:
                        Plaintiffs, :
:
            -against- :
:
:
:
MATTHEW PACELLA, MICHAEL M. :
MELNIK, JAY EDELSON, BENJAMIN :
RICHMAN and EDELSON PC, :
:
                        Defendants. :
:
------------------------------------------------------------X

Appearances:

Anne W. Salisbury
David Joseph Kaplan
Debra Joy Guzov
Guzov LLC
New York, New York
*Counsel for Plaintiffs*

Patrick Harry Peluso
Woodrow & Peluso, LLC
Denver, Colorado
*Counsel for Defendants Matthew Pacella and Michael M. Melnik*

Scott M Hare
Todd M Brooks
Whiteford Taylor Preston LLP
Pittsburgh, Pennsylvania
*Counsel for Defendants Matthew Pacella and Michael M. Melnik*

Kaan Ekiner
Cozen O'Connor
Wilmington, Delaware
*Counsel for Defendants Matthew Pacella and Michael M. Melnik*

Ryan D. Andrews
Alexander Glenn Tievsky
Edelson P.C.
Chicago, Illinois
*Counsel for Defendants Jay Edelson, Benjamin Richman, and Edelson PC*

VERNON S. BRODERICK, United States District Judge:

      Before me are the motions to dismiss the First Amended Complaint filed by Plaintiffs Bjørnulf Østvik ("Østvik"), Ecogensus LLC ("Ecogensus"), Vikingpeak Energy Fuels LLC, Vikingpeak Management Company, LLC ("VPM"), and Vikingpeak Capital Group LLC (collectively, the "Companies," and together with Østvik, "Plaintiffs").  Plaintiffs assert claims against Defendants Matthew Pacella ("Pacella"), former counsel of the Companies, Michael M. Melnik ("Melnik"), a former business associate of the Companies, as well as Østvik's former counsel, Defendants Jay Edelson ("Edelson"), Benjamin Richman ("Richman"), and their law firm Edelson PC (together with Edelson and Richman, the "Edelson Defendants").  Plaintiffs plead a variety of causes of action, chiefly for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").  Because Plaintiffs' pleadings do not allege facts sufficient to establish personal jurisdiction over the Defendants in New York, the motions to dismiss are GRANTED.

I.  **Background**[1]

Østvik is a domiciliary of Connecticut and the founder, president, and majority shareholder of the Companies. (FAC ¶ 16.)[2] Each of the Companies is a limited liability company organized under Delaware law. (*Id.* ¶¶ 18–21.) Pacella and Melnik are both domiciliaries of Pennsylvania. (*Id.* ¶¶ 22–23.) Richman and Edelson are domiciled in Illinois, and Edelson PC is a professional corporation organized under Illinois law. (*Id.* ¶¶ 24–26.)

In 2016, Østvik met Pacella while he was "part-time 'special counsel' at a leading Chicago law firm." (*Id.* ¶ 38.) After several meetings, Østvik sent Pacella an offer of employment dated July 12, 2016, which Pacella accepted to become legal counsel for the Companies. (*See id.* ¶¶ 43–44.) Pacella was to be paid an annual salary of $200,000, and the offer letter mentioned "the possibility of future 'company equity options.'" (*Id.* ¶ 44.) In the course of their relationship, Østvik shared with Pacella certain personal, sensitive information that he preferred to keep secret (the "Confidential Disclosures"). (*Id.* ¶ 46.)

In January of 2017, Østvik and Pacella had dinner together in Pittsburgh. (*See id.* ¶ 55.) Østvik alleges that, during this dinner, Pacella "made an explicit demand for compensation in exchange for keeping the Confidential Disclosures secret." (*Id.* ¶ 57.) "Specifically, Pacella made a reference to" information related to the Confidential Disclosures, stated that "he assumed Østvik would not want any further issues at this time," and "then immediately changed the subject to his equity compensation package"—Pacella allegedly wanted Østvik to grant him more equity in the Companies. (*Id.*) Østvik told Pacella "that he would consider" increasing

---

[1] This section sets forth the well-pleaded factual allegations from Plaintiffs' pleadings that are relevant to my disposition on the instant motions. I assume those allegations to be true solely for the purposes of rendering my disposition. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). I make no finding as to veracity of the allegations in Plaintiffs' pleadings.

[2] "FAC" refers to the First Amended Complaint filed on October 12, 2021. (Doc. 145.)

3

Pacella's equity compensation.  (*Id.* ¶ 58.)

"[A]round May 2017," Pacella urged Østvik to hire the Edelson Defendants "as his personal counsel" to handle certain legal claims Østvik had (the "Edelson Representation").  (*Id.* ¶ 63.)  Pacella had previously practiced law at Edelson PC for several years.  (*Id.*)  Later in June, Østvik met with the Edelson Defendants and hired them for the Edelson Representation.  (*See id.* ¶¶ 66–67.)  During this meeting, at Østvik's urging, the Edelson Defendants agreed that they would not put any of the Confidential Disclosures in writing.  (*Id.* ¶ 67.)

In early June of 2017, Pacella reached an agreement in principle with Melnik, who had been a friend of his since college, through which Melnik would extend a high-interest loan to Ecogensus.  (*See id.* ¶¶ 59, 65.)

On July 13, 2017, after a business meeting in New York City, "Pacella became angry at Østvik and said he was still expecting an equity 'plus up'" to his compensation.  (*Id.* ¶ 73.)  Østvik told Pacella his "behavior was absolutely unacceptable," and "Pacella later apologized." (*Id.*)

On July 28, 2017, Pacella wrote to Østvik that Østvik should be "entitled to $25,000,000" if he were to prevail in the Edelson Representation, and that "a jury would award this level of damages '999 times out of 1000.'"  (*Id.* ¶ 76.)  Østvik, however, remained concerned with any litigation strategy that might render the Confidential Disclosures public.  (*Id.*)  In September of 2017, Richman "discussed a supposedly hypothetical scenario with Østvik" about how, if a client were to sue his attorney, an attorney would be "free to publish . . . sensitive information about the client" learned in the course of the attorney-client relationship.  (*Id.* ¶ 78.)  Around this time, both Pacella and the Edelson Defendants had been "pressure[ing] . . . Østvik to pursue public litigation" to resolve the Edelson Representation, despite Østvik's reticence to make the

Confidential Disclosures public.  (*Id.* ¶ 80.)

By late 2017, the Edelson Representation had progressed to mediation.  (*Id.* ¶ 85.)  The Edelson Defendants "increased their pressure on Østvik to pursue litigation," which prompted Østvik to confide in Pacella that he was thinking of switching firms.  (*Id.*)  Pacella told him this would be a "mistake."  (*Id.*)  Over "strong objections" from Pacella and the Edelson Defendants, a second mediation was scheduled in Chicago for March 2018.  (*Id.* ¶ 88.)  This mediation resulted in "a quick resolution for Østvik," but the settlement Østvik received was well less than the "$20,000,000" the Edelson Defendants and Pacella had predicted, which left the Edelson Defendants "furious," as their pay for the Edelson Representation was subject to a contingent fee arrangement.  (*Id.* ¶ 91–92.)

In April of 2018, Pacella told Østvik to come to a meeting with him in New York City to discuss business matters with a friend of his who, at the time, was a partner at a major law firm.  (*Id.* ¶ 95.)  Pacella then told Østvik that the law firm partner was unable to make the meeting, and Pacella suggested that the two men meet for dinner together instead.  (*Id.* ¶ 96.)  At the dinner meeting in New York, Pacella "warned Østvik that he could 'bring down' Østvik and his [C]ompanies," and he "repeated . . . threats that unless Østvik gave in to his demands, he would 'destroy' Østvik," and that he and "Richman . . . remained very angry that Østvik had been so sensitive about the Confidential Disclosures and pursuing litigation."  (*Id.* ¶¶ 97–98.)  Pacella then "pressur[ed] Østvik to purchase a watch for him."  (*Id.* ¶ 99.)  Østvik "attempted to turn the conversation toward business," which "enraged" Pacella, who began "screaming threats and obscenities," including that Pacella "had an uncle in the Mafia and that Pacella himself hoped to become a 'made man.'"  (*Id.* ¶ 100.)  Later that evening, "Pacella showed Østvik a Maserati key," and when Østvik asked if Pacella had purchased a Maserati, "Pacella replied 'YOU got me

5

a Maserati.'" (*Id.* ¶ 101.)

Sometime shortly after the New York dinner, Pacella told Østvik that he would not fight a for cause termination if Østvik decided to terminate his employment with the Companies. (*Id.* ¶ 102.)

Around this same time, the settlement proceeds from the Edelson Representation were wired to an account controlled by the Edelson Defendants, who "had insisted that they receive the funds, withhold a portion for themselves, and release the amount they determined to be due to Østvik." (*Id.* ¶ 103.) Pacella tried to get in contact with Østvik the day the funds were wired, but after hours of being unable to reach Østvik, Pacella "became aggressive and hysterical" and "reiterat[ed] his threats from New York City, writing that he expected a payment that week and making references to 'anxiety in the household over here,'" seemingly indicating that Pacella and his family were experiencing financial struggles. (*See id.* ¶ 104–05.) A few hours after that, Pacella apologized and said "'The Xanax for the anxiety that I took right before coming out [to New York City] caused me to lose my brain.'" (*Id.* ¶ 105 (alteration in original).)

The next day (the date is not specified), Pacella "issued . . . specific threats" pertaining to publicly disclosing the "Confidential Disclosures" and to "Østvik's safety," among other things, and warned Østvik that he would "carry out these threats" unless Østvik paid him a large portion of the settlement from the Edelson Representation. (*Id.* ¶ 107–08.) "Pacella reiterated [these] demand[s] . . . for several more days," and eventually "Østvik capitulated and paid Pacella $228,000," which was structured as a backdated "retroactive personal legal services bill." (*Id.* ¶¶ 110–11.)

There are a host more factual allegations, but they are not relevant to my disposition. Through them, Plaintiffs aim to demonstrate that "Pacella and the Edelson Defendants conspired

6

to take control of the [Companies] through extortion," (*id.* ¶ 2), a scheme in which they involved Melnik "based on his perceived status vis-à-vis the Plaintiffs," (*id.* ¶ 3.)

## II. Relevant Procedural History[3]

Plaintiffs commenced this action on May 8, 2020. (Doc. 1.) After receiving extensions to the deadline to respond, Pacella filed a motion to dismiss or, in the alternative, to compel arbitration, on July 31, 2020. (Doc. 41.) That same day, the Edelson Defendants also filed a motion to dismiss. (Doc. 58.) Melnik filed a motion to dismiss on August 5, 2020. (Doc. 65.)

On August 26, 2020, Plaintiffs filed a First Amended Complaint ("FAC") under provisional seal, along with a public version in redacted form. (*See* Docs. 90–92.) The next day, the Edelson Defendants filed a motion for an order to show cause (the "Edelson Motion"), in which they generally stated that their original motion to dismiss is equally applicable to the FAC, particularly on the grounds that Plaintiffs failed to establish this Court's personal jurisdiction over any Defendant. (*See* Doc. 94.) On August 28, 2020, Pacella and Melnik each filed joinders in the Edelson Motion. (Docs. 98–99.) After receiving my endorsement on a proposed briefing schedule, on September 30, 2020, Defendants filed motions to dismiss the FAC in which they included personal jurisdiction and merits arguments, among others. (*See* Docs. 112, 114, 117, 119, 121, 123.) Plaintiffs filed opposition briefs on November 20 and 21, 2020. (Docs. 128–131.) Defendants filed their reply papers on December 18, 2020. (Docs. 133 & 136–37.)

On September 9, 2021, I entered an order resolving a large number of the sealing requests that the parties had made and directing Plaintiffs to refile the FAC if they wished to maintain any portion of it under seal. (Doc. 142.) As a result, on October 12, 2021, Plaintiffs publicly filed a

---

[3] I will assume familiarity with other aspects of this action's procedural history, including those to do with requests to file documents under seal, (*see* Doc. 142), as well as a motion for a temporary restraining order that the parties represented was no longer necessary when I held a hearing on that motion, (*see* Docs. 81, 93).

new version of the FAC with minimal redactions. (Doc. 145.) I allowed sealing of the FAC on October 28, 2021. (Doc. 146).

### III. Legal Standard

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998)). However, a court may "turn[] directly to personal jurisdiction" to dismiss an action where it faces "a straightforward personal jurisdiction issue" that "involve[s] no arduous inquiry." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587–88 (1999). Moreover, "[a]lthough [courts] traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues" on the merits. *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013) (internal citation omitted).

A plaintiff opposing a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken–Overpelt,*

*S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Prior to an evidentiary hearing, a plaintiff need only make a prima facie showing that jurisdiction exists. *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 732 F.3d 161, 167 (2d Cir. 2013)). This showing may be made through materials outside the pleadings. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

If the court considers pleadings and affidavits submitted by the parties, the plaintiff's "prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). Plaintiff's averments "must be taken as true to the extent they are uncontroverted by the defendant's" submissions. *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking*, 989 F.2d at 580 (citation omitted).

### IV. Discussion

"The lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements[:]" (1) "procedurally proper" service of process; (2) "a statutory basis for personal jurisdiction that renders such service of process effective;" and (3) "exercise of personal jurisdiction [that] comport[s] with constitutional due process principles." *Licci ex rel.*

*Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 673 F.3d 50, 59–60 (2d Cir. 2012).

Here, Plaintiffs' argue they have pleaded facts to establish specific jurisdiction over Pacella, and that this in turn is enough to establish personal jurisdiction over Melnik and the Edelson Defendants due to concepts of agency, conspiracy, and RICO "ends of justice" jurisdiction. (*See* Melnik MTD Opp. 2–5; Edelson MTD Opp. 13–15; Pacella MTD Opp. 12–13.)[4] Their argument, and whether I have personal jurisdiction over Defendants, turns on the application of New York's long-arm statute, CPLR § 302, and specifically on whether the facts alleged in the FAC establish my jurisdiction over Pacella under subsections 302(a)(1) or 302(a)(2). (*See* Pacella MTD Opp. 12.)

CPLR § 302(a)(1) provides for personal jurisdiction over anyone who "transacts any business within the state [of New York] or contracts anywhere to supply goods or services in the state." "New York courts define 'transact[ing] business' as purposeful activity—'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (alteration in original) (citation omitted). Once a defendant has engaged in even one purposeful act of "transacting business," that will satisfy CPLR § 302(a)(1) so long as "the claim arises out of the transaction." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) ("CPLR 302(a)(1) . . . is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never

---

[4] "Melnik MTD Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendant Michael Melnik's Motion to Compel Arbitration or Alternatively to Dismiss the Complaint. (Doc. 128.) "Edelson MTD Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Edelson Defendants' Motion to Dismiss. (Doc. 129.) "Pacella MTD Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendant Matthew Pacella's Motion to Compel Arbitration or Alternatively to Dismiss the Complaint. (Doc. 131.)

10

enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." (citations omitted)).

Under CPLR § 302(a)(2), for a court to exercise personal jurisdiction over a non-domiciliary defendant, the defendant must "in person or through an agent . . . commit[ ] a tortious act within the state, except as to a cause of action for defamation of character arising from the act." This statute requires a defendant to commit a "tort inside of New York," and "a defendant's physical presence in New York is a prerequisite." *Bank Brussels* , 171 F.3d at 784–85, 790 & n.1. As with section 302(a)(1), plaintiff's "claim[]" must "aris[e] out of the tort[] committed within . . . New York." *Licci I*, 673 F.3d at 60 n.10 (2d Cir. 2012).

Here, the FAC does not allege facts sufficient for CPLR § 302(a)(1) to apply. Plaintiffs do not allege that Pacella engaged in a "transaction of business" such that he "purposefully avail[ed] [him]self of the privilege of conducting activities within New York." *See Licci I*, 673 F.3d at 61 (quoting *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007)). The governing law on section 302(a)(1) requires that a "transaction of business," at minimum, involve a purposeful, completed step in the course of undertaking some business; however, some steps are too de minimis to count. *See, e.g.*, *Licci I*, 673 F.3d at 62 ("merely telephoning a single order to New York requesting a shipment of goods to another state, or the transitory presence of a corporate official here, or communications and shipments sent here by an out-of-state doctor serving as a consultant to plaintiff's New York physician do not support N.Y. C.P.L.R. § 302(a)(1) jurisdiction." (internal quotation marks omitted) (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)); *c.f. Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 72 (2006) ("a sophisticated institutional trader knowingly entering our state—whether electronically or otherwise—to negotiate and conclude a substantial transaction is within the embrace of the New

York long-arm statute."); *Licci II*, 732 F.3d at 168 (use of a "New York correspondent account 'dozens' of times 'to effect . . . support of . . . shared terrorist goals,'" rather than "once or twice by mistake," amounted to "purposeful availment of the privilege of doing business in the New York forum." (citations omitted)). Plaintiffs do not allege that Pacella completed any part of a transaction of business in New York. Rather, they allege that Pacella "repeated the prior threats" he had previously made to Østvik while the two men were having dinner in New York. (FAC ¶ 98.) These threats are neither alleged nor argued to have been part of any jurisdictionally-relevant transaction of business. Moreover, the FAC is clear that it was not until "after the trip to New York City," (*id.* ¶ 103), presumably when Østvik and Pacella were back in their respective home states of Connecticut and Pennsylvania, that Pacella made the threats that actually led Østvik to transfer funds to Pacella by a "retroactive personal legal services bill," (*id.* ¶¶ 107–111). Therefore, assuming that Pacella's alleged threats can be said to have been part of some transaction of business—and I find they were not—that transaction was not "conduct[ed] . . . within the . . . State" of New York. *Best Van Lines*, 490 F.3d at 246.

CPLR § 302(a)(2) cannot apply, either, because Plaintiffs do not plead any cause of action based on any tort Pacella committed while "physical[ly] presen[t] in New York." *See Bank Brussels*, 171 F.3d at 785. Plaintiffs plead that, "[a]t one point, Pacella physically pushed Østvik" during their dinner together in New York, (FAC ¶ 100), but Plaintiffs do not plead battery as a cause of action, nor do any of their asserted causes of action touch upon tortious behavior that could be said to have occurred in New York. Indeed, the only tort alleged against Pacella is extortion, (*id.* ¶¶ 213–22), but the allegations of extortion cannot establish personal jurisdiction in this action for a number of reasons. First, as explained *supra*, to the extent the FAC can be read as saying that Pacella "extorted" Østvik at all, even in a colloquial sense, it is

12

clear that Pacella did so "after the trip to New York City," (*id.* ¶ 103), when he allegedly managed to "extract[] $228,000 in cash by extortion," (*id.* ¶ 217). In other words, any relevant tortious conduct could not have occurred within New York. Second, New York law does not recognize extortion as a tort or as any "private right of action." *Colacino v. Davis*, 19 CV 9648 (VB), 2020 WL 3959209, at *3 n.2 (S.D.N.Y. July 13, 2020); *Dorce v. Toyota Fin. Servs.*, 19-CV-6008 (LDH) (RER), 2020 WL 6746838, at *4 (E.D.N.Y. Nov. 17, 2020) (noting that "in New York, extortion is only a criminal offense" (internal quotation marks omitted)); *Minnelli v. Soumayah*, 41 A.D.3d 388, 388–89 (1st Dep't 2007) ("The first cause of action for extortion and attempted extortion, alleging that defendant attempted to compel and compelled plaintiff to deliver money to him by threatening physical harm to plaintiff and her employees and a breach of their confidentiality agreement, was properly dismissed on the ground that extortion and attempted extortion are criminal offenses that do not imply a private right of action." (citations omitted)). Thus, even if the supposed "extortion" occurred in New York, it could not be considered tortious conduct that gives rise to Plaintiffs' claims.[5]

Moreover, Plaintiffs fail to satisfy the requirement of CPLR § 302, necessary to all of its subsections, that the claims asserted can support long-arm jurisdiction only where they "aris[e] from" Defendants' contacts with New York, which at minimum requires that "at least one element [of an asserted claim] arises from the New York contacts." *See Licci II*, 732 F.3d at 169 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 340 (2012)). Here, Plaintiffs plead

---

[5] Conceding that extortion is not a viable theory of recovery, Plaintiffs argue that I should construe their asserted extortion claim as "hav[ing] stated a claim for prima facie tort." (Pacella MTD Opp. 27). Among other elements, prima facie tort requires "special damages" and some "intentional infliction of harm." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984). Setting aside that Plaintiffs do not explain what "special damages" they suffered, Pacella is not alleged to have inflicted any sort of harm on Østvik until "after" the two men left New York. (FAC ¶ 103.) Thus, Plaintiffs have not given me any reason to think that Pacella's contacts with New York have given rise to any of their claims.

13

that Pacella repeatedly tried to induce or coerce Østvik to pay him more in cash or in stock, and most of the time these allegations lack any relationship to New York. (*See, e.g.*, FAC ¶¶ 57, 74, 87–88.) The only time Østvik allegedly did accede to Pacella's demands for payment was days "after the trip to New York." (*Id.* ¶¶ 103, 110.) Therefore, contrary to Plaintiffs' briefing, there is no allegation of acts occurring "at locations within New York State" that "brought substantial revenue to Defendants." (Pacella MTD Opp. 12–13.)

### V.     Conclusion

Defendants' motions to dismiss based upon a lack of personal jurisdiction are GRANTED. The Clerk of Court is respectfully directed to close all open motions on the docket and to terminate this action.

SO ORDERED.

Dated: March 24, 2022
         New York, New York

                                             _____
                                             Vernon S. Broderick
                                             United States District Judge